EXHIBIT A(1)

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Sgt. A. Johnson #6732. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

This Type 2 Use of Force was screened by A/Sgt. A. Johnson #6732 on 8-26-2020 at the scene. My involvement in this incident was captured via BWV. I was not equipped with an in-car ICVS microphone during this incident, as I was riding in the backseat of a (3) officer patrol car and the patrol car was only equipped with microphone syncing ports for the front passengers of the vehicle.

**DETAILED NARRATIVE:**

**EVENT/GO#: 2020-250789**
**DATE OF OCCURRENCE: 8-26-2020**
**STATEMENT OF: OFFICER J. CLAXTON #7592**

**Pre-Arrival/Arrival**

I am Ofc. J. Claxton #7592. I am currently a sworn police officer employed by the Seattle Police Department; assigned to the Seattle Police Department's South Precinct Anti-Crime Team. I was assigned to the South Precinct in November 2010; where I have spent my entire career thus far working in a uniformed patrol assignment.

I received my initial law enforcement training (720 hours) at the Basic Law Enforcement Academy provided by the Washington State Criminal Justice Training Commission. I then successfully completed the Field Training program with the Seattle Police Department. Additionally, I have completed the SPD Anti-Crime Team School, SPD Patrol Mountain Bike Training, Crisis Intervention Training, Patrol Shotgun and Patrol Rifle Programs. Also, I am trained and certified to deploy Blast Balls and O.C. in crowd control incidents. I attend yearly training, to include crowd control / demonstration management and have worked numerous demonstrations / protests in a crowd control capacity. Anti-Crime Teams are routinely tasked with crowd management assignments. During the below described incident, I was wearing my black SPD issued Anti-Crime Team uniform, black load bearing vest clearly marked "Police" on the front and back, ballistic helmet and face shield, gas mask, while carrying SPD issued O.C., blast balls as less lethal Use of Force options.

Since May 30th, 2020, SPD has needed to deploy significant resources to manage protests, demonstrations, and marches that have been occurring throughout the city. Some events have involved up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, arsons, and looting in downtown Seattle on May 30th, 2020 and ongoing conflict between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to officers, and significant property damage occurred during protests on Sunday July 19th and Saturday July 25. On August 16th, 2020, a protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On August 24th, 2020, a protest resulted in serious threats to officer safety. Violent demonstrators used quick setting concrete mix in attempt to seal the exterior East Precinct doors closed as plywood shields were burned outside the precinct in an apparent attempt to burn down the occupied police facility. The Seattle Police Officers Guild building was also damaged by Molotov cocktails thrown at exterior walls. For the past several weeks, there has been nightly planned demonstrations, called "Every Night Direct Demonstration."

On 8-26-2020 at approximately 1600 hours, our team, along with dozens of other officers, attended an operational briefing at the SPD West Precinct, where command staff members advised that the "Every Night Direct Demonstration" group was holding an event that was  scheduled to begin at 1800 hours at Volunteer Park. During previous evening events, incidents of significant property damage have occurred.   On this day our team was tasked with responding to any acts of violence or significant property damage caused by violent demonstrators.

At approximately 1947 hours, officers began monitoring the crowd of approximately 50-75 people as they marched from Volunteer Park.  I heard continuous updates over radio, to include that officers had observed several suspects from the crowd commit property damage to local businesses and a financial institution by breaking out windows to these establishments near 15 Ave/ E Thomas St.  I heard officers had arrested several suspects for the property damage and subsequently recovered (2) Molotov cocktails; one from the intersection of 15 Ave. / E Thomas St and another from the backpack of one of the arrestees.  I know from previous training and experiences that a Molotov cocktail is an incendiary device, usually assembled in a breakable glass bottle containing a flammable substance such as gasoline, and usually a source of ignition such as a burning cloth wick held inserted into the bottle's neck. The wick is usually soaked in alcohol or kerosene, rather than petrol.  In action, the wick is lit and the bottle hurled at a target. When the bottle smashes on impact, the ensuing cloud of fuel droplets and vapor is ignited by the attached wick, causing an immediate fireball followed by spreading flames as the remainder of the fuel is consumed.  Molotov cocktails can cause significant property damage, substantial injury or death.

At approximately 2113 hours it was updated via SPD radio that the crowd had gathered near Roanoke St / E Broadway and were blocking traffic with approximately a dozen vehicles.  A/Lt. Geoghagen provided the following updates via SPD radio:  GROUP BLOCKING 1000 BLK OF ROANOKE BLOCKING FIRE STATION - NO INGRESS/EGRESS FOR FIRE VEHS --- OFF RAMP FROM EB 520 COMPLETELY BLOCKED - VEHS MOVING AT HWY SPEEDS WILL HAVE TO BREAK TO AVOID VEHS -- -VEHS IN 1000 BLK OF ROANOKE ARE HAVING TO GO BLINDLY IN OPPOSITE LANE OF TRAVEL TO AVOID BLOCKAGE.  APPROPRIATE AMOUNT OF SAFETY HAZ IDENTIFIED. AFTER SUFFICIENT RESOURCES ARE ON SCENE, SUBJS WILL MOVE AND IF THEY DO NOT, THEY WILL BE ARRESTED.  A/Lt. Geoghagen further advised that multiple PA announcements had been given, instructing the drivers to remove their vehicles from the 2600 block of Roanoke or they would be arrested, and their vehicles impounded.

We arrived at approximately 2210 hours.  Upon arrival, I noticed multiple subjects dressed in black, wearing facemasks and carrying various shields and makeshift weapons walking towards the crowd of subjects and vehicles blocking the roadway.

At approximately 2216 hours, under the direction of A/Lt. Geoghagen, we assisted officers with forming a line to move the hostile crowd and vehicles away from the SFD fire station, W/B on E Roanoke St.  While moving the crowd, officers encountered several occupied vehicles blocking the roadway.  In addition to the previous warnings provided over the PA system, officers again warned the driver's that if they did not move their vehicles that they would be subject to arrest and their vehicles would be impounded.  Officers made several arrests of the vehicle occupants and continued pushing the hostile crowd W/B on E Roanoke St and then N/B on Harvard Ave. E.   Several more arrests were made as officers attempted to clear the violent demonstrators out of the roadway.

At approximately 2238 hours, Lt. Brooks used the PA system to issue a dispersal order, ordering persons to leave the area or be subject to arrest, citing property destruction and assaults on officers for the reason for issuing the order.  Most of the crowd remained in the area despite the order.

Again, officers began to move the crowd, turning N/B onto Harvard Av E from E Roanoke St. While walking N/B near the back of the left side of the line, I observed several objects thrown from the crowd towards officers on the right side of the line and a suspect shining a bright flashlight into the eyes of officers. Initially, I could not identify the suspect(s) throwing these objects. Officers near the right side of the line then appeared to effect arrests.

As officers were attempting to make the arrests, I observed a tall W/M wearing a helmet and dark jacket standing near the back of the crowd on the right side of the line, throw at least (2) unidentifiable spherical items towards the line officers attempting to effect arrests.

**Legal Authority / Lawful Purpose:**

Officers Legal Authority for being at the location of this incident was that it was occurring on public right of ways.

The Seattle Police Department and its mutual aid partner's lawful purpose was to quell rioting, assaults and restore order and public safety.

