EXHIBIT D(1)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Devon Benner - 30054231

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/24/2020 | 9/23/2020 | 10:30 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58401 | 2020-275135 | 2020UOF-1513 |
| **Date/Time Entered** | | |
| 9/24/2020 02:43 | | |

## Incident Summary

EVENT/GO#: 2020-275135
DATE OF OCCURRENCE: 9-23-2020
STATEMENT OF: DEVON BENNER
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sergeant Moore. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sergeant Moore screened this incident during the event the first time it was feasible to report the use of "blast balls".
B. ICV/BWV recorded: This entire incident was captured on Body Worn Camera. I reviewed and flagged the incident just prior to the use of force.


DETAILED NARRATIVE: I am Seattle Police Officer Devon Benner #8309, assigned to Uniformed Bicycle Unit-North Precinct.


I attended the Basic Law Enforcement Academy and have been a sworn police officer since June 30th, 2015. After graduation from the Basic Law Enforcement Academy, I was assigned to the Seattle Police Department's Advanced Training Unit for an additional 2 months of department training.
I started field training in September of 2015, after three and a half months of the field training I successfully passed. Once I was finished with training I was assigned to patrol at the North Precinct. I also completed a 40-hour Crisis Intervention Training in May of 2016. In October of 2016 I successfully passed a 40-hour Police Mountain Bike School. In SPD's Police Mountain Bike School, I was trained on crowd control tactics and movements. After I completed several annual crowd control classes and participated in facilitating protests on numerous occasions on a police mountain bike. After working very frequently with the bicycle team I was selected in July of 2018 to work as a full-time bicycle patrol officer. I was assigned to the North Precinct Bicycle team to proactively patrol high crime areas.
In addition to my crowd control course I also completed training in using "Blast Balls" as a part of our Non-lethal engagement. I completed this annual course twice, once in Spring of 2019 and once again a year later in April of 2020.
On September 23, 2020 I was assigned to work as an acting sergeant in a uniformed bicycle team in response to a coordinated protest. Social media sources sharing the protest information were calling for violent actions towards the police. Before the event started, I was informed in other parts of the country like the scheduled protest led to two officers being shot and hospitalized.
The march had several protesters with gas masks, goggles, improvised shields, carrying backpacks, dressed in all black. In the recent weeks we knew groups with similar outfits, improvised items and equipment were training on tactics to prevent police movements, arrests, and to unarrest members of the crowd.
Throughout the night, prior to my use of force, the protest caused significant property damage and made several attempts to assault officers using rocks, glass bottles, a fire extinguisher and a baseball bat.
The crowd started lighting a fire in the middle of 11th Av E and E Pine St using large dumpsters and piling debris from the roadway.
Lieutenant Brooks gave a dispersal order to the crowd building and gathered near the fire. During the dispersal order the crowd was given multiple routes of egress and several minutes to vacate the area.


Acting Lieutenant Moore gave my squad the command to push west down E. Pine St and secure the area so we could prevent the fire from spreading and to allow the Seattle Fire Department to extinguish the fire. This movement occurred in the 1100 block of E Pine St; a city street open to the public. Our legal authority was to protect the Officers from the ongoing assault of projectiles and to secure the scene of the fire creating

a significant hazard.

My Squad moved westbound to 11th /E. Pine St and we were met with a crowd that immediately starting assaulting officers with projectiles as we came down the hill.
As the Bike teams were trying to approach and push the crowd using a bicycle line, I observed individuals throwing rocks, glass bottles, small Co2 cartridges and other miscellaneous projectiles at officers. I attempted to interrupt the ongoing flurry of projectiles with the use of blast balls.
I deployed four Blast balls, in quick secession. I deployed the first blast ball, using an underhand pitch towards the individuals I observed assaulting officers using projectiles. The blast ball appeared to create more distance, but individuals kept assaulting officers with rocks and other unidentified projectiles.
I deployed the second blast ball, using an underhand pitch towards the individuals I observed assaulting officers using projectiles. The blast ball appeared to create more distance, but individuals kept assaulting officers' rocks and misc. projectiles. I even heard a few glass bottles breaking on our police line.
I deployed the third blast ball, using an underhand pitch towards the individuals I observed assaulting officers using projectiles. The blast ball still appeared to create more distance, but individuals continued to assault officers using projectiles.
I deployed the fourth blast ball, using an underhand pitch towards the individuals I observed assaulting officers using projectiles. The blast ball appeared to create more distance; although individuals continued to assault officers using projectiles. After my fourth deployment I had to prepare my squad to make a coordinated movement and guide the crowd further westbound on E Pine St.
During my Blast Ball deployments, I was not made aware of any injuries caused by the blast ball. The targeted suspects continued in the protest and left the area, no medical evaluation was possible.

ADDITIONAL INFORMATION: None.

## Incident Location

- 1100 E Pine St, Seattle, WA - Location of Occurrence: Demonstration

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Cloudy | Darkness | 11 – 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'10" – 6'0" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### John Doe

DOB:   Race:   Ethnicity:   Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Blunt Object – Use

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Devon Benner - Serial: 30054231 - Badge Number: 8309

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct B120/North Pct 2Nd W - NE B122/North Pct 2Nd Watch - North Beats B122A/North Pct 2Nd Watch - North Beats B122A

**Video Footage:** [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Balls - Blast - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - Blast | Yes | | |

Case 2:20-cv-00887-RAJ     Document 146-4     Filed 11/02/20     Page 5 of 165



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Devon Benner |
| Sent To: | Police Lieutenant Christine Robbin |
| CC: | (none) |
| Sent Date/Time: | 9/29/2020 4:49 PM |
| **Instructions from Police Officer Devon Benner to Police Lieutenant Christine Robbin:** | |
| Use of force template<br>Officer Benner, North precinct. | |
| **Comments/Response from Police Lieutenant Christine Robbin:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer Devon Benner - 30054231

EXHIBIT D(2)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Richard Bonesteel - 30043261

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/24/2020 | 9/23/2020 | 23:30 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58385 | 2020-275135 | 2020UOF-1508 |
| **Date/Time Entered** | | |
| 9/24/2020 01:29 | | |

## Incident Summary

EVENT/GO#: 2020-275135
DATE OF OCCURRENCE: 09/23/2020
STATEMENT OF: R. Bonesteel
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/LT Moore. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening:
B. ICV/BWV recorded: YES


DETAILED NARRATIVE:

This report is intended as a summary events. I have paraphrased conversations and do not include an exact sequencing of events. For any exact quotes or exact sequencing of events I would refer the reader to my body worn camera, as it was recording at the time of this incident.

On the date of 10/23/2020 I, Officer Richard Bonesteel of the Seattle Police Department was working in the capacity as a Seattle Police Mountain Bicycle as call sign 2D82. I, with the rest of the other 2D80s was assigned to a demonstration for the Grand Jury conclusion in the Brianna Taylor investigation in Louisville KY. During the past six months, I have worked several protests, demonstrations, and violent and destructive demonstrations that have been deemed riots by command staff. I have noticed in the past month to two months the group of protesters have dressed in black clothing and carried shields, misc blunt weapons, and incendiary devices, including fireworks and Molotov cocktails. The group who consists of 'Black Bloc' and antifa do not carry signs displaying their cause and have been told by intel that their plan is to cause destruction and violence. During our briefing for this demonstration we were told the same.
At approximately 2003 hours '214' informed radio that approximately 200 subjects all dressed in black and some carrying blunt objects, and umbrellas began marching from Cal Anderson Park and into the Capitol Hill Neighborhood. We were instructed to not engage with the crowd, allow the crowd to demonstrate their 1st amendment right unless they began engaging in property destruction or other acts of violence.
The crowd continued to march finding their way to Broadway and E Madison St. The crowd began spray painting ACAB 'All cops are bastards' and other anti-police related content on Whole Foods and later the Amazon Go also on E Madison St.
The crowd continued E Madison St westbound making their way across 1-5 and into downtown. At this time, we were instructed to get closer to the group due to the cause of property destruction on the above business. I, with my squad rode along side the M90s and closer to the crowd, nearing Madison St and 6 Ave. I could now see the crowd, which was approximately 200 strong, all wearing black and chanting anti-police chants. When the crowd neared 5 Av and Madison St, I heard over radio from other officers that there was information in the crowd that when on level ground the crowd would turn on the officers and attempt to assault officer.
Due to my past experiences and the hostility of the crowd tonight I believed that this was a major posibility. We followed the crowd that turned northbound onto 4 Av from Madison St. We were instructed to get closer to the crowd which when they observed officers getting closer began displaying the middle finger towards officers and screaming threats and curse words in our directions.
When we neared the intersection of 4 Av and University St the crowd stopped and turned in our direction. I was ordered to place a 'fence line' with other officers. The crowd did not charge at us but did continue to

scream threats in our direction. The crowd then continued marching northbound on 4 Av. At around this time a rock was thrown in our direction striking me in the shoulder. I did not observe who threw the rock in the crowd. The crowd counited to march and cause property damage along the way. Due to the massive amount of property damage I heard 'Car 21' Captain Allen begin to give dispersal orders and inform the crowd this was now an unlawful assembly.

When the crowd neared the intersection of Pike St and 5 Av. I observed suspects began to spray paint on the 'Banana Republic' I observed the 3E80's begins to ride towards the suspects to effect an arrest. I assisted in moving the crowd back and forming a line with my bike to keep the crowd back until the officers effecting the arrest was under control. Once the arrest was under control, we were instructed to continue following the crowd which was now marching southbound on 5 Av the wrong way from Pike St.

We followed the crowd and was instructed to attempt and move the crowd from marching the wrong way and onto Seneca St. While the crowd turned eastbound on Seneca St a water bottle was thrown from the crowd at the direction of officers. I was informed that the suspect was still in the crowd wearing a gray jacket. Officer Loux and I who were 'point officers' located the suspect and decided to wait to effect the arrest near Seneca St and 7 Ave.

When we arrived at that point, I observed the suspect who was now near the back of the crowd. Officer Loux and I moved in to make the arrest however the suspect pushed a sign in my direction and ran eastbound. During this movement, another suspect attempted to assault Officer Baldwin. I then assisted in making this arrest.

After this arrest was completed me and the rest of the 2D80s moved back to join the rest of SPD officers assigned to this event. The crowd moved back into Cal Anderson and we were instructed to move into East Precinct to await further instructions.

While at the East Precinct I was informed by A/LT Moore that Sergeant Rees who oversaw the 3E80s had been injured during our movements and would be heading to the hospital. I was instructed by A/LT Moore that I would be taking over as A/SGT of the 3E80s.

While at the East Precinct at approximately 2145 hours the crowd who was still wearing all black and approximately 200 strong began marching out of Cal Anderson back in the Capital Hill Neighborhood. Officers over radio stated that the group planned to march around Capital Hill, eventually making their way to East Precinct and that they 'had something planned.'

The crowd marching in the Broadway area continuing to vandalize business by spray painting and damaging windows.

At approximately 2245 hours the crowd had moved around the northbound sally port which is a fenced gate. A suspect in the crowd then threw a large firework into the sally port at officers, causing a large explosion. Officers over radio were able to provide me and other officers a description of the suspect who threw the firework. It was decided that the 3E80s would lead to effect the arrest. Once it was clear were the suspect was we moved out of the East Precinct from the east sally port doors and turned westbound on E Pine St to effect the arrest. A group of Black Bloc observed officers leaving the precinct and alerted the rest of the crowd which was still mostly near the northside sally port. The suspect who threw the firework noticed bicycle officers and began to run westbound on E Pine St. I followed the rest of the 3E80s towards the suspect. The large crowd around us began to attempt to block our path and throw objects at officers. The suspect ran into Cal Anderson and I ordered all the 3E80s back to 11 Ave E and E Pine St to regroup. Once my squad had regrouped, LT. Dyment informed me that officers had seen the suspect that threw the firework in the area of 11 Ave E and Denny Wy. We began moving in that direction and once we arrived, I observed the suspect being taken into custody by other officers without incident.

At this time one of my officers informed me that he was hit with a baseball bat in the head during our attempt to effect an arrest at E Pine St and 11 Ave E. I observed a large dent in the back of his bicycle helmet. The officer was treated and obtained a new bike helmet.

The crowd continued to cause destruction near the area of E Pine St and 11 Ave E including throwing bottles and rocks at officers, move trash dumpsters into the street and light them on fire, and officers had heard that suspects inside the crowd begin to make Molotov cocktails near the hotdog stand, located at 11 Ave E and E Pine St.

More dispersal orders were given by commands informing the crowd this was an unlawful assembly. We were instructed by command to begin to leapfrog and create mobile fence lines / crossbow line formations to move the crowd. I commanded the 3E80s to move behind another bicycle squad and get ready to crossbow line formation when needed. Near the area of E Pine St and 10 Ave E. I commanded the 3E80s to make a crossbow line formation. This was ineffective in moving the crowd. At this time, we began mobile fence lines towards the crowd. I instructed the front officers to keep moving the crowd and to stay in formation. I continued to order the crowd to move back while the front officers pushed the crowd.

While pushing the crowd a suspect approximately three lines back threw a large traffic cone striking Officer Binder in the chest. I then observed multiple suspects holding a large black sign pushing into officers and attempting to push their bikes back into them. Due to the assault on officers I deployed my MK9 at the suspects causing the suspects to stop the assault and move away from officers.

I did not effect any other crowd management UOF during this event.


ADDITIONAL INFORMATION:
N/A


## Incident Location

- 10 Ave / Pine St, Seattle, WA - Location of Occurrence: Demonstration - Precinct: E2 | EDWARD | EAST

## Use of Force Specific Information

| | | |
|---|---|---|
| **Reason for Use of Force** | **Service Being Rendered** | |
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Darkness | 1 – 5 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'7" – 5'9" | |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| | |
|---|---|
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
| No | No |

## Reporting/Involved Community Member Information

### John Doe

DOB:    Race: Unknown   Ethnicity:    Gender: Male

**Role**
-

**Types of Resistance Community Member Used Against Employee(s)**
- Passive Noncompliance (including Verbal)
- Blunt Object – Use

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer Richard Bonesteel - Serial: 30043261 - Badge Number: 7591
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/Citywide Response Section B180/Community Response Group - Platoon B B182/Crg - Squad 82C B182C/Crg - Squad 82C B182C

**Video Footage:** [No Response]

**Role**

- 

**Force used by this employee against the community member**
- Chemical Agent – OC Spray - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Chemical Agent – OC Spray | Yes | 1 | 1 |

FRONT                                                    BACK

Missed

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Richard Bonesteel |
| Sent To: | Police Sergeant Sean Moore |
| CC: | (none) |
| Sent Date/Time: | 10/7/2020 11:12 PM |
| **Instructions from Police Officer Richard Bonesteel to Police Sergeant Sean Moore:** | |
| 2020-275135 | |
| **Comments/Response from Police Sergeant Sean Moore:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer Richard Bonesteel - 30043261

EXHIBIT D(3)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Marshall Coolidge - 30020419

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/25/2020 | 9/23/2020 | 23:53 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58460 | 2020-275135 | 2020UOF-1535 |
| **Date/Time Entered** | | |
| 9/25/2020 16:05 | | |

## Incident Summary

EVENT/GO#: 2020-275135
DATE OF OCCURRENCE: 09-23-2020
STATEMENT OF: OFC. M. COOLIDGE
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. C. Robbin. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt Hancock - 09/24/2020 at approx. 0030 hours
B. ICV/BWV recorded: BWV was recorded. No ICV

DETAILED NARRATIVE:
On the above date, time, and location I was working as an SPD SWAT operator in full uniform loaded in a Tahoe with Ofc. Virgilio, Ofc. West, and Sgt. Hancock. I was wearing a ballistic helmet, ballistic vest, gun belt, and was equipped with an FN303 less lethal launcher. I have been on the Seattle Police Department for over nineteen years and have been in SWAT for approximately nine years. During my tenure on SWAT I have been trained to deploy less lethal projectiles in various situations to include during crowd management situations. I have experienced several crowd management events in the last several months. The FN303 is a pressurized launcher that fires a .68 caliber 8.5 gram polystyrene projectile containing marking paint.
On this evening SWAT was tasked with assisting with crowd management for a protest turned riot in response to the Breonna Taylor decision. The following incidents occurred on city streets, sidewalks, and ways open to the public. The lawful purpose is established by the declaration of lawful assembly/riot, and also multiple assaults on officers by rioters.
Throughout the evening approximately two hundred protesters congregated at Cal Anderson and then marched around various parts of Capital Hill and downtown Seattle, disrupting traffic, moving road signs and garbage cans into the streets. Property damage including the breaking of windows and graffiti had occurred. While the group was near 4th Ave and Seneca St. Capt. Matt Allen began giving dispersal orders due to the non-peaceful actions that were continually occuring. Despite his order for dispersal, the crowd continued with their demonstration and behavior. Multiple SPD bicycle squads and various other units trailed the crowd. Participants in the crowd threw rocks and bottles at police officers. I heard via radio of arrests being made. The crowd eventually made its way back to Cal Anderson park where it stayed for a spell.
At approximately 2150 hours the group exited the park and roamed through the neighborhood shining lights into residences and continued to commit property damage. At approximately 2220 the group moved eastbound on Pine from Broadway toward the East Precinct. The group numbering approximately 200 people gathered in front of the precinct and moved dumpsters into the roadway on 11th Ave and Pine. At approximately 2245 hours, while two blocks away from the crowd I heard a loud explosion. Shortly after the explosion I heard via radio that someone from the crowd threw a pyrotechnic device at the East precinct. Shortly after that, the suspect description was broadcast via radio. At approximately 2259 hours SPD bikes moved in to affect an arrest on the suspect but were unsuccessful. The crowd was moved back to 11th Ave and E Pine St. A skirmish line was briefly assembled. I briefly moved up to the line on foot to assist. At approximately 2312 hours officers moved back as ordered by Lt. Brooks leaving Pine St. clear of all officers and police vehicles. At approximately 2313 hours I heard intel via radio that Molotov cocktails were being prepared near the hot dog cart on the NE corner of 11th Ave and Pine St. At 2319 hours I heard a request for medics for an officer that was struck in the head by a baseball bat during the previous engagement.
At 2315 My SUV restaged two blocks away. Updates via radio stated that the crowd started a fire in the intersection of 11th Ave and E Pine St. At approximately 2336 hours the group again began moving eastbound toward the precinct and the fire in the intersection of 11th and Pine was growing. At 2343 hours, due to all the acts of vandalism, damage to the precinct, fires in the street and other factors, Capt. Matt Allen gave another dispersal order to the crowd. As the order was being broadcast, my vehicle moved closer to

support bicycle and foot officers. I exited the SUV and moved up to 11th and Pine where officers had cleared. Several items of garbage were on fire and the crowd had moved westbound on Pine st. I supported the bike line as we moved the crowd westbound on Pine. At approximately 2346 hours in the 1000 block of East Pine st I observed a white male/30's in a black hooded sweatshirt and gray jeans vigorously twirling in a fencing manner, the skeleton of an umbrella. This umbrella was missing the material and the metal splines were flailing as this male continued to wildly swing it around. He remained a few feet away from the police line but occasionally raised it in a threatening and taunting manner toward us. Fearing that he would attempt to assault officers with it in the future, and in an attempt to de-escalate future force by taking the dangerous item, I reached out to grab it but he pulled it back before I could gain control of the umbrella. Immediately after this, a female in all black clothing with what appeared to be a fire extinguisher canister sprayed an unknown substance at me, striking me in my face and on my clothing and gear. I now believe this substance was gray diluted latex paint. I was unable to acquire her as a target with my less lethal launcher as she was behind other rioters and quickly moved deeper into the crowd. I was unable to visually reacquire her.
As we periodically stopped moving the crowd, several rioters in the back of the crowd would throw rocks, glass bottles, and other various items at officers. During these movements I heard several blast balls deployed and occasionally saw blast balls mid-air toward the crowd. As we pushed on to Broadway the crowd moved northbound on Broadway. The police line continued to move the line as instructed by command staff. As the police line moved forward, officers shouted as trained, "move back!" At 2353 hours, as I assisted with moving the crowd on the northwest corner of Broadway and Pine, the suspect with the broken umbrella swung it overhand and struck a bicycle officer with it. I moved up an observed the suspect had fallen backwards but was still trying to retrieve the umbrella that the officer now had a hold of. I leaned forward and fired five shots toward his thighs from my FN303 at a distance of approximately five feet. Immediately after firing I observed the male let go of the umbrella and slide backwards away from the police line. He got back up to his feet and rejoined the crowd. Due to the nature of the crowd and the suspect fleeing into the crowd I was unable to safely make an arrest. I attempted to keep visual contact but he disappeared into the crowd. I believe that had he retained the broken metal umbrella he would attempt to assault more officers with it in the near future. The multiple sharp rigid splines could cause serious injury, especially to the face. This option of force achieved my intended purpose of stopping an immediate and future assault on officers. No medical aid on scene was possible and/or necessary. I applied no other force for the duration of the event. As we continued our movement of the crowd northbound on Broadway I continued to observe projectiles hurled at officers. As we took control of the intersection at Broadway and Denny, a pyrotechnic device was hurled from the crowd toward me and exploded. We continued to push westbound on Denny while the crowd continued to throw glass bottles, rocks, and mortars/pyrotechnics. As we reached Harvard and Denny a silver sedan driven southbound by a white female attempted to block officers with her vehicle. She drove it into the intersection toward the front of the police line. She was promptly arrested by other officers. I continued with the police line that turned southbound on Harvard. The crowd continued southbound on Harvard and continued to throw rocks, bottles, and other debris at officers. The crowd continued southbound past Pine st. The police line was ordered to break off and allow the crowd space. The crowd began several fires in the street, one at Pine and Boylston. After several minutes the crowd eventually began moving toward Cal Anderson park. The crowd continued to throw items at police as they moved into the park. End of statement.


ADDITIONAL INFORMATION:
Nothing to add at this time.

## Incident Location

- Broadway/E Pine St, Seattle, WA - Location of Occurrence: Demonstration

## Use of Force Specific Information

| | | |
|---|---|---|
| **Reason for Use of Force** | **Service Being Rendered** | |
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Darkness | 1 – 5 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |

| **Community Member's Build** | **Community Member's Height** |
|---|---|
| 176-225 pounds | 5'10" – 6'0" |

**Employee Assessment of Community Member Condition During Incident**
Unimpaired

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

### Unknown

DOB:    Race: Unknown   Ethnicity:    Gender: Male

#### Role
- Suspect

#### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

#### Charges against this Community Member
- Felony-Person Crime

## Involved Employees

### Police Officer Marshall Coolidge - Serial: 30020419 - Badge Number: 6666
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Special Operations Bureau B600/Metropolitan Section B620/Swat Unit B621/Swat - Day Squad 2 B621B/Swat - Day Squad 2 B621B

#### Video Footage: [No Response]

#### Role
- Secondary Officer

#### Force used by this employee against the community member
- FN303 - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| FN303 | Yes | 10, 12 | 1, 2, 3, 4, 5 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| No attachments |
|---|

## Assignment History

| Sent Dt | From | To |
| --- | --- | --- |

## Chain of Command History

| Routing #1 | |
| --- | --- |
| Sent From: | Police Officer Marshall Coolidge |
| Sent To: | Police Lieutenant Christine Robbin |
| CC: | (none) |
| Sent Date/Time: | 9/25/2020 4:17 PM |
| **Instructions from Police Officer Marshall Coolidge to Police Lieutenant Christine Robbin:** | |
| Please review for approval. | |
| **Comments/Response from Police Lieutenant Christine Robbin:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Marshall Coolidge - 30020419

EXHIBIT D(4)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

---

**Instructions:**

Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.

By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force.

---

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not
    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

EXHIBIT D(5)

EVENT/GO#: 2020-275135

DATE OF OCCURRENCE: 9/23/2020

STATEMENT OF: POLICE OFFICER G. HAY #8352

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Sgt. D. Benner #8309.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

  A. In-person supervisor screening: A/Sgt. D. Benner #8309 screened the incident in person on scene.

  B. I was assigned to a SPD mountain bike not equipped with ICV. Accordingly, this incident was not captured by ICV. This incident, however, was BWV recorded. I reviewed portions of my BWV prior to completing this statement.

---

**PRE-ARRIVAL DETAILS:**

I am Seattle Police Officer G. Hay #8352, assigned to 2nd Watch Patrol- North Precinct, John Relief Squad. I have been appointed as a Police Officer for the City of Seattle since February 18, 2016. Prior to becoming a sworn officer, I attended the 720-hour Basic Law Enforcement Academy. This included approximately 123 hours of defensive tactics training, which included control holds, handcuffing, takedowns, and OC spray training. The training included a practical application of OC to include having the OC spray applied to me. It also included approximately 18 hours of crisis training. After graduation from the Basic Law Enforcement Academy, I was assigned to the Seattle Police Department's Advanced Training Unit where I received approximately seven weeks of additional training. Included in the training was an additional approximately 40 hours of defensive tactics training, 16 hours of TASER training, and additional less lethal training. I finally completed multiple training rotations with experienced field training officers where my performance was evaluated and graded on a daily basis. After successfully completing field training, I was assigned to 2nd watch patrol, North Precinct. I have been assigned to the North Precinct since approximately August 1, 2016.


Following my permanent assignment to the North Precinct, I have volunteered for and attended the 40-hour Crisis Intervention Team training offered through the WSCJTC and King County. I have also volunteered for and attended the 40-hour basic patrol rifle school, the 80-hour Anti-Crime Team School, and the 40-hour Police Mountain Bike School. In SPD's Police Mountain Bike School, I was trained on crowd control tactics and movements. I also completed several annual crowd management trainings and participated in facilitating protests on numerous occasions on a Police Mountain Bike. Finally, I completed the 40-hour SPD Field Training Officer School and have been appointed as a Field Training Officer since October, 2019.

Since 5/29/2020, I was routinely temporarily assigned to the North Precinct bike squad in response to demonstrations, unlawful assemblies, and riots occurring within the City of Seattle. Most of the demonstrations targeted police as the source of the protest. I received numerous command briefings to include briefings from SPD's Arson and Bomb Squad. Of note, ABS indicated that explosives were more frequently located in possession of demonstrators. ABS command stated a belief that Molotov Cocktails would be more frequently employed against officers by protesters. I knew that officers were violently assaulted from the protesters and learned that violence to include firebombing increased.