**De-Escalation Techniques Employed:**

Officers used the following de-escalation tactics in order to reduce the need to use force:

- DISTANCE -Officers initially kept distance from and remained mostly out of sight of the protestors until command staff deemed the crowd's actions (blocking a roadway and fire station egress) a public safety hazard.
- COMMUNICATION –  Officers repeatedly ordered protestors to "Move back!' as officers pushed the crowd down city streets in attempt to disperse the violent crowd.  A dispersal order was also given to the crowd, warning them if they did not leave the area, they would be subject to arrest.
- TEAM TACTICS – Officers worked as a team to move the crowd.  The teams consisted of SPD SWAT, CART (Chemical Agent Response Team) officers, and foot squads.

I did not give any additional warnings prior to my blast ball deployment because several violent demonstrators were carrying shields that could easily be used to deflect blast balls  and due to my previous experiences during violent riots, I am aware that he violent demonstrators often attempt to kick and divert blast balls back at officers.  Any further warnings would likely allow them time to prepare for such assaultive actions against police.

**Threat Assessment/Decision Made**

Based on my previous experiences working violent demonstrations, I was aware that rioters had been throwing rocks, bricks, improvised explosive devises, fireworks, water bottles and other various objects at officers.  Numerous officers had been injured during previous violent demonstrations by objects thrown by violent demonstrators.

Concerned that the items thrown by the W/M suspect wearing a helmet could be some sort of improvised explosive device or some other objects that could cause significant injury to officers and the public, I made the decision to deploy an O.C. blast ball towards this assaultive suspect in attempt to defend other officers from assault, move the suspect away from police,  and to disrupt the suspect's ability to commit further acts of violence towards police.

**Use of Force:**

Per my training, I attempted a "low" deployment through a small gap in the crowd directly towards the assaultive suspect that was near the back of the crowd, on the right side of the line.    As the blast ball hit the ground, it unpredictably bounced to the left of my intended direction of travel into a shield being

carried by one of the protestors standing in front of me.  The blast ball deflected off the shield and bounced back at my feet, where it detonated.

The crowd appeared to back away from the line of officers after the deployment.   I lost sight of the assaultive suspect that I had observed throwing items at officers as the blast ball unexpectedly deployed at my feet; therefore, I was unable to arrest the suspect for attempting to assault officers.
Officers continued to push the crowd N/B on Harvard Ave. E and then E/B on E Edgar St, where the crowd appeared to disperse after officers made several more arrests.

My above described blast ball deployment directed at a violent demonstrator attempting to assault officers with thrown projectiles was necessary to assist with bringing this incident under control while protecting other officers and innocent bystanders from being assaulted.  No other reasonably effective alternatives to the use of force appeared exist.

I screened this Type 2 UOF with A/Sgt. A. Johnson #6732 at the scene after the situation had stabilized.

**Medical Aid and Evaluation:**

I did not hear any of the demonstrators complain of injury from the blast ball deployment.  I was the closest person to the blast ball as it detonated, and I did not sustain any injuries from the deployment.

**Resolution:**

Officers made several arrests during course of the unlawful assembly.  Officers eventually returned to the SFD fire station at the direction of the incident commanders after the incident had stabilized.  We cleared the area shortly after.

**Additional information:**

Radio broadcasts cannot be heard on my BWV, as I was utilizing an in-ear microphone during this incident.

EXHIBIT A(2)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Sergeant Gabriel Shank - 30017085

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 10/2/2020 | 8/26/2020 | 22:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58585 | 2020-250789 | 2020UOF-1569 |
| **Date/Time Entered** | | |
| 10/2/2020 11:08 | | |

## Incident Summary

I was ordered by Assistant Chief Tom Mahaffey to provide a statement and understand that failure to do so could lead to discipline up to and including termination.

This statement covers my assignment as the Incident Commander for the events on 8/26/20. This assignment was in response to the continued civil unrest and disturbances that were centered around the area of SPD's East and West Precincts.

I have been a Seattle Police Officer for 27 years and am currently assigned as the SPD South Precinct commander. Prior to my promotion to Captain in November of 2019, I was assigned for two years as the West Precinct Bike Unit Commander. In that capacity, I had command responsibilities in well over a hundred different demonstrations, protests and special events. As a Lieutenant, I was assigned as the SPD Blast Ball Coordinator from November 2017 to November 2019. I am currently certified by Safariland, Inc. as a less lethal munitions instructor and attended their training school in February 2018. I am certified in Field Force Command by the FEMA Center for Disaster Preparedness (2017). In 2019, I was the co-lead instructor for SPD's Commanders Crowd Control training and was responsible for the curriculum development and content. I had been an incident commander at other recent events related to the protests in Minneapolis Minnesota and witnessed and was aware of many anti-police sentiments in our community. I had also witnessed violent acts against SPD officers during protests on Capitol Hill and other areas of Seattle.

On the day of August 26th, I arrived at the West Precinct at about 1300 hrs. I spoke to our Seattle Police Operations Center (SPOC) staff about the plan for the day. I read the prepared IAP (Incident Action Plan) and acquainted myself with the resources that I would have at my disposal for that night's anticipated demonstrations. I met with Lieutenant Brooks, who was assigned as my Operations Commander and we went over the IAP, our mission and the objectives from the IAP in preparation for our 1400hrs Commanders Tactical meeting.
During the 1400 hrs meeting, I met with commanders and supervisors assigned to the anticipated "August ENDD" ("Every Night Direct Demonstration") protests, which were becoming a nightly occurrence in the area of the East Precinct and Capitol Hill. I went over our mission (from the IAP), the concept of our operation and my Commanders Intent. I have cut and pasted the Commanders Intent to this statement, below.

My top priority is to provide protection to Seattle Police buildings, resources, and the businesses and residences in Seattle, via our assigned personnel. The goal of these assigned resources is to prevent life safety incidents by targeting those in the crowd who are committing violent acts. Our duty is to support and facilitate the lawful protests, as protected under the First Amendment of the United States Constitution. We will support marches moving on City Streets until any act of violence or serious property damage occurs. When safe and feasible to do so, we will attempt to make arrests. Incident Command will assess whether to let the protest continue. If it is determined that we need to disperse any crowd, a Dispersal Order will be issued and we will deliberately move the crowd to a safe location until it disperses (See Rules of Engagement).The initial layer of our deployment will consist of ACT, Bicycle and SWAT Officers. Third Watch Patrol Task Force will be available after 2000 hours. Teams will initially be deployed around or near the East Precinct with the ability to respond to acts of violence or felony property destruction incidents. These teams will be under the command of the on-scene Incident Commander (IC), or his/her designee. I want us to be able to quickly and effectively respond to acts of violence or mass property damage incidents that come to our attention. Currently, we have three potential targets: East Precinct, West Precinct, and SPOG Office. Information was recently dispersed regarding other potential targets of arson through a Criminal Information Bulletin, dated August 12, 2020, though our Criminal Intelligence Unit. We have our Rules of Engagement and I am committed to officer safety and will do everything necessary to give you the tools needed to be

successful. My expectation is that any arrests, uses of force, or crowd management activities will adhere to department policy, training and best practices.

At 1600 hrs, we conducted a roll call at the West Precinct involving officers and supervisors from the bike squads, ACT teams and SWAT resources assigned.
I again went over the IAP and read through my Commanders Intent. Those present were also briefed by our Intelligence Section about anticipated issues. I reminded officers that less lethal weapon use should be approved by the chain of command ("COC"), if feasible. If it wasn't feasible to notify the COC, I told the gathered officers that they should use SPD policy, law and training to guide their actions.