On 9/23/2020, I was working in a uniformed capacity as a Police Mountain Bike Patrol Officer for the Seattle Police Department as unit 2J81. I was in the full Seattle PD authorized bicycle police uniform with Seattle Police patches on both shoulders, silver cloth badge, and "Police" markings on the rear of my SPD polo-shirt. I later transitioned to the bicycle authorized "hard gear" with Seattle Police patches on both shoulders and "POLICE" markings. I was also equipped with and operating my SPD issued BWV.

At approximately 2244 hours, I was assigned to the North Precinct Bicycle Team in response to demonstrations in the City of Seattle. I was assigned as the role of point along with Ofc. Keller #8371 and assigned the callsign as 2J81. This placed me as one of two officers at the front of the bike line.

The demonstrations surrounded a recent well-publicized Grand Jury decision in Louisville, Kentucky. Commanders requested officers remain in the area but preferably not interact with protesters in an attempt to not be the focal point of the protesters. By avoiding the protesters altogether, officers and commanders hoped to de-escalate any possible confrontation.

**ARRIVAL**:

While standing by in the parking garage of the East Precinct at 1519 12th Ave. I observed several protesters gathered outside the large roll up door facing Pine St. The protesters were shining lights at officers' eyes inside the garage. The protesters were yelling at officers and I learned the protesters cut cords to surveillance cameras at the East Precinct. Other officers and I did not interact with the protesters in an attempt to avoid confrontation and de-escalate any violence.

Nonetheless, and unexpectedly, an unknown protester threw a mortar-style commercial firework at the gate to the garage. The gate was made of metal horizontal slats with significant spacing between each slat. The gate allowed protesters to see inside the garage and likewise allowed officers to see outside the garage. Further, the gate was not solid to prevent items from being passed through it. I observed a bright combustion and heard a large explosion at the gate. I observed a piece of flaming suspected chunk of mortar penetrate nearly the entire garage. The mortar shell nearly struck Ofc. Keller who was seated on a cooler and in no way

interacting with the crowd. The explosion in the enclosed garage was jarring and briefly affected my hearing causing my ears to pound.

I learned that plainclothes detectives observed the suspect who threw the firework into the crowd. In my training, experience, and during the command briefings, I learned of the importance of arresting individual bad actors in a group setting. I know that violent individual protesters can often easily corrupt an otherwise nonviolent group. The specific agitators can create a situation where otherwise non-violent subjects are empowered by the group anonymity resulting in a mob mentality. The group dressed similar and used coordinated movements, hand signals, planning, and training. This further re-enforced the group dynamic. As such, I know it is important to identify, isolate, and employ consequence to individual actors to dissuade problematic group actions.

As a result of the detectives locating the suspect and in an attempt to quickly dissuade further violent group actions, officers moved in and attempted to arrest the individual suspect.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

LEGAL AUTHORITY: The incident and subsequent use of force occurred on a city street open to the public.

LAWFUL PURPOSE: I had probable cause to arrest the unknown suspects for felony assault.

**CONTACT WITH SUBJECT**:

I approached the crowd in a coordinated movement with the bicycle squad to defend officers attempting to arrest the suspect. After moving toward the crowd and with patrol cars supporting the rear of officers, command determined officers retreat back to the East Precinct area. This was, again, an attempt to de-escalate the crowd and prevent the crowd from attacking officers.

While moving back, it was clear the patrol cars would not be protected from the crowd. In previous demonstrations, protesters committed several acts of arson on patrol cars. Additionally, protesters attempted other forms of vandalism and attempted arson on other occasions. In one of the instances, a protester shot a patrol car with a rifle. It was clear to me that the patrol cars and officers inside the cars would need to be protected from the crowd. While this was happening, an unknown protester in the crowd threw a glass bottle at officers. The bottle shattered very close to me and the line of officers around and behind me.

I re-approached the crowd to provide security for the officers and their vehicles. While riding toward the crowd, I observed a metal garbage can lid flung at the line of officers. I remained

static on the line and was nearly struck with another glass bottle that was flung at high speed toward my head and face. The speed of the bottle indicated to me that it was launched potentially by an improvised sling shot. The bottle shattered behind me. Meanwhile, I observed another possible bottle thrown from a different portion of the crowd at officers.

The crowd remained very agitated and positioned umbrellas toward officers. Subjects in the crowd yelled at officers, shined lights in our eyes, and increased their aggressive behavior. I grew concerned for several reasons. Of note, the crowd already demonstrated its willingness to assault officers. It also outnumbered officers. Further, the umbrellas presented an additional risk to officers. Of note, I knew protesters to use the umbrellas to conceal further criminal activity from officers. Additionally, the umbrellas themselves were often contrived by protesters into weapons with the point and metal arms being used against officers. Finally, I knew from plainclothes elements in the crowd that protesters repeatedly referenced "cooking", which I knew to reference making and throwing Molotov cocktails. Finally, the flashlights presented further opportunity to for the protesters to conceal criminal activity behind the shield of light while diminishing my ability to see. I grew concerned the crowd could potentially be "cooking" Molotov cocktails behind the umbrellas and shields of light.

Officers remained static on the line while allowing officers in their patrol cars an ability to escape. The crowd counted down and, in unison, moved several steps forward on the line of officers. The umbrellas led the line of protesters encroaching on officers. I observed another bottle launched from the rear of the group over officers' heads and toward police. I heard it shatter behind me.

Upon clearing the street of patrol vehicles, I returned to the area of the East Precinct. This was intended to create additional distance from the protesters and hopefully mitigate any further confrontation from the already violent crowd. After moving nearly one block away from the crowd, members of the group threw items in the street. I recognized this as a repeated tactic of the protesters. For starters, the blocking of streets prevented movement of police vehicles, bicycles, and officers into a hostile crowd. It also demonstrated a potential pre-cursor to arson as similar items were previously lit on fire in the street.

Despite these somewhat obvious precursors to violence, officers moved out of sight of the protesters in a further attempt to mitigate any violence.

Officers remained out of sight of the protesters until the protesters set the items in the street on fire. I learned via radio that the fires were significant. This presented several challenges. Of note, it further blocked the roadway from emergency responders (including the Fire Department only a couple blocks away). It further presented a danger to officers, patrol vehicles, and bicycles in navigating the intersection and crowd. Finally, it placed the public at undue risk as the crowd continued feeding the fire, which was adjacent to an unoccupied vehicle.

As a result of the assaults and arson, SPD command issued several dispersal orders via PA to the protesters. Despite the repeated dispersal orders requiring protesters to disperse from the area, the crowd remained at the intersection of 11th and Pine continuing to feed the fire.

I joined additional bicycle officers in performing SPD trained cross-bow line formations. The lines are designed to push crowds back and to create additional distance between agitators and officers. While performing the cross-bow line formations, officers yelled for protesters to "get back!" Officers moved in the area in an attempt to secure the area for fire department personnel to respond to the fire.

Upon approaching the group, I learned the crowd began throwing items at officers. I heard officers yell that rocks were being thrown at them from the crowd. I observed unknown projectiles launched from the crowd at officers. However, officers still needed to secure the area for SFD.

I moved in unison through a line formation while yelling "move back!" in unison with other officers. I was the point officer in my approach with Ofc. Keller as the other point officer to my left. As there was a protester-created roadblock on fire in the street, I had to navigate my bicycle on the curb around the roadblock. While doing so, I observed numerous items launched at high speed at officers. Included were chunks of concrete, unidentified explosives, rocks, glass bottles, green lasers, and other unknown blunt objects. I was struck by multiple items.

**DE-ESCALATION**:

De-escalation occurred from the moment of arrival. Of note, officers attempted to not engage with the protesters at all. This was a break from previous tactics of forming lines where contact with the crowd was inherently increased.

Additionally, once a member of the crowd threw a commercial grade mortar inside the East Precinct, officers only made a targeted attempt to locate and arrest the specific suspect. After the attempt, officers, again, completely disengaged from the crowd in another attempt at de-escalation.

After the crowd lit a sizable roadblock on fire, officers needed to secure the scene for SFD. Prior to entering the crowd, SPD command issued multiple PA dispersal orders in an attempt to de-escalate any violence.

When it was clear other attempts at de-escalation were insufficient, I joined a large number of officers performing coordinated movements, which was an attempt to discourage violence against police. In my training and experience, I know having additional officers with coordinated movements can create a strong officer presence often mitigating the need for using force.

While performing crowd movements, I positioned myself behind bicycles in an attempt to provide additional distance and shielding. Utilizing distance and shielding often mitigate the need for using force and are important facets of SPD training.

Finally, numerous officers and I also employed verbal commands of "move back" while several other officers issued the same command in unison. This was a final attempt to gain voluntary compliance. Additional de-escalation was not safe or feasible as the suspects and numerous subjects in the crowd were actively assaulting officers.

**DECISIONS MADE**:

After seeing the male suspect arm himself with a large traffic cone and throw it at me, I determined probable cause existed to arrest the suspect for felony assault on a police officer.

After seeing the female suspect spray an unknown liquid on officers, I determined probable cause existed to arrest her for felony assault on a police officer.

I determined probable cause also existed for both for refusal to disperse.

**THREAT ASSESSMENT**:

I determined the unknown suspects and the extreme level of violence within the crowd presented a significant threat to myself and other officers. It should be noted that I have been assigned crowd control nearly since the inception of the unrest. I was also on a bicycle and the point officer for the majority of events. Consequently, I was routinely the front officer entering a hostile crowd, which led to added exposure to violence from the crowd. However, I had never personally been assaulted so many times in one event. I was struck in the head (protected by my helmet), struck in my chest, struck in my leg, and struck on my foot. I later had significant bruising in my leg. All of these assaults occurred within a short time frame while assigned to the evening's demonstrations.

I determined the suspects presented a danger to officers for several reasons. Of note, the suspects remained on scene despite several verbal and PA warnings. The warnings were clear that subjects remaining were at risk of arrest and chemical agents. This warning would likely

be sufficient for any protester not wishing to engage in violence or unnecessarily put themselves at risk.

Not only did the suspects remain on scene, but the suspects also actively armed themselves with objects to assault officers.

Finally, I know from my training and experience that unusually violent individual protesters can often easily corrupt an otherwise nonviolent group. The specific agitators can create a situation where otherwise non-violent subjects are empowered by the group anonymity resulting in a mob mentality. As such, I know it is important to identify, isolate, and employ consequence to individual actors to dissuade group actions. Therefore, I determined the suspects presented a large threat to officers not only in their actions but also in their potential to continue to corrupt the already violent crowd.

**FORCE USED**:

While riding into the crowd, I observed numerous items thrown at me and other officers. I was personally struck multiple times with multiple unknown blunt objects. The objects were thrown from many directions within the crowd and at a similar time. This suggested to me that numerous subjects within the crowd were actively engaged in assaulting officers. I was also struck with a green laser shined at me from the crowd.

It was difficult to focus on riding my bicycle as I was attempting to move out of the way of the numerous items being launched from the crowd. As such, while looking on the horizon for numerous simultaneous projectiles, I was unable to navigate a curb and left my bicycle behind.

While approaching the crowd, I observed an unknown suspect, possibly a WM, thin to medium build, approximately 5'8-6' wearing dark clothing. The male armed himself with a large traffic cone. He winded up and threw the traffic cone at me. I then directed a short, continuous burst of my department issued OC spray at the male's face. I was unable to provide a verbal warning as the suspect was already in the process of assaulting officers. After the assault and my application of OC spray, the male fled into the crowd. I discontinued the application of OC after I determined he no longer presented a threat to me and fled the immediate area.

I observed the suspect flee following the application of the OC spray, which demonstrated to me that the application of force was successful. I was, however, unable to determine if the OC spray ever struck the suspect due to the distance.

Soon after, I observed an unknown suspect, possibly a WF, thin build, approximately 5'5" with dark clothing. She was carrying a large, possibly silver fire extinguisher with apparently

rubber hose. She was spraying an unknown substance from the fire extinguisher at officers. This caused me serious concern for several reasons. First, the metal fire extinguisher could be used as a blunt weapon against officers as I had previously seen protesters demonstrate. Additionally, I know from my training and experience that the contents of bottles are unknown and can be hazardous for officers. Of note, the contents could include bodily fluids, bleach, and accelerants (all of which I knew demonstrators to use against officers). The possibility of accelerants caused me fear as we were standing in front of a large fire.

The female suspect was not retreating with members of the crowd and instead approaching officers while spraying the unknown liquid from the fire extinguisher. I then directed a short, continuous burst of OC spray directed at the subject's face. I was unable to provide a verbal warning as the subject was already in the process of assaulting officers. While applying the spray, the suspect quickly turned and retreated on foot. I stopped the burst of spray following the assault and after determining the suspect did not present a continued imminent risk.

I observed the suspect flee following the application of the OC spray, which demonstrated to me that the application of force was successful. I was, however, unable to determine if the OC spray ever struck the suspect due to the distance.

**MEDICAL AID AND EVALUATION**:

Following the application of OC spray, both suspects fled the immediate area. I was unable to re-locate either suspect and arrest either suspect.

Ultimately, I determined it was not safe and not feasible for me to break away from officers to arrest or render aid to the suspect. I know from my training and experience that it is not trained to enter an unruly, assaultive crowd until first coordinating with additional resources and finding a safe approach to the individual. Because this was not possible, I was unable to arrest and render aid to either subject.

**RESOLUTION**:

I reported the use of force in person and on scene to A/Sgt. D. Benner #8309. I reported the use of force as soon as feasible when the situation was relatively stabilized.

**ADDITIONAL INFORMATION**:

Due to repeated assignments to demonstrations and other duties, I was granted an extension on completing the use of force by Lt. C. Robbin.

EXHIBIT D(6)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, why not – Must be explained if no BWV or ICV

    C.  Note if you reviewed and BWV, ICV, or other video prior to statement.

**Pre-Arrival:**

    A.  Your relevant training/experience (brief biography)

    B.  Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C.  Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?

**Arrival:**

    A.  Observations:
        i.  People / other officers on scene.  Activity occurring, dangers, citizens exposed…

    ii.   Buildings, vehicles
    iii.  Environmental factors: weather, lighting
B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):
    i.   Public area
    ii.   Consent
    iii.  Exigency
    iv.  Warrant
    v.   Community caretaking
B.  Lawful Purpose (Explain in Detail):
    i.   Social Contact
    ii.   Terry Stop
    iii.  Probable Cause for arrest
    iv.  Community Caretaking

    **Note:** Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

A.  How did you make your presence and authority clear?
    i.   Verbal identification, commands or instructions
    ii.   Did the subject say or do anything that indicated he/she knew you were the police?
B.  Contact with involved subject(s)
    i.   Observed Details
       - Physical/verbal reaction to officer
       - Tone of voice / statements made
       - Body posture / movement
       - Subjects size / strength vs. officer
       - Intoxication / mental state
    ii.   Information obtained from each subject
C.  Was there a frisk of any subject?
    i.   Reasons to believe subject was armed and currently dangerous
    ii.   Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

A. Communication
   i. Verbal persuasion
   ii. Advisements and warnings (including Taser spark tests and warnings)
   iii. Clear instructions
   iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
   v. Avoiding language, such as taunting or insults, that could escalate the incident
B. Time, Distance, Shielding
   i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
   ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
   iii. Did you utilize cover and concealment for tactical advantage
C. If De-escalation was not safe or feasible, explain why not


**Decision Made:**

A. Overall summary of information gained from investigation
B. Decision based on information:
   i. Warning
   ii. Citation
   iii. Documentation
   iv. Arrest
C. Include any Tactical Decisions and Scene Control you employed


**Threat Assessment:**

A. Did the subject pose a threat to you, another person, or another officer?
B. Describe the threat in detail or why you believed there was a threat.


**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

A. Words, Actions or Threat posed by subject that necessitated the use of force:
   i. Attempts to flee
   ii. Fight
   iii. Resist arrest
B. De-escalation and continued attempts and the effect on the subject

        i.     Verbal de-escalation
- Warnings/commands to subject.
       ii.    Physical de-escalation
     iii.   If de-escalation was not feasible, you must explain why not

C. Lawful purpose of the force used:
       i.     Gain control
       ii.    Protect yourself or others from a threat of immediate harm
     iii.   Stop a potential deadly threat

D. Explain your decision to use a technique or Less Lethal Device, based on feasible options
       i.     Proportionality of force
       ii.    How did the totality of circumstances affect the force used?
     iii.   "No reasonably effective alternative…."

E. Explain effectiveness or lack of effectiveness of employed techniques
       i.     Was this a trained technique? Where were you instructed in this technique?
       ii.    Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
      • Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
     iii.   When and How was your force modulated?

F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Medical Aid and Evaluation:**

A. Injuries/Medical Aid
       i.     Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
       ii.    Medical aid (who provided and where provided)
     iii.   Refusal of medical aid by subject
     iv.   Refusal to accept at jail - disposition
      v.    Injuries to yourself

**Resolution:**

A. Search
       i.     Items recovered

B. Transport and processing of subject:
       i.     Use of ICV
       ii.    Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.


**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**


**EVENT/GO#:2020-275135**

**DATE OF OCCURRENCE: 9/24/2020**

**STATEMENT OF: OFC. KELLER #8371**


This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. Robbin #5191.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: Yes, by A/Sgt. Benner.
    B.  ICV and/or BWV recorded: BWV, yes.


**PRE-ARRIVAL DETAILS:**

I am Seattle Police Officer J. Keller #8371, assigned to 2nd Watch Patrol- North Precinct. I have been appointed as a Police Officer for the City of Seattle since February 18, 2016. Prior to becoming a sworn officer, I attended the 720-hour Basic Law Enforcement Academy. This included approximately 123 hours of defensive tactics training, which includes control holds and handcuffing. It also included approximately 18 hours of crisis training. After graduation from the Basic Law Enforcement Academy, I was assigned to the Seattle Police Department's Advanced Training Unit where I received approximately seven weeks of additional training. Included in the training was an additional approximately 40 hours of defensive tactics training, and 16 hours of TASER training. After the training, I have been equipped with a SPD issued TASER and carry it on my person. I also completed SPD's 8-hour advanced crisis intervention training both in my post-academy training and additional in-service training focusing on both crisis intervention and less lethal options and applications. I was then assigned to the South and North Precincts where I completed four training rotations with experienced field training officers where my performance was evaluated and graded. After successfully completing field training, I was assigned to 2nd watch patrol, North Precinct. I have been assigned to the North Precinct since approximately August 2016. I am currently

assigned to 2nd Watch, John Sector Relief and work a two-officer patrol unit with Officer G. Hay #8352.

Following my permanent assignment to the North Precinct, I have volunteered for and attended the 40-hour Crisis Intervention Team training offered through the WSCJTC. I have also volunteered for and attended a 40-hour basic patrol rifle class. I have further volunteered for and attended SPD's 16-hour Advanced Roadside Impaired Driving Enforcement (ARIDE) class. I have also completed several annual in-service trainings through the Seattle Police Department, which has included additional defensive tactics training, less lethal training, and additional crisis training. Additionally, I attended 40-hr bike training to include crowd management and I receive yearly crowd management training.

On 9/23/2020 throughout the duration of the night, I was working uniform patrol for the City of Seattle as a bicycle officer. I was assigned to crowed management during the protests. I was wearing a full police uniform with duty belt, Seattle Police patches on both arms, and a silver, cloth badge affixed to my chest as well as "Police" patches on the front and back of my uniform. I was also equipped with and operating my BWV.

During the protest, my primary function was crowd management to protect the civilians right to protest and ensure the safety of protestors, civilians and officers. During the briefing, prior to the protests, I received SPD's rules of engagement as well as the commander's intent.

Officers main objective was to protect the first amendment right of the civilians to protest in a safe manner. Officers were directed to only intervene if the protest becomes violent and unsafe for both civilians, officers and at the risk of significant property damage.

ARRIVAL:

On 9/23/2020, I was working uniform patrol as a bicycle officer because a large number of protestors had gathered and were protesting around the downtown and Capitol Hill areas. I was assigned as a crowd control/rapid response unit if the protest were to become unsafe to protect the safety of civilians, officers and against significant property damage.  My unit was tasked with monitoring the crowd from a safe distance.

At this time, the protestors size was approximately 150-200 assaultive and destructive individuals. The protestors were extremely agitated, energized and chanting at police as they marched. The protestors yelled at the police things to the effect of "fuck the police!", "All cops are bastards (ACAB)" among various other explicit statements as well as telling officers they wish harm upon them and their families. I also observed various graffiti messages on business and sidewalks reading something to the effect of "ACAB, Kill cops, Murders, Pigs, Fuck 12, Fuck SPD, etc.".

Many of the protestors had items that could be used as improvised weapons on their person to include skateboards, rocks, signs with large sticks attached, road cones, plastic/glass bottles, fireworks, full soda cans, lasers, screws, caltrops, etc.

Throughout the night on multiple occasions the crowd turned violent, assaulting officers and doing significant property damage as they marched through the city. Officers were assaulted with rocks, chemicals, explosives and one officer had been ambushed and hit in the head/neck with a baseball bat by a protestor cracking his helmet. When the protestors turned violent, they would work in unison with each other to stop officers from identifying them. They would group together tighter, put masks on, erect umbrellas and shields to help conceal their criminal activities and identities.

While on a break at the East Precinct I was the victim of assault via an explosive thrown at me and other officers while in the sally port. I was sitting down when protestors decided to walk up to the entrance of the sally port and yell at officers. The sally port door is easy to see through because it is comprised of metal slats approx. 1-2 inches apart spanning the length and width of the door.  The protestors began to yell at officers and shine their flashlights into the door to conceal their actions. During this the precinct surveillance cameras were disabled by the protestors via cutting the wires. Shortly after the disabling the wires one of the protestors lit and threw and explosive at officers. The explosive landed near the corner of the door and exploded. When it exploded, I got up and began to run away from the area. Pieces of the device flew deep into the sally port barley missing me. I was lucky to not be stuck. The explosion was so loud that it made my ears ring and was hard of hearing in my right ear for a significant time after. Multiple officers sustained ear injuries due to the explosion.

I was also assaulted with rocks, one hitting me in the head shattering the flashlight on my helmet and the other hitting me in the right shoulder. The protestors would throw rocks and items at officers while concealed in the darkness and within the crowd making if extremely hard to identify specific individuals. The protestors also intentionally dressed in similar clothing, usually black, to blend in with each other making it much harder for officers to identify individuals.

Throughout the night intel updated officers the crowd plans to attack officers via turning around, confronting and "messing up SPD".  When intel updated this, I observed the protestors begin to "bloc up", meaning conceal their identity in preparation for property damage or to confront officers. This historically was an indication the protestors were going to begin to engage in criminal activity, usually assault officers or create significant property destruction.

The majority the crowd dressed in similar clothing to make it harder for officers to identify them when committing criminal activity. Prior to assaults or property damage the crowd would cover their faces with masks, respirator, hoodies as well as conceal their actions via putting up umbrellas and shields to keep officers from seeing what they are doing. The protestors also had multiple vehicles who were blocking officers view, concealing criminal

activity. The vehicles were also used to store shields and weapons for the protestors, as well as used to illegally block traffic. Whenever the protestors would start to damage property or assault officers, they would work in unison giving hand signals to tighten up the group or make a movement together. Many of the protestors had radios and would communicate officers' movements and actions.

Intel advised officers the protestors were talking about "cooking", implying they were beginning to make Molotov cocktails. At one point, intel updated they observed what appeared to be Starbucks bottles being packed with packing peanuts and gasoline, to make napalm Molotov cocktails.

During the duration of the protest thousands of dollars property damage was done by the protestors including shattering multiple business widows and spray-painting graffiti on businesses.

As officers followed the group the protestors would attempt to barricade the road by moving anything, they could into the road blocking officers movement. They moved dumpsters, pallets, road signs and cones into the street. In some areas they would light fires in the middle of the street creating an extremely unsafe environment for both the public and officers alike. Protestors would also throw screws and improvised caltrops on the ground in an attempt to flatten bike officers' tires.

At approx. 2340hrs Officers were advised we are going to do a crowd movement to back the crowd away from the fire they started in the middle of the street. We were advised to move the crowd WB on E Pine st. During the movement the crowed continued to assault officer via throwing projectiles. In the 1000BLK of E Pine St I observed an unknown female holding a large silver what appeared to be a fire extinguisher.

LEGAL AUTHORITY & LAWFUL PURPOSE:

Legal authority:  This incident and use of force occurred on a city street open to the public.

Lawful Purpose: Probable cause existed to arrest the unknown suspect for assault on a n officer.

CONTACT WITH SUBJECT:

While conducting a crowd movement to push the protestors back away from the barricaded street and fire they started I approached the line. When on the bike line I observed the suspect with a large silver what appeared to be a fire extinguisher. She lifted the hose and

began spraying an unknown grey chemical from it at the bike line of officers.  I extended my OC cannister at the suspect and deployed the OC spray shortly to stop the assault.

DE-ESCALATION:  De-escalation occurred throughout the day of protest as well as when the crowed started to become violent A bike fence line was placed in between protestors and officers to create both a physical and clear visual barrier. A large number of officers stood on the line which often discourages assaults and mitigates the need to use force.

On multiple occasions a commander would get on the PA and advise the crowd not to throw items, assault officers, or damage property. Each time the commander got on the PA he would advise the protestors they are subject to the use of less lethal munitions to safely move the crowd if they do not disperse. There are also subject the arrest for criminal mischief, fail to disperse, etc. When contact was not needed officers would maintain distance from the protestors and allow them to exercise there right to protest.

 Throughout the night I along with many other officers gave verbal commands to the crowd to "move back". Additional de-escalation was not safe or feasible as a suspect appeared to be attempting to conceal himself behind the metro bus to ambush officers.

DECISIONS MADE: I observed the suspect with a large silver what appeared to be a fire extinguisher. She lifted the hose and began spraying an unknown grey chemical from it at the mobile fence line, assaulting officers.  I extended my OC cannister at the suspect and deployed the OC spray shortly to stop the assault.

THREAT ASSESSMENT: The large crowd of people easily outnumbered the officers. The crowd was screaming while making threating hand gestures and verbal threats to officers as well as their families. In the previous protests as well as this one the protestors had assaulted officers, caused significant property damage and continued to become violent. The crowd assaulted officers via throwing projectiles to include rocks, signs, caltrops, screws and one officer was hit with a baseball had in the back of the head. The crowed had also thrown multiple improvised explosives at officers throughout the night. The suspect was spraying officers with an unknown chemical.