After roll call, Lieutenants Brooks, Bergmann and myself drove up to the area of the East Precinct to see what was happening up there. We had information that a group of "Black Bloc" demonstrators were possibly going to meet at Volunteer Park, prior to marching, so we also drove through that area, but found little going on. It has been my recent experience that large groups of "Black Bloc" demonstrators are a danger to officers, the public at large and to property. Typically, I have seen these demonstrators utilize tactics which block the police from responding to violations of law. This is often accomplished through the use of vehicles and bicycles. The Black Bloc protesters have been responsible for arson attempts at the SPD East Precinct and have responding violently when confronted by SPD. We drove down to SODO, where the SPOG office is located, and checked that area as well. At approximately 1800hrs, we received information over radio that a group had formed at Volunteer Park and was marching Southbound on 12th Av E.

We drove up into that area and monitored the broadcast. Soon, officers began broadcasting that the group was doing property damage at several businesses, including a tavern, a bank and a marijuana shop. The damage was reported as broken windows. As resources began coming into contact with the group, I heard an officer report that they had recovered an unused Molotov cocktail from the street by the anarchist group. This heightened my fear of a violent assault on the East Precinct or against officers. Officers also made an arrest for property damage and recovered what appeared to be a Molotov cocktail from the backpack of the subject arrested. After we made multiple arrests, the group of Black Bloc demonstrators turned back towards Volunteer Park and soon began to dissolve. There is no doubt in my mind that the quick action to arrest and confront the demonstrators conducting property damage saved multiple businesses from being firebombed.

I had units stay in the area in case the Black Bloc demonstration re-formed and headed back to the West Precinct to conduct the 2000 roll call.
At the 2000 hrs roll call, I gave the same information to the 2nd group of officers, who were primarily patrol task force officers. Shortly after, we began to get reports of another demonstration forming at Roanoke Street, near I-5. Lieutenant Brooks dispatched members of the 2000 roll call to that area and he and LT. Bergmann responded. I stayed at the West Precinct, coordinated with our Media Response unit and made notifications of the earlier demonstration to the command staff.
Once he arrived at the Roanoke location, Lieutenant Brooks advised that the demonstrators there had blocked access to the Washington State Patrol office and the Seattle Fire Department station located on Roanoke Street. This was an unacceptable risk to public safety. I authorized to come up with a plan to move the protestors and to open both of those locations. My decision to do so was derived in part from current case law, in specific Menotti V. City of Seattle (2005). I became aware of this case after being a commander on scene in 2018 when Dakota Pipeline activists blocked 2nd Avenue in downtown Seattle. The resulting arrests were upheld by the SMC for the reasons below.

This court case details how SPD would be allowed to meet the exceptions to 1st Amendment Free Speech rights of protesters. That specific court case had three major inquires that drove the rulings. Was the action of the police content neutral? Was the police action narrowly tailored to serve a significant governmental interest? Did the police actions leave ample alternative channels for communication?

In this instance, my desire to open the roadway in front of a police station and fire house had nothing to do with the content of the message from the protesters. My orders to remove the protesters was content neutral and was not made in an effort to stifle their message. Lieutenant Brooks and the other commanders present requested multiple times that the protesters move one block away to a residential street in order to give them ample alternatives to protest. Finally, and most importantly, I believe that SPD narrowly tailored our response to serve the significant governmental interest of keeping a WSP police facility and SFD fire station fully operational. That WSP station serves a good portion of the I-5 corridor, so blocking it would have had severe repercussions to anyone involved in a collision during that time period. In addition, blocking potential medical and fire aid from thousands of nearby citizens by effectively closing the fire station is in no way a safe or constitutionally protected activity. Because of these factors, I ordered Lt. Brooks to act on his plan to open the streets in front of these two vital governmental assets.

I kept in radio and phone contact with Lt. Brooks as he undertook this task and approximately one hour later, it was completed despite multiple attempts by protestors to assault officers and to regain the ability to block the street.

For the remainder of the night, I coordinated the responses of assigned resources and was responsible authorizing the de-mobilization of units at the end of the demonstrations.

## Incident Location

- 811 E Roanoke St, Seattle, WA - Location of Occurrence: Demonstration - Precinct: C1 | CHARLIE | EAST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Street Lights | Greater than 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | Yes |

**More than 1 Community Member Involved**

Yes

| Community Member's Build | Community Member's Height |
|---|---|
| 125-175 pounds | 5'10" – 6'0" |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| Employee(s) Injured | Employee(s) Taken to Hospital |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

### Unknown (s) Demonstrator

DOB:   Race: Unknown   Ethnicity:   Gender:

**Role**
-

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

## Involved Employees

### Police Captain Todd Kibbee - Serial: 20187126 - Badge Number: 5837
**Assignment at time of incident:** Title: Police Captain Chief of Police A000/Operations Bureau B100/South Pct B230

**Video Footage**: [No Response]

**Role**
- Supervisor on Scene

**Force used by this employee against the community member**

- Verbal Commands - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Verbal Commands | Yes | | |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 10/2/2020 | UOF Statement Capt Kibbee | docx |

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|
| 10/2/2020 | Sergeant Gabriel Shank [6401] | Chief of Police A000, Operations Bureau B100, |

| **Assignment notes** |
|---|
| Field assigned |

| **Email sent to receiver** |
|---|
| No email sent |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Sergeant Gabriel Shank |
| Sent To: | QA |
| CC: | (none) |
| Sent Date/Time: | 10/2/2020 11:13 AM |
| **Instructions from Police Sergeant Gabriel Shank to QA:** | |
| Captain Kibbee Type II | |
| **Comments/Response from QA:** | |
| Approved: | |
| Reason: | |
| Comments:<br>Incident routing was closed out by IAPro user Sergeant Gabriel Shank [6401] and the incident was re-routed to Police Lieutenant Christine Ann Robbin [5191/20087359] | |

| Routing #2 | |
|---|---|
| Sent From: | QA |
| Sent To: | Police Lieutenant Christine Robbin |
| CC: | (none) |
| Sent Date/Time: | 10/2/2020 11:17 AM |
| **Instructions from QA to Police Lieutenant Christine Robbin:** | |
| Captain Kibbee's BT Entry | |
| **Comments/Response from Police Lieutenant Christine Robbin:** | |
| Approved: | |
| Reason: | |
| Comments:<br>(none) | |

**Author Signature Line**

_____
Police Sergeant Gabriel Shank - 30017085

**Chain of Command Signature Lines**

_____
QA

Case 2:20-cv-00887-RAJ    Document 146-1    Filed 11/02/20    Page 12 of 49

EXHIBIT A(3)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not
    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting

**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault

**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response

**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A.  Did the subject(s) pose a threat to you, another person, or another officer?
    B.  Describe the threat in detail or why you believed there was a threat.
    C.  Describe your decision regarding force and how you came to that decision
    D.  Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A.  Words, actions or threat posed by subject prior to, during, and after the use of force:
    B.  Continued de-escalation attempts and the subject(s) response if feasible
        i.  Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C.  Describe the force used and lawful purpose of the force used:
        i.  Describe any warning given.  If none were given, explain why not.
    D.  Explain your decision to use a technique or less lethal tool, based on feasible options
        i.  Describe proportionality of force
        ii.  How did the totality of circumstances affect the force used?
        iii.  If force was necessary, explain why
    E.  Explain effectiveness or lack of effectiveness of employed techniques
        i.  Was this a trained technique? Where were you instructed in this technique?
        ii.  Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii.  When and how was your force modulated?
    F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A.  Injuries/Medical Aid
        i.  Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii.  Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii.  Did the subject refuse medical aid or flee?
        iv.  Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-250789**

**DATE OF OCCURRENCE: 08/27/2020**

**STATEMENT OF: SGT. KIRK WALDORF**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Lt. Geoghagan.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: A/Lt. Geoghagan
B. ICV/BWV recorded: ICV was activated but did not capture the incident which was parked a distance away from the scene in a parking gargae. BWV was activated, uploaded, and flagged per policy. I reviewed by BWV prior to making this statement.