FORCE USED: I quickly deployed my OC for approximately 1 second at the suspect assaulting officers. The suspect disappeared into the crowd shortly after.

**MEDICAL AID AND EVALUATION**:  The suspect ran away from officers after the OC deployment. It was unsafe for me to chase her due to the fact there was not enough resources to go into the violent crowd and see if she would like medical attention. She never requested medical attention from police, rejoined the crowd and I lost site of the suspect but the crowd continued to throw projectiles at officers and yell expletives.

**RESOLUTION**: After preforming a crowd movement

**ADDITIONAL INFORMATION**:

EXHIBIT D(7)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Nathan Lemberg - 30038879

## Incident Details

| **Date Received** | **Date of Occurrence** | **Time of Occurrence** |
|---|---|---|
| 9/24/2020 | 9/23/2020 | 22:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58393 | 2020-275135 | 2020UOF-1512 |
| **Date/Time Entered** | | |
| 9/24/2020 02:27 | | |

## Incident Summary

EVENT/GO#: 20-275135
DATE OF OCCURRENCE: 09/23/20
STATEMENT OF: N. LEMBERG #7456
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Sgt Benner. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: A/Sgt Benner
B. ICV/BWV recorded: Yes, BWV


DETAILED NARRATIVE:

PRE-ARRIVAL DETAILS:
I have been a police officer for over 12 years. I have worked patrol and bikes in North Precinct for approximately 10 years of that time. I am currently assigned to the North Precinct DOC/NCI unit. I have received annual training in crowd management and all required training for use of OC spray. I am CART trained. I have also completed required training for the use of a taser and shotgun. I have completed the 40-hour CIT course and am ACT trained.
Over the course of my career, particularly while on bikes, I have worked in dozens of protests as a crowd management element while allowing protesters to exercise their 1st Amendment rights. The vast majority of these protests have remained peaceful. The direction of command staff for years has had a consistent message: We will support the constitutional rights of protesters, however, any criminal acts of violence or significant property damage will not be accepted. When possible, arrests will be made in those instances. Furthermore, officers have consistently been advised that force, including less-lethal munitions (OC spray, blast balls), may be used without authorization from the chain of command to stop crimes of violence or significant property damage. Use of these munitions as a crowd control measure may only be used by officers at the direction of the incident commander.
While I have been a participate in myriad protests, I have rarely used force during them, and to my knowledge had not previously used blast balls or OC spray during protests until the events beginning in late May.
Over the last several weeks there have been ongoing protests and riots over the death of George Floyd in Minneapolis, MN. These protests and riots have been ongoing throughout the country and have been particularly destructive and violent. I know that many officers have been injured, and some killed. At least one precinct was destroyed by arson.
Specifically, in Seattle, I saw news coverage of massive rioting and looting in the downtown corridor on riots starting May 30th. I observed several police vehicles and buildings burning with no police or fire personnel in sight for large periods of time. I was aware several police rifles were stolen from vehicles during this period. I heard from officers working at this time that the situation was very chaotic and dangerous. Officers consistently had rocks, bottles, and other projectiles thrown at them during this riot. Several were struck. Ingredients for Molotov cocktails was recovered from a backpack. Due to the dangerous and chaotic situation CS gas was dispensed by police, including Mutual Aid partners, to quell the violence.
As a result of this unprecedented riot the mayor invoked an emergency order prohibiting weapons in the downtown core. This included any items which could reasonably be used as a weapon: firearms, heavy sticks, knives, rocks, flares, etc.
Furthermore, the mayor also declared a state of Civil Emergency, invoking a curfew starting at 5pm and ending at 5am. (This curfew was extended for Sunday, Monday and Tuesday). Hundreds of National Guard troops and Mutual Aid from surrounding agencies were called in to assist with quelling the violence. This all

during Governor Inslee's "Stay at Home" proclamation due to the COVID-19 pandemic which suspended permitted public events. Suffice it to say this was unprecedented times.

I worked on Sunday, May 31st, 2020 and assisted with crowd management with North ACT. At the roll call prior to deploying I was provided additional training on the use of CS gas. CS gas was previously reserved for use only by SWAT but due to an emergency exemption by Chief Best, all CART trained officers were provided this capability as well. I was provided CS canisters for use. This was just another example of the unprecedented heightened level of emergency the city was experiencing.

During my deployment on May 31st, while on a police line at 5th/Pine St, I observed several projectiles thrown at me and the officers around me. One item, a bottle, struck an officer two down from me. A glass bottle shattered on a National Guard soldier behind me. A third projectile went over my head. These projectiles came from over a line of hundreds of peaceful protesters and the culprit could not be seen. As such, I determined it was not appropriate or possible for me to dispense less-lethal munitions to address the threat and counter the assaults. Several dispersal orders were issued by incident command and I eventually assisted with removing a crowd from Westlake Park. I did not use reportable force during this incident.

Later that night officers reported their patrol cars being struck with rocks 8 Ave/Westlake. It was believed at that time the suspect was using some type of sling shot.

I worked on June 1st, 2020, at a protest turned riot near the East Precinct. Several items, to include glass bottles, rocks and fireworks were launched at me during that time. After this riot I learned that an officer in my squad had her foot shattered from a boulder launched at officers. Another person in my squad was hit in the head with an unknown object. He believes the injury would have been fatal if not for wearing his helmet. I also learned that a SWAT officer almost lost vision in an eye due to being struck in the face mask from a high- speed projectile.

Due to the size, speed and distance with which large rocks were being launched at officers it was believed an apparatus similar to a large sling was being employed.

On June 1st, 2020 SPD initiated a Stage 4 mobilization due to the protests. This entailed a "Blue/Gold" schedule. This schedule involved officers working 12-hour shifts with no scheduled furloughs. Over the next several days I worked several shifts over 12 hours as we attempted to protect the East precinct. I used force on some of these days. Projectiles continued to be thrown at officers.

On June 8th SPD decided to abandon East Precinct due to political pressure surrounding continued use of force by officers to defend themselves. Protesters then moved into the area around the boarded-up precinct and established a "Capitol Hill Autonomous Zone" (CHAZ). The group occupying this zone fortified barricades on the streets around East Precinct, limiting access. This zone gathered national attention over the next two weeks. Crime became rife, particularly at night, resulting in two homicides among several other reported crimes.

On July 1st SPD retook this area and re-occupied East Precinct. A robust fence was placed around the precinct to reduce the success of future attacks.

Over the next several weeks protests continued consistently, some turning violent.

On July 19th a group identified as "Black Block" (an anarchist group) used an "ICE" march as cover to cause extensive property damage to government buildings and businesses. Officers were assaulted when objects, including commercial grade fireworks, were thrown at them. One officer was hospitalized when shrapnel was embedded in his neck from an explosive device. The East and West precincts were damaged. An attempt was made to burn the East precinct down.

On July 22nd I worked an event during which rioters cause massive property destruction during which fires were set inside several Capitol Hill businesses. Due to the high likelihood of injury to officers if attempts were made to disrupt the riot the decision was made to only intervene for life-safety emergencies (i.e. arson to an occupied structure).

On July 25th I worked a protest during which dozens of officers were injured and YSC construction trailers were burned as a result of arson.

On August 16th I was aware of a riot in Seattle in which officers were injured with projectiles, to include rocks, bottles and fireworks.

On August 24th I was aware of an incident during a riot at East precinct where an attempt was made to light the precinct on fire with officers inside. Quickrete was used to attempt to seal a door from the outside limiting officers' ability to get to safety.

On August 24th Molotov cocktails were used to attempt to burn down the building where SPOG is located.

On September 7th a group marched to SPOG and Molotov cocktails were recovered. There were several assaults on officers during this event.

On September 23rd, SPD was preparing for protests as a result of the return of an indictment in the Breonna Taylor death in Louisville, KY. I was asked by A/Sgt Benner if I would assist North bikes with a scheduled protest. He was concerned with the limited number of CART trained officers in the squad. I agreed to assist.

BRIEFING

Today at roll call at West precinct I was briefed on the planned events. Based on intelligence gathered and disseminated in the IAP it was known two "Justice for Breonna Taylor" protest events were planned in Cal Anderson Park and Westlake Park.

The Incident Commander was Captain Allen. Captain Allen stated his intent was to "facilitate free speech and assembly whenever possible, while protecting persons and property." His expectation was that those who commit acts of violence of significant property damage will be identified, isolated and arrested. Acts of violence or significant property damage would not be allowed. The deployment plan of the day was to monitor the events at a distance, when feasible. Any attempt to move the crowd as a whole would be at the direction of the IC and dispersal orders will be given, when feasible.

Use of force rules of engagement stated officers may use objectively reasonable, necessary and proportional

force to make an arrest. Officers may use blast balls/OC "when reasonable, necessary and proportional and targeted action to protect against a specific imminent threat of physical harm to you or identifiable others or to respond to specific acts of violence or significant destruction of property".

ARRIVAL: North bikes was initially tasked with staging in the area of West precinct until needed. We then transitioned to East precinct and staged until further notice. A group at Cal Anderson park, of about 200 people, decided to march soon after 2000 hours. The following are some radio broadcasts which occurred during this event and were updated to the call log. These broadcasts informed my decision making during this incident:

-20:29 CA group throwing rocks at Amazon Go store
-20:30 Amazon Go store tagged - Main door and one window broken at Starbucks
-20:38 Protesters planning a counter-attack on SPD and are preparing for arrests - waiting until they arrive at 5 AV/Madison
-20:42 Splinter group planning NB turn on 4 AV/Madison then double-back to attack SPD
-20:45 Wells Fargo windows are being broken
-20:46 Starbucks windows are being broken at 4/Seneca
-20:46 Bikes deploying - dispersal order given ***This is the first known dispersal order given by the IC***
-20:50 Car21 - Multiple dispersal orders given when group was just NB of 4/Spring due to property damage
-20:52 Officer taking rocks
-20:54 Officers taking more rocks
-21:02 Bottle thrown at Officers at 6/University - did not hit anyone
-21:17 Group is planning to turn around and "F the Police up severely"
-21:21 Protesters talking about "doing some cooking" - SPD will lead with munitions if that happens

The protest group marched back to Cal Anderson parked and regrouped for a period of time. After marching again around 2200 hours they arrived on the north side of East precinct around 2230 hours.

From my observations of the group I saw many in the group were dressed in all black clothing. Many were wearing gas masks. From my experience I know this type of dress is used to blend in to make identification difficult by police when criminal acts are committed. The wearing of gas masks is indicative of persons who are preparing for confrontation with police where OC would be deployed.

Throughout the evening I heard several anti-police and otherwise antagonistic statements. These included chants like "All cops are bastards!" and "Go home Nazis!".

LEGAL AUTHORITY & LAWFUL PURPOSE: Blast Ball #1-#6
Legal Authority: This is a public street.
Lawful Purpose: Responding to specific act of violence (Glass bottles, rocks and fireworks thrown at police line). Protect myself and other officers from specific imminent threat of physical harm (Glass bottles, rocks and fireworks thrown at police line).

DE-ESCALATION:
Officers initially monitored the protests from a distance until significant property damage required a response by police. Creating distance is a tenet of de-escalation.
From the initial dispersal order at approximately 20:46 hours, Captain Allen continued to issue dispersal orders, ad nauseam, throughout the evening. This order advised protesters to leave the area, provided directions to leave the area and advised they may be submitted to use of force if they did not leave the area. Communication, while giving time for compliance, is an important de-escalation technique. Despite the repeated dispersal orders there appeared to be very limited compliance.
I gave several verbal orders for protesters not leaving the area to "Move Back!" This had no apparent effect.
Blast Balls 1-6:
At the time I used force, de-escalation was no longer safe or feasible. This was determined based on the following:
-Damage to businesses had been reported in the area, prompting a dispersal order.
-Despite the dispersal order being given dozens of times over a period of hours the group was not complying and was not dispersing
-There were several reports of rocks, bottles and fireworks being thrown at officers. These items were thrown at me and I saw them landing around me. Glass bottles were breaking around me and sailing over my head. Officers in my squad had been struck with projectiles.
-A large mortar style firework had been thrown into the East precinct sally port
-There were reports members in the group were planning on "cooking" (deploying Molotov cocktails) and information was developed cocktails were being prepped near officers.
-Multiple officers had been assaulted, including one officer struck in the head with a baseball bat, cracking his helmet. The extent of all injuries was not fully known at the time.
-It was apparent that other uses of force, such as OC spray, would not been effective due to the distance from which projectiles were being launched.

DECISIONS MADE & ORDERS GIVEN AND RECEIVED:
Our squad returned to the sally port of East precinct while the protest regrouped at Cal Anderson park. The protest, still numbering around 200, began marching once again, eventually stopping near East precinct.
-22:41 CA group moved dumpster, boards and signs into intersection at 11/Pine
-22:44 Fireworks being thrown into East Precinct Sally Port - no injuries
(I was in the sally port at the time a large mortar was thrown through the gate. The resulting explosion and echo inside that enclosed area resulted in my ears ringing for a period of time afterward)
-22:59 Some protesters climbing fence - All Task Force deploying. Some protesters cutting wire.
Our squad exited and attempted to assist with the arrest of an individual who had thrown the firework in the sally port. We were unable to do so and found ourselves holding a line for several minutes at 11/Pine. I saw

objects thrown over my head at this time and shatter on the ground behind me. They had been thrown from the back of the crowd. We were ordered to pull back one block soon afterward.

-23:03 Officers taking glass bottles and beer cans

-23:12 Possible Molotov cocktails being prepared at hot dog tent - NE corner of 11/Pine

-23:17 Fire requested at 12/Pike Officer who was assaulted by subject with a baseball bat and satchel bag - suspect wearing blue jeans, black sweatshirt over blue sweatshirt and black respirator with white filters

-23:19 Officer assaulted with a milk jug to the head - fire declined - suspect is WF, all black clothing wearing pink respirator

-23:35 Fire in middle of Pine St is growing - protesters are feeding garbage into a shopping cart and lighting it on fire

-23:43 Bikes catching lasers

-23:45 Ordered: "Get prepared to throw a blast ball if needed. If someone throws something, throw a blast ball"

-23:48 Officers took another bottle - munitions deployed

-23:50 More rocks and bottles - BM in pink hoodie threw fire extinguisher at officer

-00:04 Car 21: Given multiple dispersal orders. Mortar round went off. Officers assaulted, bottles thrown, and mortar round exploded.

-00:08 Taking rocks… deploy blast balls

-00:20 Glass bottles and rocks being thrown at officers

-00:23 Officers taking water bottles

-00:24 Officers taking rocks

THREAT ASSESSMENT:

Relevant for Blast Balls 1-6:

Based on all the radio broadcasts and events I had witnessed I knew the following had occurred:

-Damage to businesses had been reported in the area, prompting a dispersal order.

-Despite the dispersal order being given dozens of times over a period of hours the group was not complying and was not dispersing

-There were several reports of rocks, bottles and fireworks being thrown at officers. These items were thrown at me and I saw them landing around me. Glass bottles were breaking around me and sailing over my head. Officers in my squad had been struck with projectiles.

-A large mortar style firework had been thrown into the East precinct sally port.

-There were reports members in the group were planning on "cooking" (deploying Molotov cocktails) and information was developed cocktails were being prepped near officers. Molotov cocktails have been consistently used against officers and/or buildings occupied by officers locally and nationally.

-Multiple officers had been assaulted, including one officer struck in the head with a baseball bat, cracking his helmet. The extent of all injuries was not fully known at the time.

-It was apparent that other uses of force, such as OC spray, would not been effective due to the distance from which projectiles were being launched.

-Someone in the crowd was shining a laser at officers

-Bright lights were being shone from the crowd at officers making it difficult, if not impossible, to pick up approaching projectiles and other threats.

-Many in the crowd had arrived with helmets and gas masks which, based on my experience, indicated a likelihood to resist and assault officers. Much of the group was also dressed in black which, based on my experience, is a way those committing crimes attempt to remain anonymous and blend into the group.

FORCE USED:

Blast Balls 1 and 2:

After a large fire was set in the street at 11/Pine and stoked with debris I was ordered to push the group west on Pine St. Upon arrival with my bike squad at 11/Pine officers set up a mobile fence line to move the crowd west. Officers were immediately peppered with several thrown projectiles from the group and a laser was shone at officer's faces. After observing objects being thrown from behind the line of protesters squaring off with officers I picked up the trajectory of objects being thrown at the police line. I deployed two blast balls at these specific threats to stop or disrupt the continued assaults on officers. I deployed these blast balls in an overhand throw so as to target the specific person acting violently. In order to do this the blast ball needed to get over the line of officers and protesters at the front facing police and attempted to target and place the blast balls in open areas near the person committing the violent act. An arrest was not possible.

Blast Ball 3:

I placed my third blast ball, using an overhand technique, in response to a person who threw what appeared to be a glass bottle at the police line at Pine St/Nagle Ave. I saw the trajectory toward the line and heard the glass bottle shatter. The overhand technique was necessary to get over the line of officers and protesters facing police to target the specific threat of the person acting violently toward police. I attempted to place the blast ball in an open area near where the threat originated. An arrest was not possible.

Blast Ball 4: The group began marching again and upon turning west on Denny from Broadway another loud explosion, consistent with previous mortar explosions.

Updates on radio included:

-00:04 Car 21: Given multiple dispersal orders. Mortar round went off. Officers assaulted, bottles thrown, and mortar round exploded.

-00:06 BOTTLES AND ROCKS, MORTARS THROWN AT INTERSECTION…HEADING SB ON HARVARD

-00:08 Taking rocks… deploy blast balls

Upon my arrival in the area I observed a projectile thrown eastbound at police from the area of Harvard Ave/Denny Way. I deployed one blast ball, in an overhand technique, in order to get it over officers and other

protesters and place it in an open area near the specific threat. This technique was necessary to target the specific threat posed of the person acting violently toward police. An arrest was not possible.

Blast Balls 5 and 6:
While pushing the crowd southbound on Harvard the bike units briefly held to create space. The crowd continued south and began pulling objects/dumpsters into the roadway. These items were then lit on fire. This behavior continued as the group continued west on what I believe was Pike St.

Additional broadcast:
00:18 CAR21 CM 5648 DECLARED UNLAWFUL ASSEMBLY FOR ASLTS ON OFCRS, MULTIPLE DISPERSAL ORDERS, DUE TO ROCKS, MORTARS
00:20: 2 ADD'L ASSAULTS ON OFCRS DURING THIS LAST PUSH... DUE TO BOTTLES/ROCKS
While continuing to push the group west I continued to observe objects thrown at police. I deployed an additional blast ball, in an overhand technique, in an attempt to stop this specific threat on officers. I attempted to target an open area near the person who threw the object. This blast ball appeared to be a dud as only the fuse separated from the ball but the ball never detonated. An arrest was not possible.
Farther west I observed Officer Hay get struck in the right arm with what appeared to be a rock. I responded to this assault with a blast ball, in an overhand technique, in order to place it in an open area near where the rock was thrown, targeted at the specific threat. An arrest was not possible.

MEDICAL AID AND EVALUATION:
Relevant for Blast Balls 1-6:
Due to the size and temperament of this crowd, attempts to provide medical aid were not possible. I observed no injured persons as a result of my force.


ADDITIONAL INFORMATION: Blast balls I deployed during this event: SN# 200800202, 200800734, 200800737, 140800426, 200800735, 200800891

## Incident Location

- 1000 Pine St, Seattle, WA - Location of Occurrence: Demonstration

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Cloudy | Street Lights | |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |

**Employee Assessment of Community Member Condition During Incident**

| Employee(s) Injured | Employee(s) Taken to Hospital |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

### JOHN DOE

DOB:    Race: White   Ethnicity:    Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Nathan Lemberg - Serial: 30038879 - Badge Number: 7456

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct B120/North Precinct Ops B129/North Pct Ops - Cpt B129C/North Pct Ops - Cpt B129C

**Video Footage**: Equipped - Activated

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | X | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Nathan Lemberg |
| Sent To: | Police Lieutenant Christine Robbin |
| CC: | (none) |
| Sent Date/Time: | 9/25/2020 4:46 PM |
| **Instructions from Police Officer Nathan Lemberg to Police Lieutenant Christine Robbin:** | |
| 2020-275135 | |
| **Comments/Response from Police Lieutenant Christine Robbin:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Nathan Lemberg - 30038879

EXHIBIT D(8)

# TYPE II USE OF FORCE
# ==CROWD MANAGEMENT==
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not
    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting


**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault


**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response


**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed

**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
           - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
           - If effective, describe assessment and modulation of force
               • Describe control of or compliance of subject
           - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below. Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-275135**

**DATE OF OCCURRENCE: 09-23-2020**

**STATEMENT OF: OFC ADAM LOSLEBEN #7420**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. C Robbin. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: Sgt Hancock
B. ICV/BWV recorded: Yes, Body Worn Video. There a couple of videos. The first video was while driving around but did not take police action or see anything. The second I accidentally turned it off before getting out of my vehicle. I was trying to check to see if it was recording. When I saw it wasn't recording, I turned it back on. The vehicle (Bear Cat) I was in was not ICV equipped. I did review my BWV before writing this statement.

**DETAILED NARRATIVE:**

**Pre-Arrival/Arrival:**

At the time of the incident I was wearing a marked uniform that consisted of a ballistic plate carrier, duty belt, helmet with police markings, and a gas mask. I also was armed with a 40mm less lethal launcher, OC blast balls, and my handgun. I am currently part of the less lethal cadre for the SWAT Team. That means I am responsible for training the SWAT Team on the use of the less lethal tools we have. I have received training from the National Tactic Officers Association on less lethal applications and training other officers on their use. I take a written test annually on the use of Less Lethal tools and get practical applications of the tools in training. I also have received crowd management training from the department and have assisted with controlling demonstrations dating back to the Occupy Movement in 2009. I did attend department training this year for the deployment of Blast Balls.

The incident occurred at night and after a rainstorm. The location of the incident was throughout the Capitol Hill area. It started in Cal Anderson Park and went down to the West Precinct area and then back to Capitol Hill. This protest was in response to the grand jury's finding in Louisville, Kentucky over the shooting and death of Breanna Taylor. The group was anti-police and was looking to destroy buildings and assault police officers. My job was to support the bike officers and officers on foot with less lethal munitions if needed. I was part of a four-officer team assigned to the BearCat (armored vehicle).

The group of protesters started in Cal Anderson Park and then walked around Capitol Hill causing some minor property damage. While they were on their route there were some arrest made of suspects for property damage. I did not see any of this because of my position and we were trying to stay out of sight until needed. Eventually the protesters made their way back to Capitol Hill. I heard over radio that the group was talking about turning on the officers that were following and charging them. To my knowledge this did not occur, but it was threatened numerous times. The group also had support vehicles with them that were trying to stop officers from doing their job. While the group was in the west precinct Captain Allen gave a couple of dispersal orders via the PA.

When they got back to Capitol Hill, they walked back to Cal Anderson Park. While walking into the park, I heard over radio that the suspects were threatening to use Molotov Cocktails against us when they came back out. The group was roughly 200 strong by this time. There approximately 100 officers to manage this event. The suspects in the crowd had home made shields, umbrellas, extra clothing, googles, and gas masks. All those items were to be used to defeat our less lethal tools. The suspects were also armed with baseball bats, explosives, pre-staged rocks, bottles, and a flame-throwing device.

**Legal Authority and Lawful Purpose:**

This occurred on public streets that were open to everyone. The streets were around Capitol Hill and around downtown Seattle.

Captain Allen had given numerous dispersal orders and the suspects started to assault officers with blunt objects (baseball bats, milk carton, rocks, water bottles, paint, and fireworks).

**Contact with Subjects:**

The suspects knew that I was a police officer because I was in a fully marked uniform and was surrounded by other officers. I was also told to "f-off pig" at least once during this riot. Pig is a derogatory term for police officers. Captain Allen was also giving a dispersal order with a PA system identifying us and I was ordering them to "Move Back" and "Leave the area".

The crowd was about 200 strong and moved all over Capitol Hill and the downtown corridor. The suspects were actively assaulting or trying to assault officers. Several officers were injured by suspects. One officer was hit in the head with a baseball bat. We were constantly told to "Fuck-off" and flipped off with middle fingers. The suspects were also lighting fires in the middle of the street and damaging property. They did break out a couple of business windows during the riot.

When we were moving them, we would have bike officers on the sides and officers on foot in the middle. We were giving them commands to move or leave the area. The suspects sometimes moved by our commands but other times they would set up a barricade and try to stop us from advancing. Their barricades were made of metal dumpsters, street signs, and building signs. They set some of the barricades on fire.

**De-Escalation Techniques Employed:**

We used time, distance, shielding throughout the incident. We allowed them to march peacefully. The only time I used force was in response to a direct threat from a suspect in the crowd. The commander tried to keep officers away from the crowd but that wasn't feasible because the suspects started damaging buildings and assaulting officers from distance by throwing heavy debris that could seriously injury officers. The shielding that was used was trying to stay out of sight from the suspects but that quickly became infeasible because the suspects were breaking the law.

Captain Allen tried to communicate with them through a PA and give dispersal orders. I was able to clearly hear the orders, but the suspects refused to obey them. It sounded like

Captain Allen was reading from the dispersal card. He was giving them the order to leave, the direction they could take, why he was giving the order, and what would happen if they did not leave. I also gave numerous orders/commands to "Move back" or leave the area.

**Threat Assessment/Decision Made:**

Every time I deployed a blast ball it was in response to an assault on an officer(s). The assaults were from rocks the size of softballs being hurled at myself or other officers, large fireworks/mortars, or bottles. Before I was interacting with the suspects, I heard over radio that an officer was hit with a baseball bat and another was hit in the head with a milk carton denting their helmet. This crowd tonight was intent on causing serious harm to officers. They do not have to follow any rules of engagement and are committing acts of violence that could turn deadly for officers quickly.

I only used force when I was assaulted, or another officer was assaulted. Each use of force was direct at a specific threat. There were a couple of times I was assaulted but did not see the person who assaulted me, or they were to deep in the crowd for me to respond. The purpose of each blast ball was to stop the assault. We tried to use officer numbers to try and control the scene. During this event I had a firework thrown at me. Luckily it missed me, but it did explode behind me and I was able to feel the concussion of the explosion against my legs.