**DETAILED NARRATIVE:**

**Pre-Arrival/Arrival:**

I have been a Law Enforcement Officer since July of 1996 and a member of the Seattle Police Department since July of 1998.  During my 22 years at the Seattle Police Department I have received ongoing training in demonstration management.  I have been trained in the proper use and deployment of the Mark 9 OC and Blast Balls. I have directly participated in numerous demonstrations including the WTO, N30, Anti-War, Mardi Gras, and May Day Riots. I have also participated in numerous demonstrations as a Patrol Officer, SWAT Officer, CART Officer, SWAT Supervisor and CART Supervisor over the last 22 years.

I was wearing an authorized Seattle Police Sergeant uniform with helmet and eye protection. I was assigned as the supervisor of the West Precinct Taskforce.

The West Precinct Taskforce was deployed to the Washington State Patrol building located at 811 E. Roanoke St. This is adjacent to Seattle Fire Station 22 with a shared ingress and egress driveway. I was briefed by A/Lt. Geoghagan to assist WSP with protecting persons, significant property, and police and fire operations.

When I arrived, I noticed approximately 10 vehicles blocking all eastbound lanes of travel from the westbound 520 off ramp to the shared WSP/SFD driveway. There were an additional 2 vehicles east of the driveway blocking the right lanes. There were approximately 50-75 people on the sidewalk and mingling among the vehicles. There were approximately 7 SPD Officers and 2 WSP Troopers on scene. I brought an additional 9 Officers. As we arrived, we were met with furry of insults. I attempted to deescalate by moving the Officers and vehicles inside the WSP property.

Many of the crowd followed the Officers and moved to in front of the driveway filming and inciting the Officers with insults. A/Lt. Geoghagan arrived with additional Officers who were staged east of the facility and out of sight.

I noticed that the vehicles in the street were blocking uninvolved eastbound traffic, which was stopped blocking the intersection, which included a METRO bus. The congestion was directly impacting vehicles exiting the freeway off ramp. Some vehicles were making their way around the blockade by driving into oncoming lanes. The westbound route from the Fire Station did not appear to have enough clearance to allow a fire truck to safety make the turn particularly if eastbound traffic was in the westbound lane.

A/Lt Geoghagan determined that the blockade was unsafe and needed to move. A/Lt. Geoghagan contacted a subject identified as "T.K." who appeared to be leading the others. I witnessed A/Lt. Geoghagan ask that the vehicles be moved out of the roadway to correct the unsafe conditions. "TK" as well as others chided A/Lt. Geoghagan and refused to move any of the vehicles. A./Lt. Geoghagan warned those present that the vehicles would be towed.

A/Lt. Geoghagan and I planned to use tow trucks to facilitate the removal of any vehicles blocking that were creating a hazard. Once we had the tow trucks and enough officers assembled, I briefed the supervisors to leave any demonstrators who remined on the sidewalk to stay in place. We would use officers to secure the street and remining vehicles. That anyone wishing to safely remove their cars would be allowed. Any vehicles that remained would be towed. Any persons that attempted to prevent their removal would be arrested for Obstructing.

Traffic control was placed to prevent additional vehicles from entering the area, and I moved the officers into the street perpendicular to the roadway. A/Lt. Geoghagan again warned those assembled

to move their cars or be towed. Two vehicles immediately adjacent begrudgingly indicated their desire to leave. Officers facilitated their exit.

At his time, I could see numerous demonstrators had now donned helmets, respirators, and goggles. Many now had shields of various construction and umbrellas often used to conceal crimes and assault officers.

Based on the immediate need to clear the obstructions and move pedestrians out of the street, the many opportunities offered to allow vehicles to be moved, and the obvious refusal to move the obstructions, I ordered the line of officers to move up and past the next set (2) of cars. The police line moved forward, and many officers order the individuals in front to repeatedly "move back". I noticed a cluster of black clad individuals near the center with shields and umbrellas. One of the individuals aggressively shoved an officer backwards while the remaining began using their shields and umbrellas to push into the officers.

**Legal Authority:** Officers were on a public street

**Lawful Purpose:** Officers were clearing blocking vehicles both occupied and unoccupied and removing persons who were committing pedestrian interference. At the time of the force, I was stopping an assault on the officers and myself.

**De-Escalation Techniques Employed:**

It was apparent to me that these individuals were attempting to obstruct and assault the officers preventing them from securing the scene. I immediately moved up to bolster the officers and manage the combative people. Based on the active assaults and the previous unheeded attempts to de escalate by issuing instructions and providing consequences., further attempts to de-escalate was not feasible.

**Threat Assessment/Decision Made:**

The individual who shoved the officer appeared to be a white male approximately 5'8 medium build wearing all black clothing, goggles, and a respirator. The suspect was actively assaulting an officer causing an escalation in force which risked injury to the officers, bystanders, and himself.

**Use of Force:**

I immediately shoved him back with both hands to create space. The suspect immediately rushed back to me. Simultaneously the other demonstrators around us began thrusting their shields and umbrellas into my face and upper body.

Based on the primary suspects aggressive actions and the fact that I was outnumbered and being assaulted, I was unable to continue de-escalation, I deployed a single discharge of OC spray from my Mark 9 canister into the suspects face, which was mostly covered by the respirator. The initial discharge did not have an immediate effect due to the respirator. I discharged a second spray to cover the goggles and limit his ability to see me. This second spray did have an effect and the suspect backed away.

However, at the same time at least three other suspects were thrusting their umbrellas and a shield into me which appeared to be an attempt to knock me down or back. I grabbed and pulled the one umbrella away from the suspect while being struck with the remaining shield and umbrella. Based on the need to immediately stop their assaults, I sprayed a second adjacent umbrella wielding suspect in the face.

I continued to issue command for the suspects to "move back" throughout the movement. These commands and attempts to de-escalate were ignored.

They appeared to be a white male approximately 5'8 medium build wearing all dark clothing with a cloth face covering and goggles. The spray had the desired affect and I was able to pull the umbrella away from them.

This seemed to dissuade their continued assaults and they backed up with some additional pushes. One individual attempted to open another umbrella but, I immediately disarmed them by grabbing it and pulling it away. The remaining individuals complied and moved back and away from the officers. I modulated by force and no longer used any force.

**Medical Aid and Evaluation:**

Once the immediate scene was rendered safe, I returned to my primary duties and re-formed the line and accounted for officers and suspects. During these duties, I lost track of the four individuals that had assaulted me. I was unable to identify them and ascertain if they needed any aid.

---

**ADDITIONAL INFORMATION**:

**Resolution:**

The suspects were able to flee into and were not located in the crowd.

EXHIBIT A(4)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If  not, why not – Must be explained if no BWV or ICV

    C.  Note if you reviewed and BWV, ICV, or other video prior to statement.

**Pre-Arrival:**

    A.  Your relevant  training/experience (brief biography)

    B.  Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C.  Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?

**Arrival:**

    A.  Observations:
        i.  People / other officers on scene.  Activity occurring, dangers, citizens exposed…

      ii.    Buildings, vehicles
     iii.    Environmental factors: weather, lighting

B. What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
      i.    Public area
      ii.    Consent
     iii.    Exigency
     iv.    Warrant
      v.    Community caretaking

B. Lawful Purpose (Explain in Detail):
      i.    Social Contact
      ii.    Terry Stop
     iii.    Probable Cause for arrest
     iv.    Community Care-taking

       **Note:** Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

A. How did you make your presence and authority clear?
      i.    Verbal identification, commands or instructions
      ii.    Did the subject say or do anything that indicated he/she knew you were the police?