**Use of Force:**

The suspects were intent on causing serious injuries to officers during this riot. They were throwing softball size rocks, large fireworks that when they exploded were kicking up debris, full water bottles, and hitting officers with blunt objects (baseball bat etc). They were also yelling anti-police slogans at us and refusing to obey lawful commands.

Throughout the incident I heard Capt Allen on a PA system giving them a dispersal order and after each use of a blast ball I reassessed if I need to continue using force or if I could stop.

I deployed three OC blast balls during the riot. The blast balls were made by ALS. The first blast ball was deployed around 0006 on 09-24-2020. The deployment was just south of Denny Way on Harvard Ave. I saw a large rock get hurled at officers from a suspect wearing black in the crowd. I had to stop that suspect from throwing anymore rocks so I deployed a blast ball at him. I could not use my single 40mm launcher because he had other people in front of him. I was able to get a blast ball to disrupt him by using an underhand toss. This technique is trained by the SPD Training unit. I never saw that suspect again during the remainder of the incident.

The second OC blast ball (ALS) I deployed was after we turned west bound on E Olive St. I saw a group of suspects pushing a metal dumpster into the road and start to mess with something. Working these riots in the past I have seen them use dumpsters to hide behind and throw explosives at us. Fearing they were doing this again I deployed another blast ball. I used the under-hand deployment method taught to me. That blast ball had the desired effect and the suspects ran away preventing them from ambushing us from behind the dumpster. Seeing them run away I determined that no more force was necessary.

The last blast ball I deployed during the riot was on E Olive St just before we reached Boylston Ave. I saw a suspect throw a bottle at officers. I could see the bottle had some weight in it because of the way it flew. To stop that suspect from throwing more blunt objects at us I deployed another OC blast ball (ALS). In order to get that blast ball at my intended target I had to move around someone were a "PRESS" badge. I used an under-hand toss to deploy that blast ball. After that deployment I saw that suspect turn and run away, and I did not see him again.

**Medical Aid and Evaluation:**

I did not have any interaction with any suspect after they were arrested. I do not know if any need medical aid. Every suspect I used forced on ran away and due to the size of the crowd and the violence we faced it was not possible to arrest them.

**Resolution:**

To my knowledge none of the suspects I used force were arrested.

**ADDITIONAL INFORMATION**:

I saw several other officers deploy blast balls, but I do not know who they are. Everyone was in riot gear and due to the violence of the riot I did not have the time to get their information.

During this riot I always had someone from the "media" in my way. The badge they were wearing looked to be homemade with a computer and simply said "PRESS" on it. It is my belief that these folks aren't actual journalist associated with any news outlet but part of the crowd. Their purpose to is try and disrupt police action.

EXHIBIT D(9)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

       Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not

    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).

    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting


**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault


**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response


**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| **PRE-ARRIVAL DETAILS / BRIEFING** | | **DECISIONS MADE & ORDERS GIVEN AND RECEIVED** | |
| **ARRIVAL** | | **THREAT ASSESSMENT** | |
| **LEGAL AUTHORITY & LAWFUL PURPOSE** | | **FORCE USED** | |
| **CONTACT WITH SUBJECT (S)** | | **MEDICAL AID AND EVALUATION** | |
| **DE-ESCALATION** | | **RESOLUTION** | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#:**

**DATE OF OCCURRENCE:**

**STATEMENT OF:**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. Robbin.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: Sgt. Kraus
B. ICV/BWV recorded: West ACT Van is not equipped with In-Car video. BWV: Not at time.

**DETAILED NARRATIVE:**

**PREFACE:**
This report is intended as a summary of the events that occurred under #2020-275135. I have paraphrased conversations and do not include an exact sequencing of events. For any exact quotes or exact sequencing of events I would refer the reader to my body worn camera, as it was recording during certain specific durations of this incident due to SMC 14.12-collective of information for law enforcement purposes (surveillance ordinance). My Body Worn Camera was activated when I was ordered to or when feasible if I saw that criminal action was afoot, happening or happened and police assistance was required to address this criminal action.

This particular event began on September 23, at around 1802 hours in Cal Anderson Park located in the East Precinct and concluded some time well after 0100 hours the following day.

Much earlier on this day, West ACT was assigned to Law Enforcement Casualty Care training at Park 90/5 that started at 0700 hours. I drove West ACT's PIU to this training which required me to wear my Body Worn Video. It was taken off the charger and placed on to my uniform sometime between 0600-0630 hours and remained on my uniform all day. At around 1530 hours during training, we were informed by West ACT's Sgt. Kraus that we would be needed to assist working two protests occurring simultaneously that night. The role call was at the West Precinct at 1700 hours. I arrived from training shortly before the roll call and knowing that I would possibly be working for an unknown amount of time, I put my BWV back on its charging station because it indicated that it was low (I don't remember what %). I was sitting in the back of our West ACT Raid Van and charging it in the vehicle was not a viable option.

We deployed from the West Precinct shortly after role call and I put my BWV back on my uniform. I do not remember what percentage it was charged when we left the West Precinct shortly after 1700 hours. Due to this extended use of my BWV over a twenty hour period in which I was wearing my BWV, it possibly ran out of battery power or did not turn on when I attempted to activate it or I was unsuccessful in properly activating it when exiting the van to put out a fire started by violent protesters. Regardless, it did not capture my use of a blast ball on Broadway at around 0000 hours. I am confident that my use of force was however, captured by my teammates who were directly to the front and side of my position when my blast ball was deployed.

The entirety of the protest and violent demonstrations continued from May 29th and continued for days, weeks and months. It is currently in progress as I begin this Use of Force statement. I have attempted to take notes throughout the one hundred and twenty plus days. These notes, some of my video and my memory are how I am completing this Use of Force. The video is unable to show the 360-degree view of myself and other officers perspective and should be viewed with the understanding that what the video is showing is not necessarily what I saw and things that I have seen are not necessarily shown on my body worn video. Additionally, I wear an earpiece to hear my SPD issued radio, therefore most transactions are not picked up by the microphone of my Body Worn Video. This could potentially be confusing to the viewer

of my video as I am hearing additional items of potential importance that the viewer cannot hear.

At the time of this use of force statement, I have been working daily 12-16 hours shifts in attempt to reestablish public order in the city. I was not given adequate time immediately after the use of force to prepare my statements, so I will be relying on memory from over twelve days prior to this report. I will also refence the radio log, SPOC log, MDT call log, body worn video, SPD video unit material, incident action plans, and other documents disseminated by the Seattle Police Department. I will attempt to construct this statement to the best of my ability given the extremely volatile nature of the situation and the level of stress and anxiety I experienced during the violent assaults that myself and fellow officers sustained from hundreds of violent protesters since May 29, 2020.

**PRE-ARRIVAL:**

Prior to becoming a Seattle Police Officer, I was enlisted in the United States Marine Corps from 1994-2002 attaining the rank of E-5, Sergeant. My Military Occupational Skill in the Marine Corps was a Forward Scout Observer (0861). I am trained in observing large areas and people's movements and interactions in dynamic situations. In addition, I bartended professionally around the city of Seattle from 2000-2013 at some of the city's busiest restaurants and bars where I was recognized with numerous awards such as Seattle's Best Bartender (2005 & 2006). I credit these awards from being able to read people's emotional IQ from very little initial interaction and being able to de-escalate most situations which was excellent training and has served me well as a Seattle Police Officer.

I have nearly 7 years of law enforcement experience. I was first hired in July of 2013 and attended the Basic Law Enforcement Academy at the Washington State Criminal Justice Training Center where I received my commission as a police officer from WSCJTC. I have attended numerous advanced training programs to include SPD Anti-Crime Team School, SPD Undercover School, SPD Rifle School, SPD Defensive Tactics Instructors Course and SPD Bike School. I have received thousands of hours of instruction and practice on defensive tactics and team tactics from the USMC, WSCJTC and Seattle Police Department when dealing with combative groups and subjects. I am currently a Seattle Police Department Defensive Tactics Instructor. I am a Crisis Intervention Trained (CIT) Officer and have attended the forty-hour class as well as eight hours of CIT Force Training and sixteen hours of Basic Force Science. I have been re-certified in crowd management on February 26, 2020 to include the use of blast balls both OC and Inert on April 9, 2020. I have been certified in the use of CS canisters and their deployment on May 31, 2020. I am currently assigned as unit 198 with the West Precinct Anti-Crime Team (WACT), a proactive unit assigned to the West Precinct and directly utilized by the precinct commander for specific missions.

**ARRIVAL:**

I was working on 9-23-2020 in full Seattle Police Department uniform equipped with my Body Worn Video and I was riding in an unmarked Seattle Police Department (WACT) van equipped with both emergency lights and sirens. My role was that of the "linebacker" which means I am usually directly behind the front line making sure that Officers are where they need to be, provide support using less lethal munitions and passing on the orders of the Sgt.'s, Lt.'s and Incident Commanders. There were 6 Officers including myself from West ACT working this day and we were being supervised by Sgt. Kraus. All five of the Officers on my team that night had worked the last two prior days starting at 0700 hours (wake-up times varying between 0500-0600 hours) and were volunteers to work this overtime shift as department needs required officers to respond to the online intelligence gathered of planned and potential destruction and damage promoted by ANTIFA(Anti-Fascists) that evening.

We were briefed by SPD command staff in the evening at the West Precinct about recent demonstrations throughout the city of Seattle, the state of Washington and widespread in the country, especially the west coast. We reviewed some of the violent tactics used against officers the prior days and nights to include countermeasures and revised tactics. I was issued OC and Inert Blast balls as less lethal munitions. These blast balls were clearly marked on the outside and color coated. White bands for Inert and orange for OC. In addition, I had OC Spray and Cold Fire to assist with less lethal munitions and putting out potential fires against officers.

Directly after roll call we left West Precinct and headed towards multiple protests happening in both downtown Seattle and Capital Hill. Both appeared to have over one hundred participants, blocker cars and bicycles that are used to stop traffic and act as obstacles to prevent officers from carrying out their lawful duties against possible criminal activities involving the protesters/rioters on foot.

These activities usually entail graffiti on businesses, breaking windows, looting and sometimes attempting to set the business on fire. The group has also used tactics of intimidation against any citizens who either do not show solidarity or oppose the mob's tactics of chaos and destruction.

By about 1900 hours, groups of 10-30 began to form at both Cal Anderson Park and Westlake Park, showing a form of command and control and communication between the two groups. This is believed to be a tactic to spread SPD's resources thin by using geographic distance and difficult traffic conditions to split our resources, sometimes by half. Within a half an hour, those numbers jumped from 10-30 to well over a hundred in Westlake Park and 60-80 in Cal Anderson showing that a specific time was established by the groups to meet. It was communicated to us that the Westlake group was associated with the Everyday March and the group at Cal Anderson were largely Black Bloc. Two groups that SPD has had in excess of four months dealing directly with. We were monitoring both groups and staying mobile in our van at this point waiting for further direction.

At around 2000 hours, the Cal Anderson group had in excess of 200 people largely dressed in all black carrying shields, wearing face masks to include gas masks and large backpacks with various unknown items inside. The Westlake group had approximately 200 as well. Both

groups marched into their respective streets at about the same time. However, it was believed by the command staff that the Broadway/Capital Hill group of Black Bloc proved to be a larger threat to community, property and general civility, therefore we were ordered to Capital Hill and to assist with monitoring the group from a distance of several blocks away. By 2014 hours, according to the radio log, it was reported that the Cal Anderson march were "very animated and agitated" and therefore South, East and West Task Force were ordered to stage on Capital Hill and Southwest Task Force were ordered to stage at West Precinct which went on lock down shortly after.

At 2030 hours, just a half an hour after their march started from Cal Anderson Park, Black Bloc began spray painting on Amazon GO stores and breaking windows of Starbucks (1101 Madison St.) while using their civilian vehicles to block and obscure the line of sight of those committing these acts of vandalism.

By the time the group from Capital Hill reached 4 Ave at around 2045 hours, they began to leave a trail of vandalism from Wells Fargo Bank, to any Starbucks they passed and other stores that were on their northbound route of 4 Ave. We could hear from several blocks behind glass windows being broken.

At 2050 hours, Car 21, Captain Allen reported to the log of giving "multiple dispersal orders just northbound of 4/Spring due to property damage". While we were not directly near Car 21, we could clearly hear these dispersal orders being given on the public address (PA)system in his department vehicle. In addition, all trailing SPD vehicle had activated their emergency lights and it was obvious between the dozens of police vehicles with emergency lights activated and the loud, consistent dispersal orders that this protest/riot was no longer lawful and the participants were subjects to arrest if they did not disperse from the area especially after committing tens of thousands of dollars in damage.

Within an hour of the group beginning their march, they began throwing bottles at officers who were trailing behind them. Probable cause was established for one such individual in the crowd who was seen throwing a bottle. As in most cases, the individual pushed his way back into the crowd and remained shielded and his anonymity continued. A common tactic used that we have seen and documented several times over four months. This anonymity commonly includes the use of changing clothes or outward appearances using items from their backpacks to attempt to conceal their identity.

At around 2104 hours, SPD Officers were making arrests of drivers who were committing RCW 9A.84.010 Criminal Mischief as a coordinated effort in a group of three or more to knowingly and unlawfully participate in the use of force against property.

About the same time that SPD began making it's first arrests, I could see to my left and right, Officers getting into pushing matches at the mobile fence line with well-armed and armored up protesters who were also dawning gas masks, face masks coverings, goggles, shields, umbrellas, sticks and bats. I began to see officers on the left side of the street use OC spray and heard blast balls. I did not see which officers used less lethal and to whom it was used against as this was a massive crowd and a very dynamic situation that we walked into. Within

15 minutes of arriving, we were pushing the mob of angry and violent protesters back from our fence line and ordered to create space between our SPD line and the mob of aggressive and actively resistant crowds.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

My legal authority was that I was a Seattle Police Officer in full uniform working in a public space in the City of Seattle. My lawful purpose was assisting my fellow Seattle Police Officers in enforcing SMC 12A.12.020 Failure to Disperse, SMC 12A.16.010 Obstructing a public officer, SMC 12A.12.015 Pedestrian Interference, RCW 9A.84.010 Criminal Mischief, RCW 9A.84.010 Riot and RCW 9A.36.031 Assault in the 3rd Degree.

**CONTACT WITH SUBJECTS**:

Around 2110 hours, we were providing security to an arrest and tow of a blocking vehicle on Boren Ave and Seneca St. It was consistent that any arrest we made would inevitably have dozens of protesters surrounding the arrest and officers involved in the arrest.

The protest group left the downtown area and returned to Capital Hill near the East Precinct. There was intelligence gathered by SPD that the protesters were reforming and had intentions of "doing some cooking" which from our experience usually meant that the crowd would attempt to light fires to include attempting to cause significant damage to the East Precinct in which they have attempted to burn down on multiple occasions.

We were eventually staged around the East Precinct around 2200 hours in our van. Slightly after we arrived, it was communicated that the remainder of the two groups who marched separately were now meeting up and intended on going to the East Precinct. By 2225 hours, the East Precinct was on lockdown.

The remainders of the two groups formed up to an estimated crowd size of about 200. This aggressive and violent remaining crowd began to move dumpsters, boards and signs into the intersection of 11 Ave/Pine St which from our experience meant that not only were they trying to create a barricade blocking our view of subjects in the crowd committing assaults on officers, they used the dumpsters and garbage to light on fire causing a large disruption and danger to the surrounding community.

At 2246 hours, a splinter group broke off and threw a large industrial size pyrotechnic into the sally port caged garage of the East Precinct on the south side causing injury to the ears of the officers inside of the sally port that were ordered to stand by and not yet confront the group. According to the event log, shortly thereafter, some of the protesters began climbing the security fence around the outside of the precinct causing damage.

By 2300 hours, due to the assault against officers, the commercial grade fireworks being used against the East Precinct and the overall dangers being presented by an angry, violent mob of

protesters, SPD Officers were ordered out of the East Precinct and to attempt to make an arrest of one of the individuals seen throwing the pyrotechnic.

**ADDITIONAL INFORMATION**:

EXHIBIT D(10)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not

    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).

    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
   a. People / other officers on scene, activity occurring, dangers
   b. Buildings, vehicles
   c. Environmental factors: weather, lighting

**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
   i. Public area, Street, Park, Open to public
   ii. Exigency
B. Lawful Purpose (Explain in Detail):
   a. Riot
   b. Looting
   c. Assault

**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
   i. Uniform – UO Gear
   ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
   i. Observed details
      - Physical/verbal reaction to officer
      - Verbal actions / statements made
      - Size of crowd / movement
   ii. During line movements, provide details
      - Your actions
      - Subject's response

**De-Escalation Techniques Employed:**

A. Communication
   i. Advisements/warnings. If no warning, explain why.
   ii. Describe instructions given
   iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
          - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
          - If effective, describe assessment and modulation of force
            • Describe control of or compliance of subject
          - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#:2020-275135**

**DATE OF OCCURRENCE:09/26/2020**

**STATEMENT OF: OFC. ESTEBAN MONREAL 8437**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Rees 6890.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: Yes
B. ICV/BWV recorded: BWV recorded, I was working as a bike officer and did not have access to an ICV system.

**DETAILED NARRATIVE:**

On 09/23/2020 I was working uniform patrol as 2-Edward-2 in a fully marked patrol vehicle with my partner Officer Dickson 7288. At approx. 1500hrs I was notified that I was going to be pulled from patrol and supplement the East Bike squad for a demonstration that was going to be occurring at Cal Anderson Park.

I responded to the West precinct for role call and was provided with the following information:

Situation:

The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice.Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25. On August 16 2020, a protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On August 24, 2020, ENDD resulted in serious threats to Officer Safety. Notably, quickrete was used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also on August 24, Molotov cocktails were used in an attempt to burn the SPOG building. On Sept 1st, a group of about 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct. Most recently, on Sept 7th, rioters marched to SPOG and arrests were immediately made after people in crowd were known to be in possession of molotov cocktails. This incident had numerous assaults on officers. On Sept 23, 2020, a Jefferson County Kentucky Grand Jury made a decision on criminal charges for Officers involved in the Breonna Taylor incident. Nationwide demonstrations, to include Seattle, are anticipated as a result of this event. **Schedule of September 23, 2020:Justice for Breonna Taylor - 1900 hours, Cal Anderson ParkJustice for Breonna Taylor - 1900 hours, Westlake Park**
The

Mission:

The mission of the Seattle Police Department is to enforce the law and preserve order. The Seattle Police response priorities are: Life Safety, Incident Stabilization, Property Conservation, and Crime Scene Preservation.

Commanders intent:

There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. In light of today's decision by the Jefferson County (Kentucky) grand jury regarding the Breonna Taylor case, further protests are expected. **My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property.** My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct.

After role call, I assembled with the 3-Edward-80 bike squad and returned to the East Precinct staging for the Cal Anderson event. Once the sun went down, the crowd at Cal Anderson Park began to march downtown. The crowd was violent and destructive. The crowd broke windows of several business as they made their way from Cal Anderson to the downtown corridor.

After hearing the crowd were actively breaking windows of a business my squad approached the large group from the rear. I heard a dispersal order given around 2046hrs near the intersection of 4th Ave & Seneca St. We followed behind the group and were instructed to parallel them from the sidewalk.  Near the intersection of 4th Ave & Pike St I observe a protester spray painting a business. At this time, I was following behind the point officer and Sgt. Reese. I observed the point officer peddle towards the tagger, initiating a crossbow arrest. I followed close behind observing an officer grabbing onto the suspect. The suspect

ran into the roadway dragging this officer behind them. I observed several other suspects in the large crowd utilizing de-arrest tactics to free the suspect from the officer's grasps. They were pulling on the suspect trying to break the officer's grasp, in addition to pushing and hitting this officer.

After observing this officer getting assaulted, I dismounted from my bike and ran towards his location. I grabbed a suspect by their left arm who was actively obstructing the arrest observing what I believed to be a rock in his right hand. The suspect was pulling away from me when I sprayed the suspect with my department issued Mark 9 in the face. The suspect was wearing a face respirator and I am uncertain of its effectiveness. The suspect broke free from my grasp and returned to the crowd. Shortly after another suspect wearing a black hoodie threw a water bottle at me, after which I targeted this suspect with my department issued Mark 9. I am uncertain of its effectiveness. The suspect left there immediately marching with the large crowd. I am uncertain if either suspect sought out medical attention. During this time, it was not feasible to attempt to de-escalate.

My Legal Authority and Lawful Purpose was as follows:

I am a Seattle Police Officer operating within the city of Seattle as bike officer attached to a bike platoon. I was tasked with facilizing the commander's intent which is as follows: Facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. At the time I used force, one suspect was located in a public roadway and the other a public sidewalk.

The initially suspect who was tagging the side of the building was taken into custody and I returned to my squad following the large group throughout the downtown corridor.

**ADDITIONAL INFORMATION**:

EXHIBIT D(11)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV and BWV recorded: If  not, why not – Must be explained if no BWV or ICV

    C. Note if you reviewed and BWV, ICV, or other video prior to statement.

**Pre-Arrival:**

    A. Your relevant  training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?

**Arrival:**

    A. Observations:
- i. People / other officers on scene.  Activity occurring, dangers, citizens exposed…

      ii.    Buildings, vehicles
     iii.    Environmental factors: weather, lighting
  B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

  A.  Legal Authority (Explain in Detail):
      i.    Public area
      ii.    Consent
     iii.    Exigency
     iv.    Warrant
      v.    Community caretaking
  B.  Lawful Purpose (Explain in Detail):
      i.    Social Contact
      ii.    Terry Stop
     iii.    Probable Cause for arrest
     iv.    Community Care-taking

     **Note:** Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

  A.  How did you make your presence and authority clear?
      i.    Verbal identification, commands or instructions
      ii.    Did the subject say or do anything that indicated he/she knew you were the police?
  B.  Contact with involved subject(s)
      i.    Observed Details
         - Physical/verbal reaction to officer
         - Tone of voice / statements made
         - Body posture / movement
         - Subjects size / strength vs. officer
         - Intoxication / mental state
      ii.    Information obtained from each subject
  C.  Was there a frisk of any subject?
      i.    Reasons to believe subject was armed and currently dangerous
      ii.    Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

    A. Communication
- i. Verbal persuasion
- ii. Advisements and warnings (including Taser spark tests and warnings)
- iii. Clear instructions
- iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
- v. Avoiding language, such as taunting or insults, that could escalate the incident

    B. Time, Distance, Shielding
- i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
- ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
- iii. Did you utilize cover and concealment for tactical advantage

    C. If De-escalation was not safe or feasible, explain why not

**Decision Made:**

    A. Overall summary of information gained from investigation

    B. Decision based on information:
- i. Warning
- ii. Citation
- iii. Documentation
- iv. Arrest

    C. Include any Tactical Decisions and Scene Control you employed

**Threat Assessment:**

    A. Did the subject pose a threat to you, another person, or another officer?

    B. Describe the threat in detail or why you believed there was a threat.

**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A. Words, Actions or Threat posed by subject that necessitated the use of force:
- i. Attempts to flee
- ii. Fight
- iii. Resist arrest

    B. De-escalation and continued attempts and the effect on the subject

         i.    Verbal de-escalation

              - Warnings/commands to subject.

        ii.    Physical de-escalation

      iii.    If de-escalation was not feasible, you  must  explain why not

C. Lawful purpose of the force used:

         i.    Gain control

        ii.    Protect yourself or others from a threat of immediate harm

      iii.    Stop a potential deadly threat

D. Explain your decision to use a technique or Less Lethal Device, based on feasible options

         i.    Proportionality of force

        ii.    How did the totality of circumstances affect the force used?

      iii.    "No reasonably effective alternative…."

E. Explain effectiveness or lack of effectiveness of employed techniques

         i.    Was this a trained technique? Where were you instructed in this technique?

        ii.    Were you able to apply the technique properly? Explain why or why not.

              - If effective, describe assessment and modulation of force

                  • Describe control of or compliance of subject

              - If not effective, explain why not and how you progressed from there

      iii.    When and How was your force modulated?

F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Medical Aid and Evaluation:**

A. Injuries/Medical Aid

         i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)

        ii.    Medical aid (who provided and where provided)

      iii.    Refusal of medical aid by subject

      iv.    Refusal to accept at jail - disposition

       v.    Injuries to yourself

**Resolution:**

A. Search

         i.    Items recovered

B. Transport and processing of subject:

         i.    Use of ICV

        ii.    Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.


**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**


**EVENT/GO#: 2020-275135**

**DATE OF OCCURRENCE: 9/23/2020**

**STATEMENT OF: A/SGT PRATT 7643**

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/LT MOORE 5995.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: A/ LT MOORE 5995 EAST PRECINCT
    B.  ICV recorded: BWV RECORDING, NOT A VEHICLE OFFICER
    C.  I reviewed the video prior to writing this statement.

---

**PRE-ARRIVAL DETAILS:**

    (A)  I have been a Seattle Police Officer for approximately seven years. I completed 720 hours of the Basic Law Enforcement Academy in 2013. I completed approximately two months of post-academy training through the Seattle Police Department and then successfully completed my Field Training. I worked as a patrol officer for approximately 4.5 years before becoming a full-time bicycle officer. I was selected as a field training officer and served for approximately 1.5 years.  I successfully completed the Seattle Police Basic Mountain Bike School, which encompasses bicycle riding, skills and crowd control management via bicycle. I have been a part of hundreds of free-speech events and multiple riots. I have served as an assistant team leader my entire time in my current assignment. In addition, I attended Seattle Police's Supervisor's school and have served as an Acting Sergeant in multiple free speech events and protests. I have been CART certified for the previous three years.

    (B)  I am a sworn officer. I was in full bicycle uniform, assigned to the protest with a team of roughly 8 officers and our sergeant. I was wearing my normal uniform and a face guard to my department issued helmet. None of these items are designed to protect against explosives, rocks, impact weapons or fire. My uniform is also not fireproof. I was with dozens of other officers either in full demonstration management equipment, bike uniforms or SWAT uniforms.