B. Contact with involved subject(s)
      i.    Observed Details
         - Physical/verbal reaction to officer
         - Tone of voice / statements made
         - Body posture / movement
         - Subjects size / strength vs. officer
         - Intoxication / mental state
      ii.    Information obtained from each subject

C. Was there a frisk of any subject?
      i.    Reasons to believe subject was armed and currently dangerous
      ii.    Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

    A.  Communication
- i.  Verbal persuasion
- ii.  Advisements and warnings (including Taser spark tests and warnings)
- iii.  Clear instructions
- iv.  Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
- v.  Avoiding language, such as taunting or insults, that could escalate the incident

    B.  Time, Distance, Shielding
- i.  How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
- ii.  How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
- iii.  Did you utilize cover and concealment for tactical advantage

    C.  If De-escalation was not safe or feasible, explain why not

**Decision Made:**

    A.  Overall summary of information gained from investigation

    B.  Decision based on information:
- i.  Warning
- ii.  Citation
- iii.  Documentation
- iv.  Arrest

    C.  Include any Tactical Decisions and Scene Control you employed

**Threat Assessment:**

    A.  Did the subject pose a threat to you, another person, or another officer?

    B.  Describe the threat in detail or why you believed there was a threat.

**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A.  Words, Actions or Threat posed by subject that necessitated the use of force:
- i.  Attempts to flee
- ii.  Fight
- iii.  Resist arrest

    B.  De-escalation and continued attempts and the effect on the subject

      i.    Verbal de-escalation
- Warnings/commands to subject.
     ii.    Physical de-escalation
    iii.    If de-escalation was not feasible, you  must  explain why not

C.  Lawful purpose of the force used:
      i.    Gain control
     ii.    Protect yourself or others from a threat of immediate harm
    iii.    Stop a potential deadly threat

D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options
      i.    Proportionality of force
     ii.    How did the totality of circumstances affect the force used?
    iii.    "No reasonably effective alternative…."

E.  Explain effectiveness or lack of effectiveness of employed techniques
      i.    Was this a trained technique? Where were you instructed in this technique?
     ii.    Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
• Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
    iii.    When and How was your force modulated?

F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid
      i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
     ii.    Medical aid (who provided and where provided)
    iii.    Refusal of medical aid by subject
    iv.    Refusal to accept at jail - disposition
     v.    Injuries to yourself


**Resolution:**

A.  Search
      i.    Items recovered
B.  Transport and processing of subject:
      i.    Use of ICV
     ii.    Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-251083**

**DATE OF OCCURRENCE: 08/26//2020**

**STATEMENT OF: OFC. MUOIO #8381**

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Norton #5295 I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: Yes, Sgt. A. Norton
    B.  ICV recorded:  No ICV. BWV recorded entire incident

---

**PRE-ARRIVAL DETAILS:** On 8/26/2020 at approx. 2230 hours I, Officer Muoio #8381, was working as unit 192 with the West Anti- Crime Team. We were assigned to the nightly demonstration near the East PCT.

Prior to this use of force incident, at approx. 1950 hours, the nightly march kicked off at Volunteer Park. Shortly after they started marching we got reports of the group, which was roughly 75 people, breaking windows at three separate businesses. Arrests were made and Molotov Cocktails were recovered. The march made its way to the 900 block of E Roanoke St. where they used their vehicles to block all lanes of traffic and then proceeded to block the ingress and egress to the Seattle Fire Department Station 22 and the Washington State Patrol facility. The off ramp from eastbound 520 was completely blocked and vehicles moving at highway speeds had to break hard to avoid vehicles. Vehicles in the 1000 block of E Roanoke had to drive blindly in opposite lane of travel to avoid blockage. The Operations Chief stated there were numerous safety hazards identified and the subjects were told to move. That included moving their vehicles out of the street and moving their demonstration onto the sidewalk. They were warned if they did not do so they could be subjected to arrest and their vehicles could be towed.

**ARRIVAL**:

When my unit arrived to the 900 block of E Roanoke St. we were assigned by our A/Sgt to stand behind the line of Officers as support. There was a line of Officers facing a crowd of roughly 75 people. The people in front of the crowd all were wearing all black clothing, wearing helmets, respirators and carrying shields, umbrella s and other improvised weapons.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:  I am a sworn Officer for the City of Seattle. The incident occurred on a roadway open to the Public. My lawful purpose was to arrest/detain a subject for failure to disperse.

**CONTACT WITH SUBJECT**:

Roughly two minutes after my arrival the Sgt in charge advised the protesters one last time to step back so Officers could remove the remaining vehicles blocking the roadway to allow the ingress and egress of the WSP facility. The Sgt gave the command to the Officers to move forward. The crowd lifted their shields and planted their feet bracing for contact, not moving back. When I got within arms reach of the demonstrators line I grabbed ahold of a shield that was being held by arrested\B      , R     H. in an attempt to remove the hazard. Based on past experience the people that carry the shields use them as weapons to assault Officers and/or to block illegal activity happening behind the shields. When the group was bracing for contact I knew they were not going to leave willingly and were not obeying lawful orders to leave the roadway.

**DE-ESCALATION**:

The group was given multiple orders to move the vehicles and get out of the roadway prior to my arrival. Seattle police had roughly 30 Officers on the line and WSP had a few Troopers on their property. The crowd had an avenue to retreat that was not blocked by police, which was West on E Roanoke St and North on Harvard Av. When they did not heed the warnings to move out of the roadway Officers continually used the phrase, "Move back!"

**DECISIONS MADE**:

The group was actively trying to prevent Officers from doing their job to open up the roadway for the safety of all involved and to reopen the ingress and egress of the fire station and WSP facility. I grabbed ahold of the shield in an attempt to remove it from the line blocking Officers from moving forward. When I pulled the shield B     refused to let go and starting pulling it back from my grasp. Others in the group started pulling on B     and his shield in an attempt to get the shield out of my hand. Because of his refusal to release the shield and his decision to stay in the area to retain the shield, I made the determination to make an arrest for failure to disperse.

**THREAT ASSESSMENT**:

There was a large unruly crowd disobeying numerous lawful orders to leave the roadway. The group was wearing all black clothing with helmets, gasmasks, and respirators while holding large shields, heavy backpacks and other improvised weapons. There were approx. 75 individuals in the group. Officers had many resources available to address the threats with approx. with 30 -40 Officers.

The individual, B█████, showed me he was not willing to leave and was looking for a confrontation. It is implied he heard the numerous warnings to get out of the roadway prior to my contact with him. He was holding a large makeshift shield and refused to move by raising his shield and bracing his feet for impact. When I grabbed ahold of the shield he refused to let go and made many attempts to pull it away from me with the help of his comrades on the line with him.

**FORCE USED**:

When myself and B█████ got into a 'Tug-O-War' match over the shield I attempted to grab ahold of his upper torso to gain control of B█████ and effectuate an arrest. My attempt to fully wrap him up with my arms around his torso failed and B█████ happened to walk backwards into a parked vehicle in the roadway. With me moving forward with the Police line and him backing into the parked vehicle he fell onto the ground with me falling on top of him with the movement of Officers moving forward. I positioned myself on the lower torso of B█████ in a straddling position with my left knee on the ground near his left hip and my right knee on the ground near his right hip. The majority of my weight was on my knees with minor pressure on his lower back. B█████ was on his stomach with his hands up near the ears of his head. B█████ appeared to be compliant at this point and was not showing any further signs of resistance. I leaned forward to grab his hands, which were sprawled out on the roadway near his head with my hands and simultaneously either lost my balance or got pushed from behind causing my weight to move forward. I attempted to catch myself causing my right open hand to brace on the rear of B█████'s head, along with being tangled up in his backpack. I regained my center of balance and told B█████ to place his hands behind his back. He complied and I was able to apply handcuffs without further incident.