(C) We were assigned to the East Precinct to monitor a group of demonstrators that are often violent and associated with wide scale property damage and arson. The group was gathering in Cal Anderson Park near the East Precinct. We were instructed to stay near the march but out of sight a few blocks away to ensure that we were not the target of their violence and escalation tactics. The march left the park and continued to Broadway before reaching MADISON ST and heading westbound towards the Downtown Core. The group began smashing windows at a Starbucks and the Amazon Go Store in the 1100 block of MADISON ST. The group continued down the hill and patrol taskforce units were instructed to follow the group. We received intel that once the group reached flat ground, they were going to rush the patrol vehicles that were following them. This is extremely dangerous as patrol vehicles lack the mobility and ability to retreat once they are surrounded by demonstrators. They are vulnerable to attacks and the chance of injury to officers and demonstrators is drastically increased. We were instructed by commanding officers that if the group tries to confront the task force vehicle following them, we would set up a bicycle fence line in order keep the demonstrators and vehicles separated. This was our expressed tactic while in the Downtown Core. Once we returned to the East Precinct we were instructed by Lieutenant Dyment to stage in the sallyport in order to deploy if needed later.

**ARRIVAL**:

A) Observations: Once the group began destroying property in the First Hill neighborhood we began following from multiple blocks away. I could hear the windows being smashed as they continued westbound towards Downtown. The group was 200-300 people. Many of which were dressed in all black clothing with shields, umbrellas, backpacks, respirators and goggles. They appeared to be acting in unison and were using tactics such as linking arms to create physical barricades while people destroyed property and used bright lights shined towards officers to conceal their activities. In addition, they had common hand signals that they were using to act in unison and coordinate their movements, showing that those in the group were taking part in coordinated criminal activity. They also had a team of vehicles which frequently block police and police vehicles from accessing criminal agitators inside the crowd. They also act as a visual barrier to shield the crowd's criminal activity. Once we returned to the East Precinct we were staging inside the sallyport for orders to deploy. Officers were completely separated from the group as a hope to deescalate the unlawful assembly. The north door to the sallyport which exits onto E PINE ST directly to the west of the intersection of 12 AV E and E PINE ST. The door is grated and provided visuals inside and out of the sallyport. The group then began to shout at officers who were inside the sallyport not engaging them. We stood inside for an extended amount of time until one individual in the crowd ignited a large explosive and threw it into the sallyport where officers were located. Officers did not provoke the crowd as we were using time distance and shielding to stay away from the group. They confronted officers and attacked officers with the large explosive. The explosive was much louder than a blast ball and had potential to seriously injure officers inside or ignite the building on fire.

Buildings: We were in the East Precinct with only two exits via the sallyport. Both doors are very slow to open and close which exposes the interior and officers inside to dangerous actions from the crowd. In addition, the Capitol Hill neighborhood is densely populated and is filled with commercial and residential buildings. There is a park (Cal Anderson) in the 1000

block of E PINE ST which demonstrators use to stage and escape to. They frequently use the park to flee from officers and throw objects at officers under the cover of the trees and darkness.

Weather: The weather was clear, and it was nighttime.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

Legal Authority: I was in the road located at 11 AV E and E PINE ST. This road is open to the public.

Lawful Purpose: The demonstration had been declared an unlawful assembly by Captain Allen due to violence against property and violence against officers and announced to the crowd multiple times via intercom. There was probable cause to arrest everyone in the crowd for Criminal Mischief (RCW 9A.84.010) and Failure to Disperse (9A.84.020).  In addition, once we began moving the crowd, I had probable cause for individuals who were throwing glass bottles, rocks, large metal objects and explosives at officers for felony assault.

**CONTACT WITH SUBJECT**:

A) It was painfully obvious that we were the police. The last four months these protests have been against the police and they continue to seek confrontation with officers and the department.
   i) I was in the SPD issued bicycle uniform. With clear and badge and name tag with issued patches.
   ii) The group was protesting the Seattle Police Department. When they began destroying property commanders ordered SPD task force vehicles to follow with their lights and occasional sirens on inside marked SPD patrol vehicles. Also, PA announcements were made to the crowd multiple times. In addition, once bicycle officers were deployed, we utilized our voices to order them to "move back", which the majority of the crowd ignored.

B) Contact with subjects: We were instructed to stage inside the East Precinct Sallyport. The north door was an open "Grate" style door in which the protests targeted in on officers inside. They began yelling at us for an extended period of time which officers did not engage. After an extended amount of time one rioter threw a large explosive at officers inside the sallyport. The enclosed space caused the explosion to be very painful to my ears. One officer determined it was a black male in brown Carhart style pants and a dark sweatshirt as the suspect who threw the device. Eventually we were ordered by commanders on scene to attempt to arrest the suspect who was near

the sallyport directly to the west. Two bicycle teams were deployed into the crowd of approximately 200 people. Once we deployed the suspect fled on foot, first westbound and then into Cal Anderson Park. The crowd became hostile and began throwing items (rocks and glass bottles) almost immediately at officers.

Officers were ordered to retreat. We gathered in the 1500 block of 12 AV E and I evaluated my squad for injuries. One of my officers was hit in the head with a milk crate and another officer was attacked by a rioter with a baseball bat. The suspect attacked the officer from behind and took a full swing with a baseball bat to the officer's head. If it was not for the officer's helmet he could have easily been killed or paralyzed. As officers were being treated by Seattle Fire the crowd began approached a line of task force officers on 12 AV E and E PINE ST. Acting Lieutenant Moore ordered bicycles to approach the line and to move the crowd. Once we engaged the crowd, we were told to keep them moving and the crowd began throwing items such as glass bottles, explosives and rocks at officers.

---

**DE-ESCALATION**:

The Department began the night with no police contact with the group as a way of keeping tensions not focused on officers. The group quickly began destroying property despite no police presence. Officers then began following the crowd but not engaging them. Commanders made multiple PA announcements to the crowd to warn them about their unlawful behavior. There was also intelligence that the crowd planned to attack police vehicles once they reached flat ground showing the group was looking for confrontation.

Once we returned to the precinct, we were instructed to stage inside the East Precinct sallyport. This provided time, distance and shielding from the rioters. The rioters then decided to ignore our attempts to disengage and approached the sallyport and eventually attempted to attack officers with the explosive.

We were ordered to attempt to arrest the suspect who threw the explosive at officers, we attempted to take the suspect into custody but were met by a much larger and hostile crowd. Once the suspect escaped, we broke contact with the group. Again, the group of rioters decided to engage officers who were being treated by Seattle Fire for injuries.

Once we were ordered to move the crowd I used as many verbals to the crowd in order to get them to leave the area. Commanders continued to use their PA system to make crowd dispersal orders to let them know the gathering was no longer peaceful or legal.

All attempts at time, distance and shielding were ignored by the rioters. I attempted to use my squad of bike officers and my bike to create a "fence line" which keeps physical space in between the rioters and officers reducing the likelihood that officers are assaulted.

Also commanders' announcements provided warnings that they may be subject to crowd control munitions if they did not disperse.

Once we were taking rocks, bottles and explosives it was no longer feasible to deescalate as we were under imminent threat of attack.

**DECISIONS MADE**:

Once the commanders made the decision to move the crowd de-escalation was no longer feasible and we were directly head-to-head with a hostile illegal assembly which had already demonstrated that they were willing to try to kill officers (baseball bat to back of head/neck). This group believes in police officers being killed and often chants and has signs relating to the murder of officers. They attacked businesses and officers unprovoked based on their political animosity towards the institutions and businesses. They have set fire to precincts, thrown explosives at buildings and officers, committed widespread arson and have repeatedly attacked officers with projectiles and assaulted officers on the line. This was a dangerous group which has tactics and trains together. Anyone assisting criminal agitators inside the crowd is also guilty of Criminal Mischief. Our squad was following direct orders to move the crowd from A/Lieutenant Moore, Lieutenant Dyment and Lieutenant Brooks.

**THREAT ASSESSMENT**:

The crowd destroyed windows with large wooden clubs and other blunt objects. They attempted to remain anonymous by discouraging filming of their actions. They also hide their identities by hiding their faces and dressing in dark clothing. They used this as an opportunity to begin attacking officers with relative impunity. That is when they began throwing the large rocks, explosives, water bottles, traffic cones and other objects at officers who were backed against the West Precinct.

The objects that they were using to destroy the large panes of glass were also readily available to the rioters to use against officers as weapons.

In addition, the protective equipment provided to bike officers is recreational mountain biking equipment and our issued helmets are basic bicycle helmets made of Styrofoam.

My assessment to use force was based on where I was seeing immediate serious threats (rocks, glass bottles, explosives) and orders from scene commanders.

**FORCE USED**:

Objectively Reasonable: I used blast balls in a targeted manner due to active and imminent threats to myself and officers on scene. The crowd was throwing dangerous objects at officers including glass bottles, rocks and explosives. The same group (ENDD) has committed multiple acts of arson, attempted to burn down the East Precinct with officers inside and

have used Molotov Cocktails against officers. I used the OC blast balls in order to create space from where the active threats were coming from. Blast balls create, noise, heat and light designed to move the crowd. The crowd was throwing glass bottles, rocks and explosives which have potential to seriously injure or even kill officers if hit in the head or neck. Assault 3 is a very serious threat as it is a felony. With my limited use of force tools, I had available the blast balls were the most appropriate and only option for addressing the violent crowd.

The crowd posed an immediate threat to all officers on scene as well as any citizens nearby. Rocks, bottles explosives and fire have the potential to seriously injure or kill those they strike.

The suspects use the crowd to mask their identities and wear matching clothing to avoid being spotted and being arrested for their crime.

The subjects in the crowd are trying to inflict harm upon officers and act in a coordinated manner, as evidenced by the crowd using bright lights to create a wall of light before the first suspect ignited and threw the explosive at officers in the East Precinct as well as people in the crowd gathering close to one another and using umbrellas to physically shield the suspects throwing items at officers. These people are committing criminal assistance to the assaults on officers.

I had very little time to make a decision to use force as we were consistently facing attacks from rocks, bottles and explosives. Once I saw where a specific threat was coming from I decided I needed to use blast balls to move the crowd to stop the specific threat.


Necessary: The use of blast balls was necessary as there was no other feasible method to disperse the crowd. As explained before we tried utilizing time, distance and shielding. We tried different forms of communication. We used verbal commands and still they feloniously assaulted officers assigned to the riot. Blast Balls were the only less lethal munition that I had that could reach the threat in hopes of stopping the attacks. I only deviated from training in that I deployed the blast balls in an overhand manner as there were multiple officers and lines of rioters who did not throw the perceived items at officers. I needed to deploy it overhand to reach where the threat came from.

Proportional: I believed the use of blast balls to stop the felonious assaults on officers was proportional because they were throwing items that could seriously injure or kill officers. Individuals in the crowd already showed extreme violence against officers by attempting to kill officers with baseball bats. Rocks and bottles have potential to kill or seriously injure officers if struck in the head. The explosives they threw have potential to kill, burn and seriously injure officers if struck.

Blast balls are an approved training technique through the Seattle Police Department and the Department of Justice. I used these in a targeted manner towards where I perceived threats reflects the seriousness of assaultive behavior from the unlawful assembly. Blast balls

produce light, sound, heat and pressure in addition to a small amount of OC. These are designed to move the crowd with minimal injury.

Ultimately after reviewing my body worn video, I believe I threw a total of four blast balls throughout the riot.

1) 11 AV E AND E PINE ST (OC BLAST BALL)
   While we first began moving the crowd at the direction of Lieutenant Dyment we began taking glass bottles and rocks from the crowd. I saw one projectile come from the southwest corner of 11 AV E and E PINE ST from someone in dark clothing. I decided to throw one blast ball overhand towards the area of the threat to stop any further additional assaults against officers. I saw people move from the area and did not see any additional projectiles from that area after deployment. The force was effective, and I did not use any additional munitions.

2) 1000 block of E PINE ST (OC BLAST BALL)
   While moving the crowd we continued to receive other projectiles at officers on the line, while those in the front of the unlawful assembly continued to push and assault officers on the line. I observed fireworks being thrown at officers from in the middle of the crowd away from the front line. I decided to throw one blast ball overhand towards the area of the threat to stop any further explosives from being thrown at officers. In addition to other crowd control munitions and OC spray against the front line of rioters that crowd continued to move westbound on E PINE ST. I did not use any additional munitions at this time.

3) BROADWAY AND E PINE ST (OC BLAST BALL/GLASS BOTTLE)
   Once the crowd was moved to the intersection of BROADWAY and E PINE ST the group began to congregate on the campus of Seattle Central Community College. The group then used the cover of darkness by throwing large glass bottles at officers. I observed one bottle come from the area of the college campus sign. They again were in dark clothing using their tactics to blend with the crowd. I deployed one OC blast ball to the area of where I believed the threat to have come from. Shortly after Lieutenant Brooks ordered officers to use additional crowd control munitions to move the crowd. The munitions plus coordinated bicycle team tactics to move the crowd stopped the immediate assaults on officers. I did not throw any additional blast balls near where I perceived the threat to come from.

4) BROADWAY AND E OLIVE WY (OC BLASTBALL/FIREWORK)
   Once we reached the intersection of BROADWAY and E OLIVE WY I observed a large mortar type explosive thrown at officers from the northwest corner of the listed intersection. I threw one OC blast ball at the northwest corner where I believed the explosive to originate



from. Once it deployed the people in the immediate area continued
westbound and officers continued to move the crowd. I did not need
to use any additional munitions for the perceived threat.

**MEDICAL AID AND EVALUATION**:

No one reported any request for medical aid to me on scene and I did not hear any requests for Fire.

I suffered a small abrasion to my left knee from falling while pursuing the male who threw the large explosive at officers who were inside the precinct. I did not need any medical attention.

Multiple officers were treated for injuries. One for the baseball hat to the back of his head and an additional officer had to go to the hospital for dislocating his shoulder.

**RESOLUTION**:

None of the subjects who assaulted and attempted to assault officers that I witnessed were arrested due to them using the unlawful assembly as cover to both commit their violence from and return to after they did so.

**ADDITIONAL INFORMATION**:

The FBI defines domestic terrorism as : "Violent, criminal acts committed by individuals and/or groups to further ideological goals stemming from domestic influences, such as those of a political, religious, social, racial, or environmental nature."

EXHIBIT D(12)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Andrew West - 30032824

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/26/2020 | 9/23/2020 | 20:38 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58468 | 2020-275135 | 2020UOF-1536 |
| **Date/Time Entered** | | |
| 9/26/2020 01:02 | | |

## Incident Summary

EVENT/GO#: 2020-275135
DATE OF OCCURRENCE: 9-23-2020
STATEMENT OF: OFFICER WEST'S UOF

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. C. Robbin. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Hancock screened this incident at the scene.
B. ICV and/or BWV recorded: BWV was recorded

PRE-ARRIVAL DETAILS:
I have been a Seattle Police Officer for almost fifteen years and had the privilege of being a part of many different units, ie. Patrol, Bike Squad, ACT team, and currently SWAT team. During my tenure, I have been involved in numerous Protest/Demonstrations. This "Protest" was the most aggressive and volatile that I have seen as a Law Enforcement Officer. As an Officer of the Seattle SWAT team, I am trained on the deployment of various hand thrown and launchable less lethal munitions. I have been thoroughly trained on various Less lethal weapons and munitions and current on my annual recertification's.

These weapons include but are not limited to 40 millimeter launch able projectiles that are designed for point target application. The 40 mm launcher has various munitions that include, Muzzle blast which contain a powder irritant in the form of OC (Oleoresin Capsicum) or CS (Chlorobenzalmalononitrile), Direct impact in the form of foam baton. The foam baton has various capabilities of delivering a powder in OC or a marking device in various colors. Other Less lethal point target weapon systems include, the FN303 which delivers a fin stabilized paintball sized projectile to deliver OC, marking, and glass breaking capabilities. I have also been trained in the use of the pepper ball gun. This Less lethal weapon can deliver paintballs that contain OC or a marking agent to the intended target. I have also been trained on the delivery of hand thrown munitions which include Blast balls (Inert, Inert OC, Etc...) Inert blast balls do nothing more than deliver an auditory noise to disperse an individual or crowd. Hand thrown gas which includes but is not limited to (OC, CS, etc...) Hand thrown gas is mainly used for area of denial applications or to persuade someone to exit a structure. Another hand thrown less lethal tool that I have been thoroughly trained in, is the deployment of an NFDD (Noise Flash Diversionary Device). This tool like the Inert blast ball, does nothing more than deliver a loud auditory noise to persuade individuals to comply. I have also been trained in handheld less lethal tools like pepper spray (OC) and Taser. Many of the above listed less lethal tools described above I have voluntarily been subjected to whether as a Law Enforcement Officer or during my time as United States Marine so I can attest to the effects psychologically and physically.

On 9/23/2020, at around 2040 hours I was working as a fully uniformed Seattle Police SWAT Officer Z22. I was wearing a load bearing vest with clearly marked and posted "Police" patches on my chest and back to include patches on my shoulders. I was working with the remainder of the Seattle SWAT team assisting Peace Officers with Less Lethal support.

During the above listed time, my presence was requested to assist Officers with another protest in the Seattle area following the George Floyd incident that occurred in Minnesota. I have been a part, the many Seattle Police Officers in the ongoing protests in a few predominately liberal ran cities. Post the George Floyd incident I have encountered property damage resulting in cars set ablaze, windows broken to businesses, looting from businesses, defaced businesses to include three Law Enforcement facilities. I have seen Officers get assaulted from head to toe with rocks, bottles, pieces of concrete, IED (Improvised fireworks to inflict substantial

damage) …. the list goes on. Since today was the release of the Jury's decision in the Breonna Taylor incident that occurred in Kentucky, some of the citizens of Seattle decided they needed to join in the unrest.

ARRIVAL:
On the above listed date and time, I was in the area of 4th Ave. and Seneca street where bicycle Officers had been monitoring a group of about 200 create property destruction in their wake. I heard Officers announce several buildings be vandalized by either breaking windows or defacing property. At around 2038 hours, I heard an Officer share intelligence he was given that the protestors were planning an attack on Officers in the area of 4th Ave. and Seneca St. I don't know exactly his source of this information and heard RTCC (Real Time Crime Center) elaborate on this and other intelligence that was being shared with Officers on the ground for safety. As Officers followed the protestors, RTCC continued to push intel that the "protestors wanted an altercation with law enforcement and to expect arrests." I along with Sgt. Hancock, Ofc. Coolidge, and Ofc. Lednicky were in a department issued Tahoe following the main Police Bike element as this was occurring.

At 2046 hours, Captain Allen gave one of many dispersal orders to the crowd of protestors turned riot on 4th Ave. via his vehicle's loudspeaker. This order was given many times with direction on how to leave the area giving them plenty of options. I followed this crowd with the others loaded in my vehicle in case our assistance was needed with Less Lethal support or if the situation went to an active shooter in the crowd. Like a situation that occurred in Dallas, Atlanta, or most recently Kentucky.

At around 2343 hours, Officers responded to the intersection of 11th and Pine St. due to a large fire that the rioters started in the intersection that was growing larger. My thought was the fire was made to draw Officers in knowing they would want to put it out or get security in place so the Fire Department could safely put it out. During Officers movement to the flames, our presence was requested to support the bicycle Officers and Officers on foot with Less lethal support. At this time, I was loaded with a single 40mm launcher and hand thrown OC blast balls. Once I was out of my vehicle, I went to catch up with bicycle Officers that were moving towards the crowd in hopes they disperse from the area since they were given countless dispersal orders to leave the area. As Officers made their movement westbound on Pine St. from 11th Ave., they were assaulted with rocks, bottles, and IED fireworks. When I refer to fireworks being IED, I'm referring that they were altered in a fashion to be more dangerous than already intended. I've seen nails, various metals, ball bearings, or multiple fireworks strapped together to create more damage and or injury to officers. I have seen this during all my altercations with these suspects. Unfortunately, during all these assaults, I could not locate nor address any of these suspects in their actions to prevent injury to Officers in the area.

At around 2350 hours, I was with the main bike Officer element that had established a bicycle fence line on the east side of Broadway Ave. and Pine St. At this time additional dispersal orders were given to the crowd with three was of egress out of the area and the crowd did not move. Finally, a call was made to move the crowd, so Officers made a push with the main crowd heading North on Broadway Ave. from Pine St. At around 0005 hours, I was personally struck in the face with some hot slag from an IED firework that landed just to the left of me near the intersection of Denny way and Broadway Ave. When I state slag, I'm referring to the unburnt metal or powder that was propelled from the device that was detonated next to my feet.

At around 0006 hours, I was walking with Officers as we made our movement with the main crowd westbound on Denny way from Broadway Ave. Once Officers arrived to the intersection of Harvard and Denny way, they were faced with a light colored four door sedan driven by a suspect that attempted to run Officers over. She saw that the intersection was full of people and waited until the Officers were physically in the round-about before she initiated her movement. Thankfully no Officers were hurt but it was obvious what her intent was. Officers removed her from her vehicle as she resisted and yelled allegiance to the rioters/suspects cause.

Just after the altercation with the vehicle, the main crowd turned South on Harvard from Denny way. As Officers made their way down Harvard an announcement over radio was made about the threat this stretch of road has been to Officers in the past. I heard Officers state that suspects had stashed various objects in the area to assault Officers in the past as if this were a gauntlet to pass through. I also heard Officers point out that there were a couple of vehicles, one being an older Ford truck full of anarchists that were seen supplying suspects in the area with weapons or materials to use against Officers. As I took note of all this information, like clockwork we were being assaulted with rocks, pieces of concrete, and bottles just to name a few. These objects were being propelled in our direction in a manner as if they were using mechanical means to deploy them. Meaning, they were moving very fast and hitting their impact area hard.

At around 0007, I walked down the middle of Harvard next to the bicycle Officers to assist them with Less Lethal means of protection. During this time, I witnessed a group of individuals to my right pick up some objects on the ground and throw them our direction. I saw a large object fly in the air like a mortar as indirect fire and heard an object fly by my head at a fast rate of speed. I observed this action and deployed an inert blast ball at their feet to deter them from further assault towards Officers or myself given all the routes of escape. The blast ball seemed effective as it deterred them from assaulting Officers and made them leave the area to the south. Thinking back to what Officers said before we made our movement down this stretch of road, I turned focus to my left and saw a group that had thrown or attempting to throw objects at us. I could not reach them with direct impact, so I decided to deploy another inert blast ball in their direction

to deter them from further assaults on Officers. My deployment seemed effective because the suspects would in turn create distance from us and move to the South. After that deployment, I looked to my right and there is another group looking as they were going to assault Officers so I assumed this was coordinated attack amongst themselves to throw us off and assault us from all sides utilizing some concealment, congestion, and numbers of assaulters. In all I deployed about five blast balls in the area to defend Officers and address the suspects that were assaulting or in the middle of the act of assaulting. The deployment of the blast balls seemed effective moving the suspects South until the regathered at the end of the street. Also, during this movement I witnessed large rocks, bottles, and fireworks being thrown towards myself and Officers at the scene.

As Officers continued to move the crowd, we made a westbound turn from Harvard onto Olive. Once we were mid-block on Harvard, suspects began pulling dumpster into the streets with mattresses as if they were fortifying a position for themselves. During this time an individual threw and object they had concealed behind the dumpster towards us, so I deployed a foam baton 40mm round aiming towards their beltline or below. This deployment seemed effective resulting in the suspect from fleeing in the opposite direction. This happened on two occasions resulting in the same resolution. Point of aim, point of impact towards the beltline and below on the suspect with the assaultive behavior. As this movement continued, the numbers of rioters seemed to thin out as we made our way southbound on Boylston. Since their numbers were low, I feel they didn't feel so emboldened to assault Officers in the area. Given that, I along with the rest of the SWAT Officers in the area got into our vehicles and staged elsewhere until we were requested.

As we were driving around, I noticed a large fire that was started in the intersection of Boylston Ave. and Pine St. Some Officers maintained security on that so the Fire department could respond, and bike Officers continued to monitor the remainder of the crowd. After some time, we regrouped with the main element of Officers that was monitoring the crowd as it approached Cal Anderson Park. Cal Anderson park has been a haven hub for these criminals for quite some time now resulting in the closure of the park post "CHAZ/CHOP". When they had their lawless anarchy, zone filled with murders and other various crimes. Once we were in front of the park on Pine St., Officer Evans told me he was assaulted by a male in the park and broadcasted his description and location over radio. I observed bike Officers approach this suspect in the park which led Officers in a pursuit of him since he started to run off. He was later apprehended inside the park out of my view.

After the Cal Anderson incident, we responded to our respective vehicle and monitored the crowd from radio traffic relayed by Officers on scene. As time went by, the crowd finally diminished, and our assistance was no longer needed so we responded to the Office. End of statement.


LEGAL AUTHORITY & LAWFUL PURPOSE:
My lawful purpose was to prevent assaults on innocent individuals and Peace Officers, and to prevent property destruction. This riot took place on the city streets of Seattle that is open to the public.


CONTACT WITH SUBJECT:
By dispersion of Blast Balls or irritant munitions for area of denial and targeting belt line and below for impact munitions.


DE-ESCALATION:
Participants in this riot were given a route of escape and warnings to leave the area on numerous occasions. I heard front-line Officers tell them to "stop" or "get back" as we continued our push or held at the line.


DECISIONS MADE:
The rioter's actions dictated my actions in order to ensure the safety of the Officers at the scene. I decided to deploy irritant munitions for area of denial and direct impact munitions to address individuals that were throwing, kicking, and launching objects towards me and Officers at the scene.


THREAT ASSESSMENT:
Visually observing individuals assault Officers by kicking, throwing, and launching objects utilizing mechanical means at me and other Officers at the scene.


FORCE USED:
Deploying irritant (OC) munitions to evoke area of denial to a crowd of hostile individuals and directly impacting individuals targeting belt line and below that are assaulting Officers with objects that are propelled towards us.


MEDICAL AID AND EVALUATION:

Several Officers were injured during this incident. I do not know if they sought out medical attention or not. No medical aid was possible for anyone I used force on since they would leave the area without me being able re-acquire them. Also, I didn't see anyone of them in need of aid.

RESOLUTION:
The crowd diminished somewhat and their hostility declined. It was not feasible for me to take anyone I used force on in custody because they would run off after they conducted their assaultive act and I was unable to re-acquire them.