The above mentioned incident is believed to cause a minor abrasion on B█████'s forehead on the left side from coming into contact with the roadway.

**MEDICAL AID AND EVALUATION**:

The transport Van, Sgt. Norton #5295, screened the incident on scene. B█████ told Sgt Norton that his head hurt "from being slammed to the concrete" Sgt. Norton took photos of the abrasions on the top of the forehead on the left side. B█████ declined any medical attention.

**RESOLUTION**: B█████ was transported to the WEST PCT for processing and was booking for failure to disperse.

**ADDITIONAL INFORMATION**:

EXHIBIT A(5)

# TYPE II USE OF FORCE
# ==CROWD MANAGEMENT==
# INVOLVED OFFICER STATEMENT GUIDE

## Instructions:

Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.

By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force.

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

## Preface:

A. In-person supervisor screening:

Supervisor's name/rank/serial number, date/time/location

B. ICV and BWV recorded: If not, explain why not
C. Note if you reviewed BWV, ICV, or other video prior to statement

## Pre-Arrival/Arrival

A. Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
B. Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C.  Location
D.  Information received from briefing/supervisor
E.  What was happening when you arrived/first observed the demonstrators?
    a.  People / other officers on scene, activity occurring, dangers
    b.  Buildings, vehicles
    c.  Environmental factors: weather, lighting

**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):
    i.   Public area, Street, Park, Open to public
    ii.  Exigency
B.  Lawful Purpose (Explain in Detail):
    a.  Riot
    b.  Looting
    c.  Assault

**Contact with Subject(s): (If feasible)**

A.  How did you make your presence and authority clear?
    i.   Uniform – UO Gear
    ii.  Verbal identification, commands, instructions, orders, PA announcements
B.  Describe contact with involved subject(s)
    i.   Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii.  During line movements, provide details
        - Your actions
        - Subject's response

**De-Escalation Techniques Employed:**

A.  Communication
    i.    Advisements/warnings. If no warning, explain why.
    ii.   Describe instructions given
    iii.  Dispersal orders you heard
B.  Time, Distance, or Shielding employed
C.  If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given.  If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below. Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-251102 & 2020-250789**

**DATE OF OCCURRENCE: 08/26/2020**

**STATEMENT OF: OFC BOURDON #7523**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt O'Neil #6835. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: Post event with Sgt O'Neil.
B. ICV/BWV recorded: BWV equip, ICV not equip since the Raid Van is not equip.

**DETAILED NARRATIVE:**

This report is intended as a summary of the events that occurred under case# 2020-251102 & 2020-250789. I have paraphrased conversations and do not include an exact sequencing of events. For any

exact quotes or exact sequencing of events I would refer the reader to my body worn camera, as it was recording at the time of this incident.

On 08-26-2020 I was working for the Seattle Police Department assigned to the West Precinct Anti-Crime Team. I was working as the team Acting-Sergeant and my callsign was unit# 190. I was wearing black BDU's with Police markings. We were working out of our Raid Van which is equipped with inside emergency lights and sirens.

Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25. More recently, on August 16, 2020, the protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On 8/24/2020, ENDD resulted in serious threats to Officer Safety. Notably, Quickrete was used to block exterior East Precinct doors as plywood shields were burned outside the precinct. SPOG building was also damaged by Molotov cocktails thrown at exterior walls.

For the past several weeks, there has been nightly planned demonstrations, called "Every Night Direct Demonstration", which is being promoted on social media. The event is scheduled to begin at 1800 hours at Volunteer Park. During previous evening events, incidents of significant property damage have occurred.

I have been working the un-permitted marches since 05-29-2020 that were supposed to be a peaceful protest supporting George Floyd. The demonstrations turned violent against the officers working the events. I had witnessed protestors physically assaulting police officers and throwing projectiles at our lines. Some of those objects ended up injuring myself and other officers. I also observed protestors destroying, looting and vandalizing business and property causing significant property damage. Seattle Police Patrol cars were set on fire and a Seattle Police rifle was stolen from a police vehicle. The stolen rifle was then used to shoot the burned police vehicle. The protests events had to be dispersed by order of the Incident Commander due to the violent altercations with Police and significant property damage caused to multiple businesses throughout the City.

During my approximately over 11 years working at the Seattle Police Department, I have worked numerous large crowd events throughout the City of Seattle. Some of the events were protests/demonstrations, marches, parades, rallies and "May-Day" demonstrations. I have worked the above large crowd events as a bicycle officer, on the line as a foot squad member, and force protection assigned as a patrol officer in the East and West Precincts and as Rapid Deployment Force (RDF) on the West Precinct Anti-Crime Team. I have also performed the duties of linebacker and Acting-Sergeant during protest/demonstrations. During my employment, I have attended yearly mandatory department training on crowd/demo management and Chemical Agent Response Team (C.A.R.T) training. I have been trained on OC, CS and blast balls. My last C.A.R.T training was on 04-05-2019. This year I wasn't able to attend blast ball training due to be on active military status as part of

the COVID-19 pandemic response. I however completed the 2020 online C.A.R.T training and certification.

As a member of RDF, some of our duties are to be mobile in vehicles for quick response and be readily available to maintain crowd management or to affect an arrest. We also support bicycle officers and patrol officers conducting crowd management and crowd control actions. It is our Department policy to facilitate free speech and assembly whenever possible. When the need to defend oneself or someone else and/or to prevent significant property damage we can utilize crowd control tactics which include rubber blast balls, OC spray.

The Incident Commander also has the authority to direct the use of blast balls and OC to disperse the crowd. For this incident, CPT Kibbee was the IC, Lt Brooks was the Operations Section Chief, A/Lt Geohagan was the Patrol Task Force Commander and Lt Robbin was the designated UOF review Lieutenant.

For this demonstration, I was equipped with a helmet and helmet shield, Mark-9 Oleoresin Capsicum solution (OC), rubber blast balls and a Cold Fire tactical can which is used to extinguished small fires.

Our RDF team for this demonstration was composed of West ACT team members and officers from the downtown Focus Squad.

The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice.

Due to the above circumstances the marches were un-permitted but our Department still facilitated the rights of all gathered for the freedom to assemble and express their views within the limited conditions necessary to address public safety concerns.

We attended a briefing at the West Precinct for the schedule demonstration at Volunteer Park.

At approximately 1947 hrs, a group of protesters were spotted leaving Volunteer Park. The protesters then headed over to several businesses located at 15 Av E where they proceed to break windows and damage property. Some of the business damaged were the Key Bank located at 15 Av E, the Canterbury Ale House and Uncle Ikes. Several arrests were made for the property damage.

We then responded to follow the protesters as they were marching in the streets. The protesters then returned to Volunteer Park and we left the area.

At approximately 2118 hrs, a group of about dozen vehicles were blocking traffic at the entrance of the Washington State Patrol Station located at 811 E Roanoke St. Protestors appeared to be organizing a protest in front of the WSP Station. Protesters had vehicles in the road blocking traffic in all directions including the I-5 freeway ramp and the Seattle Fire Station.

We arrived on scene and I observed multiple Metro buses and vehicles stuck on traffic due to the protesters blocking E Roanoke St.