ADDITIONAL INFORMATION:
N/A

## Incident Location

- 100 Harvard, Seattle, WA 98001 - Location of Occurrence: Demonstration - Precinct: E2 | EDWARD | EAST

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
| --- | --- | --- |
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Cloudy | Darkness | Greater than 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |

**Employee Assessment of Community Member Condition During Incident**

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
| --- | --- |
| Yes | No |

## Reporting/Involved Community Member Information

### John Doe

DOB:    Race:    Ethnicity:    Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Blunt Object – Use
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
| --- | --- | --- |
| | | |

| | | |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race: Unknown   Ethnicity:    Gender: Male

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use
- Other (Specify in Narrative)

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB: 4/1/1984   Race: White   Ethnicity:    Gender: Male

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use
- Other (Specify in Narrative)

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race:   Ethnicity:    Gender: Unknown

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use
- Other (Specify in Narrative)

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race:   Ethnicity:    Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Blunt Object – Use
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race:    Ethnicity:    Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Blunt Object – Use
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race:    Ethnicity:    Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Blunt Object – Use
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer Andrew West - Serial: 30032824 - Badge Number: 6892
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Special Operations Bureau
B600/Metropolitan Section B620/Swat Unit B621/Swat - Day Squad 2 B621B/Swat - Day Squad 2 B621B

**Video Footage**: [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Balls - OC - Was force effective: Yes
- 40mm Launcher - Was force effective: Yes
- 40mm Launcher - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | | |
| 40mm Launcher | Yes | 10 | 1 |
| 40mm Launcher | Yes | 12 | 2 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| Self-Treatment | 1 | 1 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
| --- | --- | --- |

## Chain of Command History

| Routing #1 |
| --- |

| Sent From: | Police Officer Andrew West |
|---|---|
| Sent To: | Police Lieutenant Christine Robbin |
| CC: | (none) |
| Sent Date/Time: | 9/27/2020 11:53 AM |
| **Instructions from Police Officer Andrew West to Police Lieutenant Christine Robbin:** | |
| Officer West's UOF 9-23-2020 | |
| **Comments/Response from Police Lieutenant Christine Robbin:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____
Police Officer Andrew West - 30032824

EXHIBIT D(13)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must document every use of force throughout the incident.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B. ICV and BWV recorded: If not, explain why not
    C. Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A. Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B. Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting

**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault

**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response

**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A.  Did the subject(s) pose a threat to you, another person, or another officer?
    B.  Describe the threat in detail or why you believed there was a threat.
    C.  Describe your decision regarding force and how you came to that decision
    D.  Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A.  Words, actions or threat posed by subject prior to, during, and after the use of force:
    B.  Continued de-escalation attempts and the subject(s) response if feasible
        i.  Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C.  Describe the force used and lawful purpose of the force used:
        i.  Describe any warning given.  If none were given, explain why not.
    D.  Explain your decision to use a technique or less lethal tool, based on feasible options
        i.  Describe proportionality of force
        ii.  How did the totality of circumstances affect the force used?
        iii.  If force was necessary, explain why
    E.  Explain effectiveness or lack of effectiveness of employed techniques
        i.  Was this a trained technique? Where were you instructed in this technique?
        ii.  Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
              • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii.  When and how was your force modulated?
    F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A.  Injuries/Medical Aid
        i.  Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii.  Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii.  Did the subject refuse medical aid or flee?
        iv.  Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#:2020-275135**

**DATE OF OCCURRENCE:09/23/2020**

**STATEMENT OF: R. ZECH 7383**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sergeant Rees.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A.  In-person supervisor screening: Yes. I screened this incident with Sgt. Rees after returning to the East Precinct.
B.  ICV/BWV recorded: BWV-yes. No ICV capabilities on bike. I viewed my BWV before writing this statement.

**DETAILED NARRATIVE:**

**PRE-ARRIVAL DETAILS / BRIEFING:**

I was hired by the Seattle Police Department in December of 2014 and attended the 720 Hour Basic Law Enforcement Academy, provided by the Washington State Criminal Justice Training Commission. I became a sworn commissioned officer on April 28, 2015. After that I attended the SPD academy which focused on Seattle's policies, tactics, and procedure. I successfully completed the field training program and was assigned to patrol at the East Precinct in the fall of 2015. Since then I have become a certified CIT officer, attended shotgun/patrol rifle training, completed a two-week training school for Anti-crime along with a 2-week undercover school. I also attended a three-day training course at New Mexico Tech for incident response to terrorist bombings and am a certified Field Training Officer. I am certified by IPMBA as a bike officer and have been trained on SPD crowd control tactics and arrest tactics, specifically developed for bike officers. I have also received 8 hours of crowd control training annually. Over the past two years I have worked dozens of protests and demonstrations within the city of Seattle. I have worked peaceful marches and events that have been deemed riots. I am currently assigned to patrol at the East Precinct.

During this incident, I was working with the East Precinct bike squad under Sergeant Rees as the 2E80s. We were assigned to the "Justice for Breonna Taylor" protest that was scheduled to occur in two different locations in the City of Seattle; Cal Anderson Park and Westlake Park.

Before this event, all of SPD was briefed at roll call on the situation and Commander's Intent:

SITUATION:

The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice. Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25. On August 16, 2020, a protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to

officers. On August 24, 2020, ENDD resulted in serious threats to Officer Safety. Notably, quickrete was used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also, on August 24, Molotov cocktails were used in an attempt to burn the SPOG building. On Sept 1st, a group of about 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct. Most recently, on Sept 7th, rioters marched to SPOG and arrests were immediately made after people in crowd were known to be in possession of Molotov cocktails. This incident had numerous assaults on officers. On Sept 23, 2020, a Jefferson County Kentucky Grand Jury made a decision on criminal charges for Officers involved in the Breonna Taylor incident. Nationwide demonstrations, to include Seattle, are anticipated as a result of this event.

Schedule of September 23, 2020:

Justice for Breonna Taylor - 1900 hours, Cal Anderson Park

Justice for Breonna Taylor - 1900 hours, Westlake Park.

COMMANDER'S INTENT:

"There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. In light of today's decision by the Jefferson County (Kentucky) grand jury regarding the Breonna Taylor case, further protests are expected. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct."


The mission of SPD was stated in the IAP as:

The mission of the Seattle Police Department is to enforce the law and preserve order. The Seattle Police response priorities are: Life Safety, Incident Stabilization, Property Conservation, and Crime Scene Preservation.

---------------------------------------------------------------------------------------------------------------------

While assigned to the protests/riots leading up to this incident, I was assaulted multiple times and obtained multiple injuries from protestors throwing wood, bottles, and rocks at me. I heard thousands of protestors chant and scream anti-police slogans while hold signs accusing all police of being murderers and heard them chant to burn the East Precinct to the ground. Each day/night the crowd consistently threw rocks, cans, and water bottles at officers resulting in injury, and set off explosions in the crowd trying to instigate riots and injure officers. Protestors were adamantly focused on police and anything they could make issue of, specifically the fact that police would not allow them near the East Precinct. This continued until we were ordered to abandon the East Precinct, which was taken over by the rioters who developed "CHOP".  After the precinct was recovered and the CHOP was cleared out, a group of participants moved over to Cal Anderson Park where they currently remain. This group has continued with attacks and assaults on officers and has tried to burn the precinct down with Molotov cocktails. The Park is considered a "high risk" area for officers and we do not enter unless we have enough officers to control a small riot, which occurs each time we enter. The participants of the riot met in the same park before they began marching through the City.

**ARRIVAL:**

At approximately 1745hrs, my squad had been observing the march as it moved through the Capitol Hill area. We began receiving information that the marchers were breaking out windows of businesses and spray-painting buildings. The March was soon after declared an unlawful assembly by command staff and dispersal orders were given over a PA.

We followed the rioters downtown as they refused to disperse. They started assaulted officers with rocks, bottles, and anything they could find on the street to throw at us (street signs Etc.). The crowd continued to destroy property as they marched NB on 4th Avenue. We also received intel that the crowd was planning to reach level ground where they would "turn and battle it out" with police. This continued for several blocks as dispersal orders were repeatedly given over a PA by command staff.

AS this situation continued, the rioters used vehicles in attempt to separate us from those on foot. Eventually officers were able to apprehend one of the vehicles that was assisting the rioters and the other vehicles fled. We were then able to get closer to the crowd and to identify those assaulting officers and causing property damage.

Officer Binder saw a male in the crowd causing property damage to a business near 5th Ave and Pike St. and pointed him out to Sergeant Rees. I saw Sgt. Rees ride towards the male, and I went to assist. At that time, the entire group of approximately 200 rioters were in the street directly in front of us and to our side as they marched EB.

Sgt. Rees grabbed on to the male who was in the process of spray painting a building t place him under arrest. As soon as Sgt. Rees grabbed on to the male to arrest him, members of the riot grabbed on to the male and began dragging him towards the middle of the crowd. I could see that Sgt. Rees and Officer Binder were both being pulled into the crowd by the arrestee who was attempting to free himself, and by the people who were trying to de-arrest the him. I ran towards Sgt. Rees and Officer Binder and began pulling subjects off the male who was being arrested and giving orders for them to move back.

**LEGAL AUTHORITY & LAWFUL PURPOSE**

I had legal authority to be in the area because the incident occurred on a public street. The crowd was illegally occupying the street and participating in an unlawful assembly. I was there to protect the public and to prevent assaults and property damage. The had been given multiple dispersal orders but refused to comply.

My lawful purpose was to assist with conducting a probable cause arrest, and to prevent the officers from being assaulted by the violent and hostile crowd.

**CONTACT WITH SUBJECT:**

As officers were being pulled into the hostile crowd and multiple subjects were attempting to free the arrestee by pulling him away from the arresting officers, I gave multiple orders for subjects to "get back" and began pushing them. The crowd was so aggressive that they did not move and continued to grab on to the arrestee and pull them away from officers. One subject began pushing me with an umbrella along with approximately 15 others who were pressing up against us in effort to get to the arresting officers.

**DE-ESCALATION**:

I had already given multiple orders for the subjects to move back and Sgt. Rees had already been pulled approximately 20' across the street towards the crowd. The group had already assaulted officers and this was an immediate active threat of harm. It was clear the intent of the rioters was to assault, obstruct, and overwhelm police.

Because officers were being actively assaulted and pulled into the crowd and because the crowd had surrounding us, it was not feasible at the time for me to attempt de-escalation.  It would have severely compromised officer safety and given the crowd further opportunity to harm us.

**DECISIONS MADE & ORDERS GIVEN AND RECEIVED**

Because Sgt. Rees and several other officers had already been pulled into the crowd by multiple subjects and we were surrounded by a large hostile group potentially carrying weapons, I decided to use my mark9 to move the crowd away from us.

**THREAT ASSESSMENT**

The crowd was approximately 200 strong and were all planning to fight with officers at some point, per intel. They had already assaulted multiple officers with projectiles and were actively grabbing and pulling officers into the crowd as they surrounded us. They were screaming at us and pushing and grabbing at us.

Officer were unable to make arrests due to the aggressive assaultive behavior and we were not able to control the scene. I believed at the time that we were in a very dangerous position that needed to end quickly. I knew based on my experience that if we did not disperse the crowd that was surrounding us, we would be assaulted and potentially injured.

**FORCE USED**

I took my Mark 9, which is a pepper spray commonly used by SPD as a less lethal option and sprayed it at two different subjects who were pushing me. The subjects were attempting to push past me to reach the arrestee who was behind me with Officer Binder.  Due to the urgency of the situation with the hostile crowd around us, and because the priority was to protect officers conducting the arrest, I gave the subjects verbal commands to get back but was not able to provide a warning for OC spray. I believed that mark 9 was the best option at the time. I was not able to go hands on with all the subjects because there were not enough officers to safely conduct the arrests.

I believe the force used was objectively reasonable, necessary, and proportional to the present threat of assaultive actions towards officers. If I had not used my OC spray, I would have had to go hands on which was not a safe option.

**RESOLUTION**

The subjects eventually ran away and continued marching EB with the group where they conducted further assaults on officer, caused property destruction and set multiple fires. I was not able to identify either subject. The male arrested by Officer Binder was Searched incident arrest and I read him Miranda on scene. He was then placed in a transport van for booking.

EXHIBIT D(14)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV recorded: If  not, why not – Must be explained if no ICV

    C. Note if you reviewed ICV or other video prior to statement.

**Pre-Arrival:**

    A. Your relevant  training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?

**Arrival:**

    A. Observations:
- i. People / other officers on scene.  Activity occurring, dangers, citizens exposed…

      ii.    Buildings, vehicles

      iii.   Environmental factors: weather, lighting

B.  What was happening when you arrived or first observed the subject(s)?

**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):

      i.     Public area

      ii.    Consent

      iii.   Exigency

      iv.   Warrant

      v.    Community caretaking

B.  Lawful Purpose (Explain in Detail):

      i.     Social Contact

      ii.    Terry Stop

      iii.   Probable Cause for arrest

      iv.   Community Care-taking

      **Note:** Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.

**Contact with Subject(s):**

A.  How did you make your presence and authority clear?

      i.     Verbal identification, commands or instructions

      ii.    Did the subject say or do anything that indicated he/she knew you were the police?

B.  Contact with involved subject(s)

      i.     Observed Details

          - Physical/verbal reaction to officer

          - Tone of voice / statements made

          - Body posture / movement

          - Subjects size / strength vs. officer

          - Intoxication / mental state

      ii.    Information obtained from each subject

C.  Was there a frisk of any subject?

      i.     Reasons to believe subject was armed and currently dangerous

      ii.    Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

A. Communication
   i. Verbal persuasion
   ii. Advisements and warnings (including Taser spark tests and warnings)
   iii. Clear instructions
   iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
   v. Avoiding language, such as taunting or insults, that could escalate the incident
B. Time, Distance, Shielding
   i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
   ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
   iii. Did you utilize cover and concealment for tactical advantage
C. If De-escalation was not safe or feasible, explain why not


**Decision Made:**

A. Overall summary of information gained from investigation
B. Decision based on information:
   i. Warning
   ii. Citation
   iii. Documentation
   iv. Arrest
C. Include any Tactical Decisions and Scene Control you employed


**Threat Assessment:**

A. Did the subject pose a threat to you, another person, or another officer?
B. Describe the threat in detail or why you believed there was a threat.


**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

A. Words, Actions or Threat posed by subject that necessitated the use of force:
   i. Attempts to flee
   ii. Fight
   iii. Resist arrest
B. De-escalation and continued attempts and the effect on the subject

      i.    Verbal de-escalation

           - Warnings/commands to subject.

      ii.   Physical de-escalation

      iii.  If de-escalation was not feasible, you  must  explain why not

C.  Lawful purpose of the force used:

      i.    Gain control

      ii.   Protect yourself or others from a threat of immediate harm

      iii.  Stop a potential deadly threat

D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options

      i.    Proportionality of force

      ii.   How did the totality of circumstances affect the force used?

      iii.  "No reasonably effective alternative…."

E.  Explain effectiveness or lack of effectiveness of employed techniques

      i.    Was this a trained technique? Where were you instructed in this technique?

      ii.   Were you able to apply the technique properly? Explain why or why not.

           - If effective, describe assessment and modulation of force

                  • Describe control of or compliance of subject

           - If not effective, explain why not and how you progressed from there

      iii.  When and How was your force modulated?

F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid

      i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)

      ii.   Medical aid (who provided and where provided)

      iii.  Refusal of medical aid by subject

      iv.  Refusal to accept at jail - disposition

      v.   Injuries to yourself


**Resolution:**

A.  Search

      i.    Items recovered

B.  Transport and processing of subject:

      i.    Use of ICV

      ii.   Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

EVENT/GO#: 2020-275262

**DATE OF OCCURRENCE: 09/23/2020**

**STATEMENT OF: OFFICER A. RIDLON**

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Fliegal #7414.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:
    A.  In-person supervisor screening: Sgt Fliegal #7414
    B.  ICV recorded: No. Bicycle Officer. BWC reviewed for report.

---

**PRE-ARRIVAL DETAILS:**

Completed Washington Criminal Justice Training Commission 740 hour Police Academy. Completed 993 hour California Basic Peace Officer Standards and Training Academy.

Sworn Seattle Police Office since 11/01/2018. Assigned uniform patrol, North precinct, First watch. Solo Officer.

I was working as a uniformed bicycle Officer in a bike squad tasked with crowd control for a 'Justice for Breonna Taylor' protest. The protest quickly turned into and was declared an unlawful assembly.

---

**ARRIVAL**: I was riding eastbound on Seneca St following the unlawful assembly. Suspects in the crowd were throwing cones, thrash cans and other debris into the road to block Officers from following them and severely limiting the access of emergency vehicles to the area. Suspects were spray painting and smashing business windows in the area. The crowd size was approximately 150-200 people. I recall several arrests for various offenses had been made. I arrived at the intersection of 8th Av and Seneca St. I first saw the Suspect opening the hatch of his Sedan which was parked facing east bound blocking the southern most part of the intersection of 8th Ave and Seneca St.

**LEGAL AUTHORITY & LAWFUL PURPOSE**: I contacted the Suspect in the intersection of 8th Av and Seneca St. The area is public road completely open to the public.

I had probable cause to arrest the Suspect for rendering criminal aid.

**CONTACT WITH SUBJECT**: I first saw the Suspect opening the hatch of his Sedan which was parked facing east bound blocking the southernmost part of the intersection of 8th Ave and Seneca St. I was on a Police Bicycle, wearing full riot gear with 'POLICE' marked on it. There was approximately 10 other Bicycle Officers around me. I ran towards the Suspect on foot after dropping my Bicycle. Before I could identify myself verbally as Police the Suspect started running southbound on 8th Ave. The Suspect appeared startled and uttered some curse words. The Suspect appeared to be approximately 200 pounds, 6'2'', medium build. I grabbed the Suspects arm to gain control of him as he was fleeing. I was able to grab his arm but he continued to run. It appears the Suspect either falls to the ground by tripping or other Officers also grabbing him. I could not tell from where I was during the contact. The Suspect fell to his knees, his hands also came to the ground, I verbally told the Suspect to 'turn over' and used both hands placed on his back/shoulder area to guide him onto his stomach. This was effective on getting him to roll onto his stomach. The Suspect held his hands under his chest so Officers could not move them behind his back for handcuffing once he was laying on his belly. I told the Suspect "hands out like an air plane' after approximately 3 seconds the Suspect removed his hands from under his chest allow us to bring them almost behind his back. I told the Suspect again to put his 'hands behind his back'. I controlled the Suspects left arm by holding it towards the ground until Officers could began handcuffing the Suspects right arm. The Suspect tensed his arms actively resisting Officers Handcuffing. Officer continued to issue the Suspect commands including 'hands behind your behind back' and 'stop tensing'. I moved the Suspects hand behind his back and he was handcuffed after several seconds of commands. The handcuffs were gauged and double locked while the Suspect was laying on his stomach.

**DE-ESCALATION**: : I was wearing a Seattle Police Approved bicycle outfit with 'Police' written on the chest. Immediately upon me approaching the Suspect he attempted to run away. I approached the Suspect with another Officer to lessen the use of force necessary to take the Suspect into custody.  I grabbed his arm to maintain control, the Suspect continued to try to run. It appears the Suspect either falls to the ground by tripping or other Officers also grabbing him bringing his momentum towards the ground. I could not tell from where I was during the contact.  Once on the ground I, along with other Officers gave the Suspect calm, clear commands to 'roll over' onto his stomach, put his

'hands out like an airplane' and 'put his hands behind his back'. Officers were very patient with the Suspect allowing him ample time to follow our commands without increasing the level of our force.

**DECISIONS MADE**: : The Suspect was arrested for rendering criminal aid and booked into King County Jail.

Bicycle Officers surrounded myself, other Officers and the Suspect while we were taking him into custody to prevent others from interfering with the arrest.

**THREAT ASSESSMENT**:  The Suspect immediately tried to run away when he saw me approaching him. I believed the Suspect intended to escape arrest by fleeing on foot.

**FORCE USED**: I grabbed the Suspects arm to gain control of him as he was fleeing.  I was able to grab his arm but he continued to run. It appears the Suspect either falls to the ground by tripping or other Officers also grabbing him. I could not tell from where I was during the contact. The Suspect fell to his knees, his hands also came to the ground, I verbally told the Suspect to 'turn over' and used both hands placed on his back/shoulder area to prevent him from getting up and guide him onto his stomach. This was effective to getting him to roll onto his stomach. The Suspect held his hands under his chest so Officers could not move them behind his back for handcuffing once he was laying on his belly. I told the Suspect "hands out like an airplane' after approximately 3 seconds the Suspect removed his hands from under his chest allow us to bring them almost behind his back. I told the Suspect again to put his 'hands behind his back'. I controlled the Suspects left arm by holding it towards the ground until Officers could began handcuffing the Suspects right arm. The Suspect tensed his arms actively resisting Officers Handcuffing. Officer continued to issue the Suspect commands including 'hands behind your behind back' and 'stop tensing'.  I moved the Suspects arm behind his back, the Suspect was handcuffed by another Officer after several seconds of commands.

All forced used by me was to gain control of the Suspect who was attempting to flee then resisting Officers attempts to handcuff him. Once on the ground I held the Suspects left arm to the ground while Officers handcuffed the Suspects other arm. Several Officers on the opposite side of me has their knees on the Suspects back. I do not recall ever putting my knee on the Suspects back. Sgt Fliegal stated while reviewing other Officers assisting in the arrests body cameras, I can be seen with my knee near his left but cheek, and then slightly across his lower back. I do not have access to other Officers cameras and do not recall doing this.

The control techniques including having the Suspect roll on his belly and putting knees on the Suspects back were effective, preventing the escape and controlling the Suspect until he could be handcuffed.

**MEDICAL AID AND EVALUATION**:

No medical aid was given to the Suspect or requested by him on scene to my knowledge. The Suspect made no complaints of pain to my knowledge on scene.

**RESOLUTION**:  The Suspect was arrested for rendering criminal aid and booked into King County Jail.

**ADDITIONAL INFORMATION**: This incident occurred on 09/23/2020. I am writing this use of force as ordered on 10/5/2020. I wrote the use of force consistently with my memory and BWC from the incident.

It is my understanding according to Sgt. Fliegal the Suspect did not complain of pain on the night of the arrest but has since complained his lower back was hurt during the arrest. I was ordered to write the use of force because my knee was seen by Sgt. Fligals BWC review of the incident being closest to the area the Suspect complained of injury.

EXHIBIT D(15)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not

    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).

    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting


**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault


**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response


**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed

**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| **PRE-ARRIVAL DETAILS / BRIEFING** | X | **DECISIONS MADE & ORDERS GIVEN AND RECEIVED** | X |
| **ARRIVAL** | X | **THREAT ASSESSMENT** | X |
| **LEGAL AUTHORITY & LAWFUL PURPOSE** | X | **FORCE USED** | X |
| **CONTACT WITH SUBJECT (S)** | X | **MEDICAL AID AND EVALUATION** | X |
| **DE-ESCALATION** | X | **RESOLUTION** | x |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-275308**

**DATE OF OCCURRENCE: 9/23/20**

**STATEMENT OF: SGT. TRAVIS HILL #7441**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. Robbin.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: Lt's on scene
    B.  ICV/BWV recorded: BWV recorded, bicycle unit no ICV

**DETAILED NARRATIVE:**

On 9/23/20 while on uniform bicycle patrol with the Seattle Police Department as 2D80 (2-DAVID-80) I was advised early in the day of possible protests happening due to the release of the findings in the Breonna Taylor incident. I was advised that events had formed later in the day and that there would be a roll call in the West Precinct at 1700. During the roll call I was advised that there was chatter that two events would be happening simultaneously and there was word that the one in Westlake would be for the peaceful people and the one on capital hill would be for the violent crowd.

We headed to the East precinct shortly after 1800 when Radio was advising of what appeared to be a crowd of Black Block forming in the area of Cal Anderson. This is the same group of people that have been violently demonstrating for months.

Officers remained away from the demonstration and they began to March. Shortly after they proceeded to cause property damage and there were a few head to heads with Officers in which I was advised one was hit with a milk crate and another with a bat. The demonstrators had also been throwing rocks, glass bottles, fireworks, water bottles and other objects likely to cause injury at Officers.

At approximately 2340 we were advised to fall back to the precinct and were standing by outside on 12th Ave when the group began back east bound on Pine towards the precinct. It is important to note that Captain Allen had already started giving dispersal orders prior to this time. We moved in position at 12th and Pine up hill from the crowd. The crowd stopped at 11th Ave and began building a barriers with signs, and whatever else they could to block units. They also started a fire in the middle of the street and continued to put more objects into it. We were told to move the crowd due to their actions so bikes pushed forward yelling "move back". When Officers moved in more objects were throwing at us from the crowd, including rocks and glass bottles. Officers moved up and in front of the fire and continued to take rocks and bottles. Officers began using Munition Blast Balls and pepper spray in order to create space and then the next squad would take that space and continue to move the crowd. As the crowd moved West Bound they pulled more objects into the streets, including trash cans, dumpsters and cones.

At this point this had been declared an unlawful assembly and the crowd had been ordered to disperse. The crowd was also throwing objects and Officer, lighting fires and had committed property damage. This incident occurred on a public street.

As Officers moved west bound in the 1000 Blk of Pine St the crowd slowed and some locked arms in front. The group began refusing to move and Officers needed to push them with their bicycles. More objects began being throw and I observed some coming from the middle of the crowd approximately 20 feet deep behind the group with locked arms. De-escalation was not feasible at this time as this was a hostile crowd that was continuing violence, ignored dispersal orders and was refusing to obey Officer commands. I took one OC Blast Balls and pitched it on the ground past the group with locked arms to the location I observed objects being thrown from. The blast ball made it to the intended location and dispersed the crowd in the are of my target. This was the intended effect in order to stop objects from being thrown at Officers. I was not approached by anyone afterwards stated they were injured from the blast ball.

Officers continued to move the crowd with munitions when necessary while making arrests when applicable. This continued until the crowd stopped committing acts of violence and property damage. We were told to return to the East precinct later in which I reported my Use of Force and was advised to route it to Lt. Robbin.

**ADDITIONAL INFORMATION**:

I marked my BWV where I deployed the single OC Blast Ball.

EXHIBIT D(16)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

> **Instructions:**
>
> Please provide a detailed narrative answer to each of the questions asked. The listed bullet points are not specific to your incident and may or may not apply.