Multiple PA announcements were given for the protesters move their vehicles from the 2600 block of E Roanoke St. Vehicles could go eastbound of E Roanoke if they choose to leave the area.

The protesters refused to move the vehicles from the road. WSP Troopers started pushing the protestors away from their station and into E Roanoke St.

A/Lt Geoghagan established a police line on E Roanoke facing westbound in order to push the protesters westbound. Our team then setup behind the line to support the officers. Some protesters were wearing helmets, gas masks, eyewear, shields and umbrellas.

A/Lt Geohagan then gave the command and we started the westbound push as we were yelling "move back".

As soonest we started the push, I observer officers trying to take suspects into custody. We then established a line passed the first protesters vehicles that we encountered. Tow trucks were on standby to towed vehicles that refused to move. Protesters were yelling "fuck all ya", "you are in the wrong side of history".

The command was given to push to the next set of protester vehicles. As we established the police line, I observed a green laser been shine into the police line.

From my experience in the military, I know that lasers can cause significant damage to vision and some type of lasers can even cause blindness. From my experience, I know lasers come with either a warning label or a danger label. Some lasers even come with a warning label stating to avoid direct eye or skin exposure and to not stared into the laser beam. Per RCW 9A.49.020 Unlawful discharge of a laser in the first degree, it covers the unlawful discharge of a laser at a law enforcement officer which is a class C felony.

The suspect shining the laser was pinpointed and an arrest team was established to affect the arrest. We continued the push and Multiple arrest were affected. Protesters were throwing what appeared to be smoke grenades.

Lt Brooks gave the dispersal order via PA. I was able to hear the order with no problem.

A/Lt Geohagan then planned for us to push the protesters northbound on Harvard Av E. The protesters were still in the area disregarding the dispersal order.

As we turned northbound on Harvard Av E I could the protesters were still in the road failing to disperse. The protesters were facing the police line in a formation using their shields and umbrellas. With my training and experience I know that the umbrellas are used to conceal violent acts against police officers and to block OC deployments. It appeared that the protesters were organized mimicking our tactics with their shields.

We continued yelling loudly "move back" as we continued the push northbound.

At approximately 2241 hrs, I observed as Officers were trying to affect an arrest in the line. I immediately move forward to support the officers affecting the arrest. As I went forward I observer as multiple officers were trying to affect arrest and suspects were actively resisting and trying to get away.

I observer as Officer Muoio was trying to arrest a W/F. I observed as a W/M wearing a dark helmet with a face shield, a mask and a purple shirt immediately charged forward and got a hold of the Female Suspect. The female suspect was later identified as A██████ L█████ K███████. S/K███████ was later booked into KCJ for investigation of assault.

The un-identified male suspect was actively trying to pull away and un-arrest the female suspect from Officer Muoio. I immediately deployed my MK-9 can of OC pepper spray and targeted the specific unknown male in the face area with a short burst of OC.

Officers immediately went forward to assist in the arrest as the protesters were violent trying to un-arrest suspects.

I couldn't see if my OC deployment was effective since I lost track of my suspect as I went forward to provide cover and protection for the officers affecting the arrest in the ground.

An OC verbal warning wasn't feasible at the time due to the protester being actively trying to un-arrest a suspect that officers were trying to take under custody. With my training and experience I had suffered injuries in the past from the suspects actions as they were trying to un-arrest suspects.

A firework was thrown at officers as we re-establish the line.

We then continued the push northbound on Harvard Av E.

The unknown suspect was not identified since he wasn't arrested and appeared to have left the area.

Once the crowd was dispersed, we re-deployed to the West Precinct.

I reported my less lethal OC deployment to Sgt O'Neil.

**ADDITIONAL INFORMATION**:

No.

EXHIBIT A(6)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

**Instructions:**

Please provide a detailed narrative answer to each of the questions asked. The listed bullet points are not specific to your incident and may or may not apply.

Please read the following for information on what you might include in your statement. Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed. This is a guide only.

At the bottom of this guide is the cut and paste section. Fill out your statement using the format included and then cut and paste your response into your Blue Team entry. If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV and BWV recorded: If not, why not – Must be explained if no BWV or ICV

    C. Note if you reviewed and BWV, ICV, or other video prior to statement.

**Pre-Arrival:**

    A. Your relevant training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion. Weapons involved? Crime of Violence?

**Arrival:**

    A. Observations:
        i. People / other officers on scene. Activity occurring, dangers, citizens exposed...

    ii.    Buildings, vehicles
    iii.   Environmental factors: weather, lighting
B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):
    i.    Public area
    ii.   Consent
    iii.  Exigency
    iv.  Warrant
    v.   Community caretaking
B.  Lawful Purpose (Explain in Detail):
    i.    Social Contact
    ii.   Terry Stop
    iii.  Probable Cause for arrest
    iv.  Community Care-taking

**Note:** Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

A.  How did you make your presence and authority clear?
    i.    Verbal identification, commands or instructions
    ii.   Did the subject say or do anything that indicated he/she knew you were the police?
B.  Contact with involved subject(s)
    i.    Observed Details
       - Physical/verbal reaction to officer
       - Tone of voice / statements made
       - Body posture / movement
       - Subjects size / strength vs. officer
       - Intoxication / mental state
    ii.   Information obtained from each subject
C.  Was there a frisk of any subject?
    i.    Reasons to believe subject was armed and currently dangerous
    ii.   Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

    A.  Communication
- i.   Verbal persuasion
- ii.   Advisements and warnings (including Taser spark tests and warnings)
- iii.   Clear instructions
- iv.   Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
- v.   Avoiding language, such as taunting or insults, that could escalate the incident

    B.  Time, Distance, Shielding
- i.   How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
- ii.   How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
- iii.   Did you utilize cover and concealment for tactical advantage

    C.  If De-escalation was not safe or feasible, explain why not


**Decision Made:**

    A.  Overall summary of information gained from investigation

    B.  Decision based on information:
- i.   Warning
- ii.   Citation
- iii.   Documentation
- iv.   Arrest

    C.  Include any Tactical Decisions and Scene Control you employed


**Threat Assessment:**

    A.  Did the subject pose a threat to you, another person, or another officer?

    B.  Describe the threat in detail or why you believed there was a threat.


**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A.  Words, Actions or Threat posed by subject that necessitated the use of force:
- i.   Attempts to flee
- ii.   Fight
- iii.   Resist arrest

    B.  De-escalation and continued attempts and the effect on the subject

      i.    Verbal de-escalation
- Warnings/commands to subject.
      ii.   Physical de-escalation
      iii.  If de-escalation was not feasible, you  must  explain why not

C.  Lawful purpose of the force used:
      i.    Gain control
      ii.   Protect yourself or others from a threat of immediate harm
      iii.  Stop a potential deadly threat

D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options
      i.    Proportionality of force
      ii.   How did the totality of circumstances affect the force used?
      iii.  "No reasonably effective alternative…."

E.  Explain effectiveness or lack of effectiveness of employed techniques
      i.    Was this a trained technique? Where were you instructed in this technique?
      ii.   Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
- Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
      iii.  When and How was your force modulated?

F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid
      i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
      ii.   Medical aid (who provided and where provided)
      iii.  Refusal of medical aid by subject
      iv.  Refusal to accept at jail - disposition
      v.   Injuries to yourself

**Resolution:**

A.  Search
      i.    Items recovered
B.  Transport and processing of subject:
      i.    Use of ICV
      ii.   Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.