Please read the following for information on what you might include in your statement. Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed. This is a guide only.

At the bottom of this guide is the cut and paste section. Fill out your statement using the format included and then cut and paste your response into your Blue Team entry. If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

### Preface:

A. In-person supervisor screening:
  - Supervisor's name/rank/serial number, date/time/location
B. ICV and BWV recorded: If not, why not – Must be explained if no BWV or ICV
C. Note if you reviewed and BWV, ICV, or other video prior to statement.

### Pre-Arrival:

A. Your relevant training/experience (brief biography)
B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo
C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion. Weapons involved? Crime of Violence?

### Arrival:

A. Observations:
  i. People / other officers on scene. Activity occurring, dangers, citizens exposed…

    ii.   Buildings, vehicles

    iii.   Environmental factors: weather, lighting

B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):

    i.   Public area

    ii.   Consent

    iii.   Exigency

    iv.   Warrant

    v.   Community caretaking

B.  Lawful Purpose (Explain in Detail):

    i.   Social Contact

    ii.   Terry Stop

    iii.   Probable Cause for arrest

    iv.   Community Care-taking

> **Note:**  Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

A.  How did you make your presence and authority clear?

    i.   Verbal identification, commands or instructions

    ii.   Did the subject say or do anything that indicated he/she knew you were the police?

B.  Contact with involved subject(s)

    i.   Observed Details

       - Physical/verbal reaction to officer

       - Tone of voice / statements made

       - Body posture / movement

       - Subjects size / strength vs. officer

       - Intoxication / mental state

    ii.   Information obtained from each subject

C.  Was there a frisk of any subject?

    i.   Reasons to believe subject was armed and currently dangerous

    ii.   Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

- A. Communication
    - i. Verbal persuasion
    - ii. Advisements and warnings (including Taser spark tests and warnings)
    - iii. Clear instructions
    - iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
    - v. Avoiding language, such as taunting or insults, that could escalate the incident
- B. Time, Distance, Shielding
    - i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
    - ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
    - iii. Did you utilize cover and concealment for tactical advantage
- C. If De-escalation was not safe or feasible, explain why not


**Decision Made:**

- A. Overall summary of information gained from investigation
- B. Decision based on information:
    - i. Warning
    - ii. Citation
    - iii. Documentation
    - iv. Arrest
- C. Include any Tactical Decisions and Scene Control you employed


**Threat Assessment:**

- A. Did the subject pose a threat to you, another person, or another officer?
- B. Describe the threat in detail or why you believed there was a threat.


**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

- A. Words, Actions or Threat posed by subject that necessitated the use of force:
    - i. Attempts to flee
    - ii. Fight
    - iii. Resist arrest
- B. De-escalation and continued attempts and the effect on the subject

      i.    Verbal de-escalation
- Warnings/commands to subject.
     ii.    Physical de-escalation
    iii.    If de-escalation was not feasible, you  must  explain why not
C.  Lawful purpose of the force used:
      i.    Gain control
     ii.    Protect yourself or others from a threat of immediate harm
    iii.    Stop a potential deadly threat
D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options
      i.    Proportionality of force
     ii.    How did the totality of circumstances affect the force used?
    iii.    "No reasonably effective alternative…."
E.  Explain effectiveness or lack of effectiveness of employed techniques
      i.    Was this a trained technique? Where were you instructed in this technique?
     ii.    Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
        • Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
    iii.    When and How was your force modulated?
F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid
      i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
     ii.    Medical aid (who provided and where provided)
    iii.    Refusal of medical aid by subject
    iv.    Refusal to accept at jail - disposition
     v.    Injuries to yourself


**Resolution:**

A.  Search
      i.    Items recovered
B.  Transport and processing of subject:
      i.    Use of ICV
     ii.    Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-275331**

**DATE OF OCCURRENCE: 9-23-2020**

**STATEMENT OF: OFC. EASTGARD 8348**

---

**This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Lt. Collier. I DO invoke my Garrity rights prior to giving this statement.**

**Preface:**

    A.  Sgt. Hill was present during the incident.
    B.  BWV was recording. I had an initial review of my video two weeks prior. On a more recent review in order to write this use of force, my BWV was locked. I am basing this off of memory.

---

**PRE-ARRIVAL DETAILS:**

I have been with the Seattle Police Department for 5 years. Prior to that I was with the Memphis Police Department for two years. I attended the Memphis Police academy, which is a 21-week long academy that goes over defense tactics, police tactics, and constitutional law, including other law enforcement relevant topics. When I got hired by the Seattle Police Department, I attended the two-week lateral academy at the Washington State Criminal Justice Training Center, where I was taught Washington State laws. I then completed nine-weeks of POST-BLEA, where I was taught Seattle Police policy, and tactics. Every year I have attended and completed all mandatory training and complete all e-directives. I have been assigned to West Precinct Mary Sector Bikes since July 2017 under Sgt. Moore. I have made and participated in hundreds of proactive stops. As a bike officer, I have been trained in the handling of crowd management and I know the use of force policy in regard to the use OC spray and munitions, and in regards to crowd management.

On 9/23/2020 at aprox 2350hrs I was working uniform mountain bicycle patrol, in full police uniform working for the Seattle Police Department, in the City of Seattle. I was part of the 2-Mary-90s, and we were assigned to a large demonstration that was taking place in the area of Capital Hill. I made an

arrest that apparently resulted in a use of Force.  The arrested was part of a large demonstration that took place, called the "Justice for Breonna Taylor".

BWV was recording. This report is intended as a summary of events. I have paraphrased conversations, actions, and do not include an exact sequencing of events. For any exact quotes or exact sequencing of events, I would refer the reader to my body worn camera, as it was recording at the time of the incident.

The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice. Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25. On August 16 2020, a protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On August 24, 2020, ENDD resulted in serious threats to Officer Safety. Notably, quickrete was used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also on August 24, Molotov cocktails were used in an attempt to burn the SPOG building. On Sept 1st, a group of about 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct. Most recently, on Sept 7th, rioters marched to SPOG and arrests were immediately made after people in crowd were known to be in possession of molotov cocktails. This incident had numerous assaults on officers.
On Sept 23, 2020, a Jefferson County Kentucky Grand Jury made a decision on criminal charges for Officers involved in the Breonna Taylor incident. Nationwide demonstrations, to include Seattle, are anticipated as a result of this event.

Roll call was held at the 1700hrs at the West Precinct. We were provided details about two separate events taking place. One that was to start at Westlake Park and the other to start at Cal Anderson Park. Cpt. Allen provided his commanders intent as follows

"There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. In light of today's decision by the Jefferson County (Kentucky) grand jury regarding the Breonna Taylor case, further protests are expected. **My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property.** My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by

identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. "

After Roll call, the mary-90's were assigned to monitor the demonstration at Cal Anderson Park. The following updates are from CAD logs that took place prior to the arrest of Arrested/Massagli.

1924hrs "BLACK BLOC HEADING EB TO 12 AV,HAVING 216'S GROUP MOVE TO AREA"

2003hrs "214 CROWD OF APPX 200/OLIVE SIDE"

The group of 200 were headed W/B on Madison and at 2029hrs "214 STARTING TO THROW ROCKS AT STARBUCKS" at 2030hrs it was reported "AMAZON GO WAS TAGGED,COUPLE WINDOWS AT STARBUCKS BROKEN"

As the group was moving still moving W/B on Madison crossing I5 when at 2040hrs "REPORTING ONCE THEY GET ONTO FLAT GROUND ON 5 AV,THEY ARE PLANNING ON TURNING AROUND AND DOING COUNTER ATTACK,ALL PREPARING FOR ARRESTS". The demonstration had several support vehicles with them and it was reported at 2044hrs "GROUP IS TELLING THEM NOT TO COOPERATE WITH POLICE AND STAY IN VEHS"

At 2046hrs, as the group moved N/B along 4 Av, property damage was reported to the Wells Fargo at 4 AV/Seneca street and then the first of many dispersal orders were given. "BIKES DEPLOY,GIVING DISPERSAL ORDER". At 2050hrs "CONTINUE FOLLOWING AND GIVE DISPERAL ORDERS DUE TO PROP DAMG". At 2052hrs we began to take rocks, "TAKING ROCKS". At 2353 "CAR21 DOING ADDITIONAL DISPERSAL ORDERS" and at 2054hrs "TAKING MORE ROCKS".

At 2055hrs due to the hostility of the crowd, we were ordered to put bike protection gear on, "260 TO BIKES- IF YOU AREN'T UP FRONT- GET HARDENED UP".

The crowd was pushed back up towards Capital Hill area, via E/B Pike St, S/B 6th Av, and E/B Seneca St.The whole time rocks bottles and other objects were thrown at Officers. 2057hrs "ONE SUSP OBSERVED THROWING ROCK-- HAT,". 2103hrs "BOTTLE THROWN AT OFCR 6 AV/UNIVERSITY,NOT HITTING ANYONE". 2107hrs "THROWING TRAF CONES,ETC DISPUTTING PD PATH" and "CROWD THROWING TRAF CONES AT SPD"

The group had made it back to Broadway/Union St, 2118hrs "GROUP PLANS ON TURNING AROUND WANT TO MESS SPD UP". At 2122hrs we were updated via radio that group "TALKING ABOUT 'COOKING', IMPLYING MOLTOV COCKTAILS,PER 214 WANT TO LAUNCH MUNITIONS… IF THAT HAPPENS".

At 2122hrs "GROUP GOING BACK INTO CAL ANDERSON,REASSEMBLE APPX 10 MIN THEN GOING TO E PCT".

The group had entered Cal Anderson but at 20330hrs "SCOUTS OUT LOOKING FOR MARKED UNITS ON FOOT & SCOOTERS". At 2048hrs "GROUP OUT NB 11 AV,... PLANS ON GOING THRU NABORHOOD TO MAKE NOISE THEN RETURN TO E PCT,HAVE 'SOMETHING PLANNED'

The group marched around the area of Capital Hill. And at 2226hrs "GROUP IN FRONT OF PCT NORTH SIDE".  At 2232hrs "GROUP IS MOVING TO 11/PINE TO BLOCK INTERSECTION- ALSO A GROUP AGAINST SALLY WALL" and 2235hrs "...GROUP HAS MOVED DUMPSTER INTO ROADWAY 11/PINE,MOVING SIGNS AND BOARDS- TRYING TO CREATE BLOCKADE". At 2042hrs we were updated "CAR21 GROUP OF 200 - CROWD SIZE".

While in the East Precinct sally port  someone threw a firework into the sally port at Officers at 2245hrs "FIREWORKS IN THE SALLY PORT. SOMEONE THREW FIREWORK AT THE WALL OUTSIDE SALLY,CAME INTO SALLY PORT - NO INJ,260 COPIES".

At 2259hrs we left the sally port and engaged the crowd, in order to try and arrest the subject who had thrown the firework into the sally port. The suspect managed to get away. As bike pused down to 11/Pine "PEPPER SPRAY BEING DEPLOYED... ALL BIKES AT THIS INTERSECTION".  As 2304hrs the crowd "THROWING GLASS BOTTLES AND BEER CANS". As Officers pulled back from 12 Av, to E Pine St back up to 12 Av "...THAT MOLTOV COCKTAILS BEING PREPARED AT HOTDOG TENT". During the previous push down to 11 Av E/ E Pine St, an Officer was assaulted by a protester hitting him in the back of the helmet with a baseball bat. Several other assaults occurred including an officer hit I the head with a milk crate.

At this point w2e were positioned away from the protesters on 12 AV E. At 2336hrs the protesters had started a fire on  E Pine St just East of 11 Ave E. "FIRE GETTING SLIGHTLY BIGGER ON PINE,APPEARS GROUP FEEDING GARBAGE,SHOPPING CART ON FIRE" and then "CROWD MOVING EB TOWARDS 12 AV". A crowd gathered at 12 Ave E/ E Pine St confronting Officers. At 2341hrs another Dispersal order was given "...BIKES/CARS,GET ON FOOT,GIVING DISPERSAL NOW,ACTS OF VANDALISM,FIRES IN STREET,DAMAGE TO PCT,BIKES PUSH WB ON PINE AFTER LAST DISPERSAL ORDER GIVEN,CAR TASK FORCE FOLLOW BIKES THEN NB ON 11,ACT IS SUPPORT BEHIND THE BIKES"

Using trained tactics we started a bike push of the protesters from 12 AV/E Pine St W/B to Broadway. During this push was when I made the arrest of arrested/M███████ .

**ARRIVAL:** I first observed arrested/M███████ , lying in the street at 11 Av/ E Pine St. We had just made a bike line push and he had laid down in front of bike Officers. This push started at 12 Av E and resulted from protesters, who previously had made many assaults on Officers and were extremely hostile towards Officers, had refused to leave after a dispersal order was given. 2341hrs "BIKES/CARS,GET ON FOOT,GIVING DISPERSAL NOW,ACTS OF VANDALISM,FIRES IN STREET,DAMAGE TO PCT,BIKES PUSH WB ON PINE AFTER LAST DISPERSAL ORDER GIVEN,CAR TASK FORCE FOLLOW BIKES THEN NB ON 11,ACT IS SUPPORT BEHIND THE BIKES".  During the push, there were lots of rocks, bottles and other objects thrown at Police.

The push W/B on E Pine St happened for several blocks. I observed a/M███████ again when he laid down again in front of bike Officers as they were attempting a trained tactic to push the protesters back to Broadway. As a/M██████ laid down, several Bike Officers had to go around him in order to perform the trained tactic.

Most of the protesters were wearing all black. a/M███████ was wearing a light colored shirt and tan overalls, and stood out compared to the crowd.

**LEGAL AUTHORITY & LAWFUL PURPOSE:**

Legal authority is the incident took place in a public street. Lawful purpose was I had Probable Cause to arrest for Obstruction and failure to disperse. Multiple dispersal orders had been given at this point.

**CONTACT WITH SUBJECT:**

I was wearing a fully marked Seattle Police uniform. All the Officers who were involved in working the demonstration were wearing fully marked Seattle Police uniforms.  Our presence in the area was obvious. Multiple dispersal orders were given. The subject intentionally obstructed officers by lying down in front of bicycle Officers, as they were attempting to move a hostile crowd. The first time being at 11 AV/ E Pine St and the second time at Nagle Ave and E Pine St.

The arrested was lying on the ground on his stomach, after intentionally placing himself there to obstruct Officers. I went up to the subject and informed him he was under arrest for obstruction. He immediately brought his hands and arms under him, making it hard for myself and Officer Loux, who joined me, to take him into custody. Upon contact, the arrested made comments to us saying, "you are kidnapping me", "why would I comply", and "viva la revolution!". The arrested did not seem to be intoxicated or on any other from of drug. He seemed to know what he was doing and what he was saying.

There was no frisk of the subject as we immediately placed tried to place the arrested into custody. I did not think the subject was armed with a weapon.

**DE-ESCALATION:**

I asked the arrested several times that he gives us his arms so that we can place him into custody. He responded by saying he would not comply, and that we were kidnapping him. I heard Officer Loux ask and tell the arrested that he needed to comply and take his arms out from under him. To which the arrested continued to say we were kidnapping him and that he would not comply with "his kidnappers". This went on for several minutes and then another unknown Officer came over and performed "cross face" on the subject which then got the arrested to bring his hands and arms from under his body, allowing us to place him into custody.

**DECISIONS MADE:**

After seeing the subject for the second time lay down in front of Officers, obstructing their movement, causing Officers to deviate from their intended path, I made the decision to make the arrest. The arrested was first seen at 11 Ave E/ E Pine St, laying in the road, obstructing Officers, causing thm to deviate from their intended path. With the arrested intending to obstruct Officers at 11 AV E, just one block from where a dispersal order was given, I am certain he heard the order to leave. When I initially saw the arrested again at Nagle, he was up walking around in the front of the protesters line. As Bikes went to make another push with a bike line, I observed the arrested again, laying down in the path of Officers, causing them to deviate from their intended path. As the bike line went past the arrested, I went in to make the arrest for RCW 9A.76.020 Obstructing a Public Servant.

**THREAT ASSESSMENT:**

I did not think that the arrested posed a threat to myself, or any other person. Although not a threat if I had not arrested the subject, I believe that he would have continued to obstruct officers throughout the evening. Possible escalating beyond just lying in the roadway.

**FORCE USED:**

The arrested was laying on the ground. He had placed himself there to obstruct Bike Officer movement. I contacted the arrested and advised him he was under arrest for obstruction. The arrested immediately, before I could stop him, "turtled up", bring his arms under him. I asked him several times to give me his hands and to allow me to arrest him. He refused and stated he would not comply with his "kidnappers". He was moving around and scraping his bare elbows on the ground. I was on his left side and pulled on his left arm several times, to get it out, without success. As I continued to ask the arrested to give us his hands, and place them behind his back, I tried pulling out his left elbow, which was the side I was on. Officer Loux was on the right side. The arrested continued to refuse to comply to our commands and efforts. Another Officer come over and did a "cross face" maneuver on the arrested, which then made the arrested bring his arms out from under him. Officer Loux and I were then able to place the arrested into custody.

The arrested was place in a recover position while we waited for a transport wagon to get to us. The arrested did not say he was injured or say he needed medical services. He continued to yell at us and scream "viva la revolution". The transport wagon arrived and the arrested used active resistance to try and prevent from being placed in the transport wagon. His active resistance included making himself dead weight, trying to twist from officers, and put his feet out to prevent from being placed into the transport wagon. He had to be carried and placed into the rear of the transport wagon. I was on his right side, and grabbed is legs and right arm, to put him in the transport wagon. Due to his noncompliance, it was not feasible, and could have resulted in more use of force, to seatbelt him into the transport wagon.

**MEDICAL AID AND EVALUATION:**

The arrested reported no injuries to me nor did I observe any injuries to the arrested. The arrested at no point while I was in contact with him, reported any injuries.

It was later, 2 hours or so later, that it was reported to me that the arrested had and abrasion on his elbow. I did not observe any abrasion to his elbow during my contact with the arrested.

**RESOLUTION:**

I placed him into a transported wagon, and he was eventually booked into KCJ.

**ADDITIONAL INFORMATION:**

This report is being written two weeks after the incident happened, as I did not receive an order to write a use of force until ordered by A/Lt. Collier of 10/5/2020. I was not able to review by BWV, due to it being locked, at the time of this writing.

EXHIBIT D(17)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Kent Loux - 30053063

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/24/2020 | 9/24/2020 | 00:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58394 | 2020-275331 | 2020UOF-1517 |
| **Date/Time Entered** | | |
| 9/24/2020 02:31 | | |

## Incident Summary

.EVENT/GO#: 2020-275331
DATE OF OCCURRENCE: 9/24/20
STATEMENT OF: K. LOUX

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Collier. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Fliegel, #7414. The arrest took place in the 900 block of E Pine St between Broadway / Nagle Pl.
B. ICV recorded: BWV equipped and activated.
C. Following this incident, I reviewed my BWV after I had heard a scrape on his elbow had triggered a Type II UOF. I had only seen a single photo taken by prisoner processing depicting the injury. I am unable to recall the specific day, but I was able to review my BWV and placed several markers in the video to write a very thorough report. However, since I have placed those markers, the video has been locked by FIT who is conducting its own investigation. As such, it should be noted that while I have reviewed my BWV, I am unable to write this report while referencing that BWV. This report is thus written by memory from the incident itself and the review of the video that occurred several days prior to this report.


PRE-ARRIVAL DETAILS:
I am a sworn police officer currently assigned to the 2-David-80s bicycle squad. I have been a permanent member of a bicycle squad since May of 2017. I have handed hundreds of events all over Seattle to include peaceful and non-peaceful protests.
The night of this event I was on a department issued police mountain bicycle wearing a fully marked bicycle uniform. I was working as a point officer with my squad, in the front, to lead the squad where directed.
During this evening's event I observed the protestors wearing all black, with shields, marching through the streets setting up obstacles in our way and lighting fires in the streets. The group was extremely violent and wanted a confrontation with police. The group would enter and control intersections, specifically at 11 AV / E Pine St, they removed dumpsters from the parking lot of Rancho Bravo, located at 1001 E Pine St, and turned them on their side in the intersection facing police. With these dumpsters on their side and other debris collected fires were started in the dumpsters. The fires with other signs and obstructions were gathered as further obstructions and lit on fire.

ARRIVAL:
Resources (bikes and foot officers) were relocated to 12 Av / E Pine St facing WB observing the demonstrators. From this vantage point I observed the obstacles being put in our path and fires being lit inside of dumpsters. The dumpsters were turned on their sides and the openings were facing EB towards police. As we entered and positioned ourselves in the 1100 block of E Pine St the fires grew and the smoke became darker as the demonstrators continued to build this flaming obstacle for police.
The smoke turned EB towards officers and made it difficult to breathe. As we moved closer the rioters ignited several fireworks. As I eventually passed the obstacle, the smoke and other chemicals that were burning made it increasingly difficult to breathe and see. I began coughing more and experience burning in my eyes, nose, and mouth. I learned later; the rioters created their own chemical mixture that caused this irritation.

LEGAL AUTHORITY & LAWFUL PURPOSE:
At this time, dispersal orders were given as it was considered an unlawful assembly in the public streets. The orders were given over a vehicle PA system. The rioters ignored these warnings and continued building

obstacles and lighting items on fire.
The unlawful assembly and the acts of violence, committed by the group provided probable cause for the rioter's arrest.

CONTACT WITH SUBJECT:
As I moved WB on Pine St. to move the crowd, I noticed a white male intentionally lie down in the street. This occurred in the middle of Pine St. in front of The Rhino Room located at 1535 11th Ave. in the SW corner of 11th Ave & Pine St. The male was eventually identified as M████ during his later arrest.
When I first witnessed M████ lie down near 11th Ave. & Pine St. I was part of a larger bicycle movement and bypassed him by riding around him. I could see him on the ground lying face down and notices he was wearing a white hard hat.
As bicycle officers pushed the crowd towards Broadway, I witnessed M████ lie down again near Nagle Pl. & Pine St. M████ walked from south to north and entered the middle of Pine St. As M████ neared the center of the road, he laid and put his arms under his head towards the north. As I rode by M████i a second time, Sgt. Hill ordered his arrest for obstruction as this was the second time, he lied down in the street in front of bicycle officers.
I rode just past his feet when I heard Sgt. Hill order his arrest. I quickly dismounted my bicycle and observed Officer Eastgard already on M████'s left side. I put hands on M████ on his right side. M████ was still face down with his hands underneath his torso. I rolled M████ to his left side to try and gain control of his right arm. I observed both hands clasped together tightly. I ordered the suspect to give me his hands, but he refused. M████'s hands were tightly held together to resist arrest and not comply with lawful orders to effect an arrest. While trying to separate M████'s hands he stated he would "not comply". As officer Eastgard and I struggled with M████ a third officer, unknown to me, said he was going to apply a cross face. As the cross face was applied, M████'s hands came out to his side. I took control of M████'s right arm and applied handcuffs. I gauged and double-locked the handcuffs and grabbed his left shoulder to roll M████ on his right side in a recovery position.
During this time M████ remained uncooperative and screamed about fighting the revolution. I read M████ his Miranda warnings as he continued to yell about the revolution.
I attempted to assist M████ in standing up, but he would not stand on his own, instead he would let his body go limp and continued to be uncooperative. M████ was set back on the ground as we came up with a plan to move him to the transport van. I asked Officer Hewitt to retrieve a long baton to assist with the transport. The long baton was placed under M████'s knees to assist with carrying him to the transport van. The long baton worked effectively and allowed multiple officers to carry M████ to the rear of the transport van where he was placed on the ground after refusing to stand up and enter the van.
M████ had to be picked up and placed inside the rear of the transport van feet first. The suspect seemed to intentionally put his feet underneath the transport van's rear bumper to continue to hinder law enforcement's efforts. Eventually officers were eventually able to lift M████ into the van feet first. Due to M████'s resistance, he was unable to be restrained inside the van.
During my entire contact with M████ he never complained of pain or indicated he was in pain.
Once M████ was inside the transport van I had no further contact with the suspect.

DE-ESCALATION:
While I was effecting an arrest on M████ I made it very clear he was under arrest. I gave clear commands to give me his hands, but he still refused.
The scene was chaotic and M████ was an active participant lying down in the street multiple times in front of fully uniformed officers to obstruct our actions.
I explained to M████ that he was under arrest and to give me his hands. M████'s responded that he would not comply.
After M████ was handcuffed and near the back of the transport van, I attempted to de-escalate but speaking with him about being cooperative and entering the van. M████ said "why would I comply with my captors?"
As M████ was determined to remain uncooperative, I instead, used extra officers and tools (baton) at my disposal to accomplish the mission of arresting him and placing him in a transport van.

DECISIONS MADE:
Once the decision was made to arrest M████, officers immediately moved in and controlled the suspect. It was quickly determined that control was needed of his arms and this was gained through a control hold, a cross face, taught in defensive tactics. This control hold proved to be very effective and allowed handcuffs to be applied.
With handcuffs applied, the scene and the lack of cooperation from M████ was reassessed, and a plan was put into action. Multiple officers were utilized to aid in moving M████ inside the transport van and transporting him from the scene. The rioters were far enough in front of this location and scene security was maintained by the officers near the prisoner van.
The officers controlled the suspect and the scene was secure from others that did not move with the crowd.

THREAT ASSESSMENT:
The suspect, M████, made multiple attempts to obstruct officers as the moved towards a very dangerous and threatening crowd. M████'s attempts at distracting officers and ignoring commands to move back and disperse from the scene posed a distraction for officers have to focus on the rocks, bottles, and glass being thrown at them from the large crowd.

While M█████ laid down in the street, having to move around him or step over him poses its own risk to officers. Stepping over, may be the only option if you trying to keep your bike line intact to properly address the crowd and move them back. Going around might be feasible dependent on your position on the line and the location of the crowd. Both options leave the suspect behind you for other officers to keep an eye on as they possibly circle in front of the officers to continually obstruct time and time again.

Circling in front of the officers is exactly what M█████ did. He single-handedly created multiple obstructions while officers are trying to keep their eyes up and forward to avoid the rocks, bottles, and glass being thrown at them.