**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**


**EVENT/GO#: 2020-251113**

**DATE OF OCCURRENCE: 08/26/2020**

**STATEMENT OF: OFFICER O. MURPHY 8462**


This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt O'Neil 6835.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: I initially screened this incident with Sgt. Waldorf 6311, I was then directed to screen with Sgt. O'Neil at the West precinct.

    B.  ICV recorded: ICV was activated, but would not have captured the incident, as my vehicle was not near the event. Body Worn video was activated and recording at the time of the event.


**PRE-ARRIVAL DETAILS:** At 2000 hours, I was assigned as a taskforce officer for the purposes of crowd management at an un-permitted demonstration. A group of people had blocked E. Roanoke St. and appeared to have intent to cause damage to Washington State patrol vehicles parked at 901 E. Roanoke St.


**ARRIVAL**: The SPD incident commander gave a verbal order for the crowd to disperse, and for the subjects to move their vehicles being used to blockade the street. The group refused to disperse, despite multiple warnings. Officers moved forward in a skirmish line, ordering and guiding the group off the street.

**LEGAL AUTHORITY & LAWFUL PURPOSE**: I was on a public street, I had legal authority to be there. My lawful purpose was to disperse the crowd from the roadway and allow tow trucks to safely tow vehicles that were being used to barricade the street, not allowing traffic to flow.

**CONTACT WITH SUBJECT**: I was on foot, on a skirmish line with other officers. We were moving forward as a unit, at the direction of supervisors, ordering the crowd off the street. Subjects were defying orders, standing in front of officers in an obstructive manner, requiring officers to push subjects forward, encouraging them to move off the street.  During this push, I observed other officers attempt to make an arrest of a subject in front of me. I then witnessed a female (later identified as M██████, S█████ M███) grab ahold of the female that officers were attempting to arrest, and pull the subject free of officers. During M██████'s intervention, she was knocked to the ground. When she got back up, she immediately grabbed ahold of an officer's gun belt and began to pull him. When M█████ grabbed ahold of the officer, I took action to remove her from the officer.

**DE-ESCALATION**:  M████████ was actively interfering with officers, and was assaulting an officer via unwanted touching of the officer's gun belt. It was not safe, nor feasible to attempt to de-escalate.

**DECISIONS MADE**: I made the decision to interdict M██████ form interfering with officers due to the significant risk she posed.

**THREAT ASSESSMENT**: A person attacking an officer from behind them poses a significant safety risk, especially when a suspect is grabbing at an officer's gun belt. I felt that M███████ posed an imminent threat to the officer, as he seemed unaware of M████████, as he was attempting to secure the scene with potential active threats to his front.

**FORCE USED**: I grabbed ahold of M████████ by bringing my left arm around her torso. My riot baton was in my left hand, which extended horizontally across the front of M███████. I then

grabbed the opposite end of my baton with my right hand, using it to lasso M████████'s torso. I pulled the baton towards my center mass, and drove backwards with my legs, driving her backwards with me. I directed her to my right, steering M████████ away form the officer she had latched onto so that she could not re-engage. M████████ then leaned forward with her body weight. Due to the fact that she was leaning forward at the waist, M████████ was able to leverage more weight forward than I could hold. My right hand slipped free from my baton. When this occurred, M████████ very suddenly broke free of my hold, causing her to fall forward. As she began to fall, I grabbed onto her backpack attempting to stop the fall. I was knocked into by another officer as I was doing this, causing my to fall forward with M████████. We both landed on the ground with me falling on top of M████████. I got up onto my hands and knees, and swung both of my legs over the top of M████████'s prone body, landing on her left side. I went into the prone handcuffing position, gabbing ahold of M████████'s left hand/wrist. I then brought her left arm behind her back and held it there while an assisting officer placed her into handcuffs.

**MEDICAL AID AND EVALUATION:** I removed M████████ from the active scene, and walked her to a patrol vehicle well behind the line. Once there, I evaluated M████████. She notified me that her handcuffs hurt, as she had a pre-existing injury. There was a splint on her left wrist. She asked that the splint could be tightened. The officer who applied the cuffs gauged them and adjusted as needed. He then tightened the splint as requested. M████████ then asked me if I could inspect her left knee. I did so, and observed a scrape on her knee cap. M████████ was asked if she needed medical aid, she declined.

**RESOLUTION:** M████████ was booked into King County jail for SMC 12A.16.010 Obstructing a Peace Officer.

**ADDITIONAL INFORMATION:**

EXHIBIT A(7)

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Sergeant M. Blackburn.  I DO invoke my Garrity rights prior to giving this statement.

BWV was activated and captured the force used.

BWV was activated.

**Pre-Arrival Details**

On Wednesday August 27th, I was in uniform working for the East Precinct Anti-Crime Team (ACT). We were tasked with demonstration management. Around 2234 hours, there was a large group of protestors outside of the SFD station and WSP station at Harvard Av E/ E Roanoke St. The protestors were blocking the entrance to the fire station which was a public safety issue. The protestors also had multiple vehicles blocking the street and refusing to move. Officers were tasked with moving the protestors and vehicles out of the way.

**Arrival**

Protestors were pushed west from the fire station entrance and were now occupying the intersection of Harvard Av E/ E Roanoke St. People in vehicles who refused to leave were placed under arrest and their vehicles towed. Protestors lined E Roanoke St north to south and were facing officers. Many of them were wearing eye protection, and gas masks. There were also multiple shields held by the front lines of their group. One of the demonstrators started to shine a high-powered green laser pointer into officer's eyes. The suspect pointed the laser right into Officer Vergara's eyes but luckily Officer Vergara was wearing laser eye protection and avoided damage to his eyes.

Pointing a laser at a law enforcement officer who is performing his or her duties in uniform is a class c felony RCW 9A.49.020-Unlawful discharge of a laser in the first degree. There was probable cause to arrest that suspect for the crime listed above. Throughout the many protests and riots that have occurred in Seattle in 2020, suspects have used laser pointers to target officers. These lasers have the capability to permanently blind an individual. A/ Sergeant Blackburn informed East ACT that we were going to arrest the suspect who was shining the laser at Officers.

**De-Escalation**

As officers moved forward, they shouted for the crowd to move back. These protests/riots have been occurring very frequently since May 2020. Many of the people in the crowd protest on a nightly basis and have been present when police push forward to move the crowd or make and arrest. When police move forward and tell the crowd to move back, common sense would indicate by now that the crowd should move back or there are consequences. Before I sprayed OC I yelled at the shield bearers to move back as well.

**Legal Authority and Lawful Purpose**

Legal Authority: I was on a public street in the middle of the road.

Lawful Purpose: My lawful purpose was to protect Seattle Police Officers from being assaulted and to prevent demonstrators from obstructing officers from making a felony arrest.

**Force Used**

Officer Moreland and Officer Vergara kept eyes on the suspect and were going to the be the arresting officers. My assignment was to prevent other demonstrators from trying to de-arrest the suspect and/or assault the arresting officers.  East ACT pushed forward to arrest the suspect and there were multiple demonstrators holding shields that stood their ground. Officers shouted to move back as we moved towards the shield brigade. Officer Moreland and Officer Vergara were able to push past the shield bearers and arrest the laser pointed suspect. While they grabbed the suspect, the people holding shields tried to push back against line officers moving forward. In order to protect the arresting officers and line officers, I used OC to spray two individuals in the face that were pushing forward with shields. The shield bearers retreated and were not arrested due to the distance and arrest that was already going one.

**Resolution**

The force that I used was reasonable and necessary. My actions were to prevent officers from being assaulted and to be able to make a felony arrest. The OC spray that I used was effective and caused the shield bearers to retreat.

This incident was screened by A/Sergeant Blackburn.