FORCE USED:

During my interaction with M█████ I did not use reportable force. My physical contact with M█████ was de minimus force as I attempted to gain compliance to effect the arrest. At no time did I hear M█████ complain of pain or injury. Any control holds used did not to inflict pain that was audible for me to hear.

As I took control of M█████'s right arm after a cross face was applied, from an unknown officer, I took hold of his right hand. I grabbed around his hand, as trained, so he could not grab me. I took hold of his right hand with my left hand and kept my right hand on his right elbow. I did this to ensure I have control of his arm and to keep M█████ from pulling his arm back underneath him. Once I determined I had control of his right arm, I deployed handcuffs, and first handcuffed his right wrist. Having full control of the suspect before handcuffs are used is taught in training and is part of the C.R.E.S.T model.

As soon as both hands were handcuffed, I ensured they were gauged and double-locked before the suspect was moved from his handcuffed position. I assisted M█████ in standing up by controlling his left arm. As we assisted M█████ he immediately went limp and sunk to the ground as stated above.

MEDICAL AID AND EVALUATION:

At the scene, I was unaware of any medical attention needed by M█████. Attempts were made to see if he needed medical aid, but he did not respond with anything in the affirmative. M█████ continued to be uncooperative and sing and yell about fighting a revolution.

As we turned M█████ onto his right side I noticed, what appeared to be dried blood on his face but it was dry and I did not see any recent wound where the blood may have come from. This did not appear to occur from this arrest.

RESOLUTION:

M█████ was loaded in the transport van and was immediately removed from the scene. I had no further contact with the suspect.

Back at the West Precinct, after the riot concluded, I completed the arrest report for M█████.

ADDITIONAL INFORMATION:

Back at the West Precinct, after I completed all my necessary paperwork, I learned of a scrape to one of M█████'s elbows. I only saw a still photo from prisoner processing and I was told to start a Type II UOF Blue Team for this incident. I did as I was ordered and was released for the night.

At the time of arrest, I did not notice any scrape to M█████'s elbows. I am unsure how or when this cut or scrape appeared. I do not even know which elbow the cut or scrape is on.

## Incident Location

• 900 E. Pine St., Seattle, WA - Location of Occurrence: Demonstration

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Cloudy | Darkness | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 176-225 pounds | 6'1" – 6'3" | |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

**Employee(s) Injured**                        **Employee(s) Taken to Hospital**

No                                             No

## Reporting/Involved Community Member Information



DOB: ▇/1994   Race: White   Ethnicity:   Gender: Male

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Passive Noncompliance (including Verbal)

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| Abrasion | D, F | 1, 2 |

FRONT    BACK

Condition

### Charges against this Community Member

- Obstructing Charge
- Pedestrian Violation

## Involved Employees

### Police Officer Kent Loux - Serial: 30053063 - Badge Number: 7766
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - David Beats B112A/West Pct 2Nd W - David Beats B112A

**Video Footage:** Equipped - Activated

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Control Hold – Restraint - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Restraint | Yes | F | 1, 2 |



FRONT    BACK

Missed

**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Kent Loux |
| Sent To: | Police Sergeant Detective Wesley Collier |
| CC: | (none) |
| Sent Date/Time: | 10/5/2020 4:55 PM |
| **Instructions from Police Officer Kent Loux to Police Sergeant Detective Wesley Collier:** | |
| 20-275331 | |
| **Comments/Response from Police Sergeant Detective Wesley Collier:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Kent Loux - 30053063

EXHIBIT D(18)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

**Instructions:**

Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

<u>Preface:</u>

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV and BWV recorded: If not, why not – Must be explained if no BWV or ICV

    C. Note if you reviewed and BWV, ICV, or other video prior to statement.


<u>Pre-Arrival:</u>

    A. Your relevant training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?


<u>Arrival:</u>

    A. Observations:
        i.    People / other officers on scene.  Activity occurring, dangers, citizens exposed…

     ii.    Buildings, vehicles
    iii.    Environmental factors: weather, lighting
  B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

  A.  Legal Authority (Explain in Detail):
     i.    Public area
     ii.    Consent
    iii.    Exigency
    iv.    Warrant
     v.    Community caretaking
  B.  Lawful Purpose (Explain in Detail):
     i.    Social Contact
     ii.    Terry Stop
    iii.    Probable Cause for arrest
    iv.    Community Caretaking

      **Note:**  Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

  A.  How did you make your presence and authority clear?
     i.    Verbal identification, commands or instructions
     ii.    Did the subject say or do anything that indicated he/she knew you were the police?
  B.  Contact with involved subject(s)
     i.    Observed Details
         - Physical/verbal reaction to officer
         - Tone of voice / statements made
         - Body posture / movement
         - Subjects size / strength vs. officer
         - Intoxication / mental state
     ii.    Information obtained from each subject
  C.  Was there a frisk of any subject?
     i.    Reasons to believe subject was armed and currently dangerous
     ii.    Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

  A. Communication
    i.    Verbal persuasion
    ii.   Advisements and warnings (including Taser spark tests and warnings)
    iii.  Clear instructions
    iv.   Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
    v.    Avoiding language, such as taunting or insults, that could escalate the incident
  B. Time, Distance, Shielding
    i.    How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
    ii.   How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
    iii.  Did you utilize cover and concealment for tactical advantage
  C. If De-escalation was not safe or feasible, explain why not


**Decision Made:**

  A. Overall summary of information gained from investigation
  B. Decision based on information:
    i.    Warning
    ii.   Citation
    iii.  Documentation
    iv.   Arrest
  C. Include any Tactical Decisions and Scene Control you employed


**Threat Assessment:**

  A. Did the subject pose a threat to you, another person, or another officer?
  B. Describe the threat in detail or why you believed there was a threat.


**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

  A. Words, Actions or Threat posed by subject that necessitated the use of force:
    i.    Attempts to flee
    ii.   Fight
    iii.  Resist arrest
  B. De-escalation and continued attempts and the effect on the subject

      i.    Verbal de-escalation
- Warnings/commands to subject.
      ii.   Physical de-escalation
      iii.  If de-escalation was not feasible, you must explain why not

C.  Lawful purpose of the force used:
      i.    Gain control
      ii.   Protect yourself or others from a threat of immediate harm
      iii.  Stop a potential deadly threat

D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options
      i.    Proportionality of force
      ii.   How did the totality of circumstances affect the force used?
      iii.  "No reasonably effective alternative…."

E.  Explain effectiveness or lack of effectiveness of employed techniques
      i.    Was this a trained technique? Where were you instructed in this technique?
      ii.   Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
    - Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
      iii.  When and How was your force modulated?

F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid
      i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
      ii.   Medical aid (who provided and where provided)
      iii.  Refusal of medical aid by subject
      iv.  Refusal to accept at jail - disposition
      v.   Injuries to yourself


**Resolution:**

A.  Search
      i.    Items recovered
B.  Transport and processing of subject:
      i.    Use of ICV
      ii.   Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

EVENT/GO#:2020-275348

DATE OF OCCURRENCE: 9/24/2020

STATEMENT OF: OFC. KELLER #8371

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Fliegel #7414.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: Yes.
    B.  ICV and/or BWV recorded: BWV, yes.

---

**PRE-ARRIVAL DETAILS:**

I am Seattle Police Officer J. Keller #8371, assigned to 2nd Watch Patrol- North Precinct. I have been appointed as a Police Officer for the City of Seattle since February 18, 2016. Prior to becoming a sworn officer, I attended the 720-hour Basic Law Enforcement Academy. This included approximately 123 hours of defensive tactics training, which includes control holds and handcuffing. It also included approximately 18 hours of crisis training. After graduation from the Basic Law Enforcement Academy, I was assigned to the Seattle Police Department's Advanced Training Unit where I received approximately seven weeks of additional training. Included in the training was an additional approximately 40 hours of defensive tactics training, and 16 hours of TASER training. After the training, I have been equipped with a SPD issued TASER and carry it on my person. I also completed SPD's 8-hour advanced crisis intervention training both in my post-academy training and additional in-service training focusing on both crisis intervention and less lethal options and applications. I was then assigned to the South and North Precincts where I completed four training rotations with experienced field training officers where my performance was evaluated and graded. After successfully completing field training, I was assigned to 2nd watch patrol, North Precinct. I have been assigned to the North Precinct since approximately August 2016. I am currently

assigned to 2nd Watch, John Sector Relief and work a two-officer patrol unit with Officer G. Hay #8352.

Following my permanent assignment to the North Precinct, I have volunteered for and attended the 40-hour Crisis Intervention Team training offered through the WSCJTC. I have also volunteered for and attended a 40-hour basic patrol rifle class. I have further volunteered for and attended SPD's 16-hour Advanced Roadside Impaired Driving Enforcement (ARIDE) class. I have also completed several annual in-service trainings through the Seattle Police Department, which has included additional defensive tactics training, less lethal training, and additional crisis training. Additionally, I attended 40-hr bike training to include crowd management and I receive yearly crowd management training.

On 9/23/2020 throughout the duration of the night, I was working uniform patrol for the City of Seattle as a bicycle officer. I was assigned to crowed management during the protests. I was wearing a full police uniform with duty belt, Seattle Police patches on both arms, and a silver, cloth badge affixed to my chest as well as "Police" patches on the front and back of my uniform. I was also equipped with and operating my BWV.

During the protest, my primary function was crowd management to protect the civilians right to protest and ensure the safety of protestors, civilians and officers. During the briefing, prior to the protests, I received SPD's rules of engagement as well as the commander's intent.

Officers main objective was to protect the first amendment right of the civilians to protest in a safe manner. Officers were directed to only intervene if the protest becomes violent and unsafe for both civilians, officers or at the risk of significant property damage.

---

**ARRIVAL**:

On 9/23/2020 to 9/24/2020 approx. 0130hrs, I was working uniform patrol as a bicycle officer because a large number of protestors had gathered and were protesting around the downtown and Capitol Hill areas. I was assigned as a crowd control/rapid response unit if the protest were to become unsafe to protect the safety of civilians, officers and against significant property damage.  My unit was tasked with monitoring the crowd from a safe distance.

 At this time, the protestors size was approximately 150-200 assaultive and destructive individuals. The protestors were extremely agitated, energized and chanting at police as they marched. The protestors yelled at the police things to the effect of "fuck the police!", "All cops are bastards (ACAB)" among various other explicit statements as well as telling officers they wish harm upon them and their families. I also observed various graffiti messages on business and sidewalks reading something to the effect of "ACAB, Kill cops, Murders, Pigs, Fuck 12, Fuck SPD, etc.".

Many of the protestors had items that could be used as improvised weapons on their person to include skateboards, rocks, signs with large sticks attached, road cones, plastic/glass bottles, fireworks, full soda cans, lasers, screws, caltrops, etc.

Throughout the night, on multiple occasions, the crowd turned violent, assaulting officers and doing significant property damage as they marched through the city. Officers were assaulted with rocks, chemicals, explosives and an officer had been ambushed and hit in the head/neck with a baseball bat by a protestor cracking his helmet. When the protestors turned violent, they would work in unison with each other to stop officers from identifying them.

While on a break at the East Precinct I was the victim of assault via an explosive thrown at me and other officers while in the sally port. I was sitting down when protestors decided to walk up to the entrance of the sally port and yell at officers. The sally port door is easy to see through because it is comprised of metal slats approx. 1-2 inches apart spanning the length and width of the door.  The protestors began to yell at officers and shine their flashlights into the door to conceal their actions. During this the precinct surveillance cameras were disabled by the protestors via cutting the wires. Shortly after the disabling the wires one of the protestors lit and threw and explosive at officers. The explosive landed near the corner of the door and exploded. When it exploded, I got up and began to run away from the area. Pieces of the device flew deep into the sally port barley missing me. I was lucky to not be stuck. The explosion was so loud that it made my ears ring and was hard of hearing in my right ear for a significant time after. Multiple officers sustained ear injuries due to the explosion.

I was also assaulted with rocks, one hitting me in the head shattering the flashlight on my helmet and the other hitting me in the right shoulder. The protestors would throw rocks and items at officers while concealed in the darkness and within the crowd making if extremely hard to identify specific individuals. The protestors also intentionally dressed in similar clothing, usually black, to blend in with each other making it much harder for officers to identify individuals.

Throughout the night intel updated officers the crowd plans to attack officers via turning around, confronting and "messing up SPD".  When intel updated this, I observed the protestors begin to "bloc up", meaning conceal their identity in preparation for property damage or to confront officers. This historically was an indication the protestors were going to begin to engage in criminal activity, usually assault officers or create significant property destruction.

The majority the crowd dressed in similar clothing to make it harder for officers to identify them when committing criminal activity. Prior to assaults or property damage the crowd would cover their faces with masks, respirator, hoodies as well as conceal their actions via putting up umbrellas and shields to keep officers from seeing what they are doing. The protestors also had multiple vehicles who were blocking officers view, concealing criminal

activity. The vehicles were also used to store shields and weapons for the protestors, as well as used to illegally block traffic. Whenever the protestors would start to damage property or assault officers, they would work in unison giving hand signals to tighten up the group or make a movement together. Many of the protestors had radios and would communicate officers' movements and actions.

Intel advised officers the protestors were talking about "cooking", implying they were beginning to make Molotov cocktails. At one point, intel updated they observed what appeared to be Starbucks bottles being packed with packing peanuts and gasoline, to make napalm Molotov cocktails.

During the duration of the protest thousands of dollars property damage was done by the protestors including shattering multiple business widows and spray-painting graffiti on businesses.

As officers followed the group the protestors would attempt to barricade the road by moving anything, they could into the road blocking officers movement. They moved dumpsters, pallets, road signs and cones into the street. In some areas they would light fires in the middle of the street creating an extremely unsafe environment for both the public and officers alike. Protestors would also throw screws and improvised caltrops on the ground in an attempt to flatten bike officers' tires.

As I rode up the 500blk of E. Pine St paralleling the crowd, I observed an individual in the middle of the crowd where probable cause existed for his arrest for assaulting an officer. This individual had been observed on multiple occasions throwing projectiles at officers. There were multiple attempts to apprehend this suspect, but he was very aware and would run into the middle of the crowd each time officers would attempt to effect an arrest. I paralleled the group and maintained eyes on the suspect as they walked eastbound. The crowd would surround, hold on and pull the suspect back into the crowd to stop officers from arresting them. This technique is often referred to as "de-arresting" and is a practiced technique by the protestors.

While paralleling the group a metro coach stopped on the northside of the street in the 500BLk of E Pine street. Shortly after I observed an individual later identified as arrested/A█████, H████ run across the street behind the rear of the bus. As I watched him run across the street and conceal himself behind the metro coach, I grew extremely concerned that A█████ was going to ambush and assault officers as they rode past and broke the plane of the bus. I could see A█████ had stopped behind the bus and it appeared he had crouched behind it as if he was preparing to lung at officers.

With dozens of officers being ambushed and assaulted throughout the night and based on A█████'s actions I grew fearful he was going to assault myself or fellow officers. A█████ also had a skateboard in his hands which earlier in the night I observed multiple individuals raise skateboards as if they were going to swing and hit officers with them. A█████ was

wearing a black backpack on which appeared to have multiple items in it as it was bulky and pultruding outwards from his back.  I feared he may have weapons in the backpack to assault officers.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

**Legal authority:**  This incident and use of force occurred on a city street open to the public.

**Lawful Purpose:** I had reasonable suspicion to believe the suspect was attempting to ambush and assault bike officers as they rode Eastbound and approached the end of a metro bus that had parked on E. Pine St. There was also probable cause to arrest the suspect for property destruction as he was spray painting graffiti on a metro coach.

**CONTACT WITH SUBJECT**:

As I broke the plane of the bus I extended my OC cannister, yelled "move back" and deployed my OC at the suspect.

**DE-ESCALATION**:  De-escalation occurred throughout the day of protest as well as when the crowed started to become violent. A large number of officers paralleled the crowd which often discourages assaults and mitigates the need to use force. On multiple occasions a commander would get on the PA and advise the crowd not to throw items, assault officers, or damage property. Each time the commander got on the PA he would advise the protestors they are subject to the use of less lethal munitions to safely move the crowd if they do not disperse. There are also subject the arrest for criminal mischief, fail to disperse, etc.

 Throughout the night I along with many other officers gave verbal commands to the crowd to "move back". Additional de-escalation was not safe or feasible as a suspect appeared to be attempting to conceal himself behind the metro bus to ambush officers.

**DECISIONS MADE:** I observed A███████ attempting to conceal himself behind the parked metro bus. I broke the plane of the bus, yelled "move back" and briefly deployed my OC at the suspect. He quickly ran away after the deployment but was arrested by Ofc. Hay for criminal mischief.

**THREAT ASSESSMENT:** The large crowd of people easily outnumbered the officers. The crowd was screaming while making threating hand gestures and verbal threats to officers as well as their families. In the previous protests as well as this one the protestors had assaulted officers, caused significant property damage and continued to become violent. The crowd assaulted officers via throwing projectiles to include rocks, signs, caltrops, screws and one officer was hit with a baseball had in the back of the head. The crowed had also thrown multiple improvised explosives at officers throughout the night.

The suspect quickly ran to the back of the metro bus concealing himself from officers. Given the previous ambush and assaults on officers along with Molotov cocktails being made by the protestors I believed A███████ was preparing to ambush officers. As he went behind the bus he stopped and appeared to crouch as if he was waiting for officers to pass the back of the bus before ambushing us. The crowed had become more and more organized as these protests go on. They have developed ways to conceal their identity and work in unison to unarrest anyone being apprehended by officers. They have developed signals to communicate with each other and have continued to become more and more assaultive toward law enforcement.

**FORCE USED**: I quickly deployed my OC for approximately 1 second at the suspect. The suspect immediately tried to run away and was arrested shortly after by Ofc. Hay.

**MEDICAL AID AND EVALUATION**: After A███████ was arrested, he was quickly transported to the west precinct where SFD was able to evaluate and treat him for the OC spray. It was not feasible to treat A███████ in the field as there was a large crowd and there was no safe access for SFD.

**RESOLUTION**: A███████ was arrested and booked into KCJ for criminal mischief.

**ADDITIONAL INFORMATION**:

]

EXHIBIT D(19)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not
    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting

**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault

**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response

**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-275135**

**DATE OF OCCURRENCE: 9/23/2020**

**STATEMENT OF: OFFICER WARNOCK**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/ SGT Pratt.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A. In-person supervisor screening: A/SGT Pratt 7643
    B. ICV/BWV recorded: BWV Recorded. I reviewed my BWV prior to writing this statement.

**DETAILED NARRATIVE:**

I have been a sworn police officer with the Seattle Police Department for four years. I have been a full-time bicycle officer for two years. During my time as a bicycle officer I have received specialized crowd management training. I have been involved in over 100 protests and large gatherings in the capacity of crowd control. I have been trained to use and deploy blast balls.

On this day is was wearing my normal bicycle patrol uniform. On the front of my polo shirt is a cloth badge with my serial number and a cloth name tape. I have shoulder sleeve patches that clearly say Seattle Police. "POLICE" is written on the back of the shirt. My bicycle also has "POLICE" marked on the bag. Due to the escalating violence of the mob. I was ordered to put on our "hardened gear" which is mountain bicycle plastic gear with "Seattle Police" markings. On this day I was assigned as a "linebacker" and issued blast balls and OC spray. In my capacity as linebacker I was to ensure the line of bicycle officers maintained their formation and deploy munitions to ensure the safety of our officers.

On 9/23/2020 I was assigned to the event planned in response to the impending announcement of the Grand Jury Results of the Breonna Taylor officer involved shooting. Nationwide police departments were bracing for another round of protests that would hopefully remain peaceful. Unfortunately, they would not remain peaceful in Seattle.

A crowd of approximately 200 people gathered in Cal Anderson Park. The crowd was almost universally clad in "Black Block" style clothing. This clothing is black pants, black hoody, and a black ski mask or face covering. This is done to grant the crowd a level of immunity from arrest as it can be difficult for officers to locate suspects. Many in the crowd were also wearing goggles and respirators. These suggests that they knew their actions would provoke the police to use pepper spray. There were also numerous suspects in the crowd displaying homemade shields, umbrellas, and other improvised weapons. This sort of "black block" crowd is what has precipitated the worst riots we have had in Seattle since the riots began on May 29th. When a crowd that size, assembles in Cal Anderson, and is wearing that uniform it highly suggests that their will be significant property damage to include shattered windows and arson.

The group began marching at approximately 2000 and wound their way from Capitol Hill to Downtown. Once the crowd turned Westbound on Madison their intent became clear. Up to that point SPD had stayed out of visible range and only monitored from a distance. Despite that, the mob began smashing windows at the Amazon Go and Starbucks near the 1100 block of Madison ST.

The decision was made by command staff to intervene and resources began staging. Once the crowd had made its way to 4th AVE downtown, we were made aware that their intent was to push back the patrol cars and confront officers. Several dispersal orders were given multiple arrests were made as the crowd was pushed reluctantly back to Cal Anderson Park. During that push multiple rocks and glass bottles were thrown at officers. Police resources withdrew to the precinct.

The crowd did not disperse from Cal Anderson. Instead they began to gather around East Precinct and became highly agitated. Several protesters approached the sally port on the Pine ST side of East Precinct where they could see bicycle officers staged. We were not engaging with protesters. However, they were yelling insults at officers to get a reaction out of officers. This did not work, so a member of the group threw a homemade explosive into the sally port. This caused a deafening explosion. While that activity was occurring, the rest of the crowd was moving dumpsters and miscellaneous objects into the roadway to prevent an effective response. That suspect was observed by officers, a description was given, and two bike squads were sent out to arrest that suspect. My squad was sent out in support of the first bike squad.

The lawful purpose of this event was to disperse an unlawful assembly and effect the arrest of suspects for whom we had probable cause. The legal authority was that we were on streets open to the public.

Prior to entering the crowd de-escalation had included Captain Allen giving multiple, audible dispersal orders from a loudspeaker on a PIU. These were given downtown and again on Capitol Hill at the East Precinct.  These commands were ignored by the crowd. Prior to the dispersal orders we had maintained a low profile to let the crowd peacefully express their first amendment right to protest. When interacting with the crowd, multiple warnings were given to  "move back" and "leave the area". These were ignored. We also attempted to enter into the crowd with as many officers as possible to deter assaults on officers.

As soon as the first squad of bicycle officers entered the crowd at the intersection of 11th and Pine, followed immediately by the second squad assaults on officers began. The crowd began throwing rocks, bottles, road cones, and a red bin at officers. I saw a member of the crowd throw a bin that hit Officer Spady in the face. We hastily formed a bike line. That line was immediately challenged by a group of black clad individuals. That group approached out officers, refusing clear commands to disperse. They had umbrellas raised. This is done intentionally to obscure the activity that occurs behind the umbrellas. As umbrellas are raised it is a signal that missiles are about to be thrown. I pointed my pepper spray at the individuals holding the umbrellas. I told them to leave the area immediately or they would be pepper sprayed. They refused, I deployed pepper spray in a targeted manner at the suspects who were refusing to disperse and posing a significant threat to the outnumbered officers in the intersection. This deployment was not particularly successful as all the suspects had goggles and respirators on or were able to deflect the spray with an umbrella. No injuries were reported to me from this deployment. As far as I know none of these suspects were arrested due to lack of officers.

After the arrest was effected, we were ordered to withdraw away from the crowd to 12th AVE. This was done to break contact and hopefully the crowd would calm down and disperse. I would found out on 12th AVE that as we were retreating, an officer was struck in the back of the head by a baseball bat.

This tactical withdrawal was unsuccessful in deterring the rioter's actions. The rioters began setting their barricades on fire in the street which presented another life-safety emergency as the fires grew and became out of control. The fires could easily have spread to the near by apartment building or businesses.  More dispersal orders were given and we were ordered to move in to push the crowd west on Pine ST. As we approached on bicycles the crowd began to flee West Bound.

As we began our west bound push of the crowd, we rode through their flaming barricades and immediately came under a barrage of missiles that were effective and striking officers. These missiles were mostly rocks and glass bottles, all capable of causing serious injury. I observed items being thrown at officers from the west side of the 11th and Pine St intersection. A group of rioters were holding shields and umbrellas hiding the individuals throwing missiles at officers. I threw one blast ball at that group to end the assault on officers. The group briefly dispersed but almost immediately reformed.

As the line continued to push west bound, resistance maintained heavily. A group of rioters in the center of our line formed a make shift shield wall that was several lines deep. They were pushing back against the line officers and attempting to assault them with umbrellas and other objects. Missiles were continuously being thrown from behind this group. I deployed one blast ball over this group to the area were missiles were being thrown from. I deployed pepper spray at the members of the group holding the shields in an attempt to get them to break their formation and leave the area. These

deployments were done to stop immediate missile assaults and confrontations with line officers. The group maintained its integrity but was beginning to retreat backwards.

The west bound pushed continued until we were Broadway and Pine ST. At that point police resources needed to regroup. The group or rioters attempted to regroup as well. I saw them attempting to reconstitute one of their shield walls. This needed to be prevented as their shield walls will assault officers and protect missile throwers. I rolled a blast ball at this group to keep them from organizing. This was an effective deployment as it prevented a shield wall from forming.

The push began to move north bound and several members of the crowd appeared to make a stand on the north west corner of Broadway and Pine ST. Officers were doing a mobile fence line movement and members of the crowd began to shove the officers. I deployed pepper spray at those in the crowd who were pushing back against officers. This was successful as it moved them back and Officers could maintain the integrity of the line and continue the push.

As the crowd deliberately walked backwards while facing officers, missiles continued to be thrown from behind the line of shield and umbrellas. I deployed another blast ball at a shield wall on the West side of Broadway just north of Pine ST. This was done to disrupt the shield wall and stop the missile assaults on officers.

The mob turned west bound on Denny. Missiles continued to be thrown at officers. I deployed one blast ball at Broadway on the north west corner where officers were receiving missiles. This was  a successful deployment as the missile throwers fled west bound.

The crowd turned north on Harvard. As the turn began a softball size rock nearly hit several officers. I deployed a blast ball at the section of the mob where the rock was thrown from. The crowd continued to move south bound. Another large rock was thrown at officers from the crowd. I deployed my final blast ball in response to this large rock almost hitting officers. The crowd continued north bound.

I was not made aware of any injuries from any of the force I used.

After another half an hour of a continuous push, the mob made its way back to Cal Anderson and dispersed.

**ADDITIONAL INFORMATION**: